FILED

12/31/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: PR 23-0496

PR 23-0496

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 304

IN THE MATTER OF

AUSTIN MILES KNUDSEN,

An Attorney at Law,

Respondent.

PROFESSIONAL REGULATION: Commission on Practice of the Supreme Court of the State of Montana, ODC File No. 21-994

COUNSEL OF RECORD:

For Office of Disciplinary Counsel:

Timothy B. Strauch (argued), Special Counsel, Office of Disciplinary Counsel, Helena, Montana

For Respondent:

Mark D. Parker, Parker, Heitz & Cosgrove, PLLC, Billings, Montana

Christian Brian Corrigan (argued), Solicitor General, Office of the Attorney General, Helena, Montana

Shane P. Coleman, Billstein Monson & Small PLLC, Billings, Montana

Tyler Green, Consovoy McCarthy PLLC, Salt Lake City, Utah

For Amici State of Iowa and State of Texas:

Dale Schowengerdt, Landmark Law PLLC, Helena, Montana

Brenna Bird, Attorney General of Iowa, Eric H. Wessan, Solicitor General, Des Moines, Iowa

Ken Paxton, Attorney General of Texas, Brent Webster, First Assistant Attorney General, Aaron L. Nielson, Solicitor General, William F. Cole, Principal Deputy Solicitor General, Austin, Texas

Argued:  March 28, 2025

Decided:  December 31, 2025

Filed:

_____
Clerk

Chief Justice Cory J. Swanson delivered the Opinion and Order of the Court.

¶1 This matter comes before the Court based on findings of attorney misconduct filed by the Commission on Practice (Commission) against Montana Attorney General Austin Knudsen. The Office of Disciplinary Counsel of the State of Montana (ODC) charged Knudsen with 41 counts of misconduct for actions taken while Knudsen was representing the Montana State Legislature in two cases before this Court and the United States Supreme Court. A two-day contested hearing was held before the Commission on October 9-10, 2024, which found Knudsen violated five Rules of the Montana Rules of Professional Conduct as set forth below.

¶2 On October 23, 2024, the Commission filed its recommendation that this Court suspend Knudsen from the practice of law for 90 days. Knudsen objects.

**INTRODUCTION**

¶3 There's an old saying in our profession that "bad facts make bad law." *Cf. Hodgens v. Hodgens* 7 Eng. Rep. 124, 145 (1837). This case presents an unusual accumulation of bad facts. It's a real mess, or as Sheriff Ed Tom Bell said, "if it ain't, it'll do till a mess gets here."[1] Our task is to not only address the allegations of the Attorney General's conduct, but also to make good law which will guide the future conduct of attorneys and the procedural requirements for disciplinary proceedings in Montana.

¶4 This case has also taken on additional significance due to its implication of constitutional separation of powers issues, and its centrality in an ongoing political debate

---

[1] Cormac McCarthy, *No Country for Old Men* 76 (2007).

3

about the authority and conduct of the Judicial Branch vis-à-vis the political branches. Those two themes appear to be separate, but they are often opposite sides of the same coin. Part of the Court's respect for the separation of powers includes avoiding holdings which intrude into the political powers of the other branches. Conversely, we must give expression to the Constitution, despite the potential for political criticism or fallout. As Chief Justice John Marshall once wrote:

> The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

¶5 Having reviewed the voluminous record and related proceedings, we affirm in part and reverse in part the Commission on Practice's findings that Knudsen violated the Montana Rules of Professional Conduct. We hold Knudsen violated Rule 3.4(c) for disobeying the July 2021 Order of the Court to return the disputed subpoena material. Knudsen violated Rule 5.1(c) for failing to ensure his subordinates complied with Rule 3.4(c) by also violating the July 2021 Order.

¶6 We do not affirm the Commission's findings against Knudsen regarding the other alleged violations.

¶7 ODC simply failed to prove the remaining allegations of misconduct. Knudsen did not violate Rule 8.2(a) because each of his statements critical of the Court was either a

4

factual statement, which ODC failed to prove was false, or a statement of opinion. Knudsen did not violate Rule 8.4(d) because the Commission failed to demonstrate his conduct had a nexus to an adverse effect on a specific court proceeding. Finally, Knudsen did not violate Rule 8.4(a) because the Commission failed to issue a conclusion of law sufficiently justifying how this Rule should be applied as an additional violation of any other Rule.

¶8 Due to the Commission's violation of Knudsen's due process guarantees, we dismiss this case without further action.

**FACTS**

¶9 Knudsen became a member of the State Bar of Montana on October 7, 2008. In his oath of admission to the Bar, Knudsen swore to, among other things, "maintain the respect due to courts of justice and judicial officers"; to "be candid, fair, and courteous before the court"; and to "strive to uphold the honor and to maintain the dignity of the profession to improve not only the law but the administration of justice." Every attorney in Montana is bound by his or her lawyer's oath and by the M. R. Pro. Cond. *E.g.*, § 37-61-301, MCA.

¶10 Knudsen was elected as Montana Attorney General in November 2020 and was sworn in on January 4, 2021. He previously served as a State Representative, including Speaker of the Montana House of Representatives, and as Roosevelt County Attorney.

¶11 On March 16, 2021, Senate Bill 140 (SB 140) was signed into law, which changed the way the Governor fills vacancies for judges and justices in Montana. *See* Title 3, chapter 1, part 9, MCA. The next day, challengers filed an original proceeding in the Montana Supreme Court, challenging the constitutionality of SB 140. *See Brown v. Gianforte*, 2021 MT 149, 404 Mont. 269, 488 P.3d 548.

5

¶12 While under consideration at the Legislature, the Montana Supreme Court Administrator Beth McLaughlin surveyed Montana district court judges through the Montana Judges Association (MJA), querying whether the judges should take a legislative advocacy position on SB 140. Votes were submitted via an unofficial online poll and email responses from some district court judges. *McLaughlin v. Mont. State Legislature*, 2021 MT ¶ 2, 404 Mont. 166, 489 P.3d 482 (*McLaughlin 5/12/21*). After learning of the MJA poll, the Legislature requested McLaughlin provide information on the poll. *McLaughlin 5/12/21*, ¶ 2. McLaughlin provided the poll's tally but indicated some emails from the judges responding to the poll were routinely deleted. *McLaughlin 5/12/21*, ¶ 2.

¶13 Then-Chief Justice Mike McGrath recused himself from the litigation over SB 140 because he had lobbied the Governor on the issue. District Court Judge Kurt Krueger was appointed in his stead. On April 1, the Governor, represented by Knudsen, Deputy Attorney General Derek Oestreicher, and the Governor's General Legal Counsel Anita Milanovich, filed a motion in *Brown* to recuse or disqualify Judge Krueger from participating in the litigation over SB 140 as he had expressed opposition to the MJA poll, including a comment that SB 140 was unconstitutional. The next day, Judge Krueger recused himself. This Court held the Governor's motion was moot and advised no other justice had participated in the poll. *Bradley v. Gianforte*, No. OP 21-0125, Order (Mont. April 7, 2021).

¶14 On April 7, 2021, McLaughlin emailed Abra Belke, Chief of Staff to the Republican Leadership in the Montana State Senate, notifying her she did not retain other records on the SB 140 poll but would continue to search for and provide other requested information.

6

On Thursday, April 8, McLaughlin sent a follow-up email, explaining she had no other responsive documents in her possession beyond what she already produced on the SB 140 poll. She additionally explained she "did not retain" the requested emails.

¶15 That same day, the Legislature issued an investigative subpoena to Director Misty Giles of the Department of Administration (DOA), which administers the Judiciary's computer system, seeking the production of "[a]ll emails and attachments sent and received by Court Administrator Beth McLaughlin between January 4, 2021 and April 8, 2021" and "[a]ny and all recoverable deleted e-mails sent or received by Court Administrator Beth McLaughlin between January 4, 2021 and April 8, 2021." The request excluded "any emails and attachments related to decisions made by the justices in disposition of final opinion" but otherwise demanded all other emails and attachments. The subpoena required the production of documents by 3:00 p.m. the next day, a Friday.

¶16 The subpoena was issued without notice to McLaughlin or the Judicial Branch.[2] *McLaughlin 5/12/21*, ¶ 2. McLaughlin learned of the subpoena after 5:00 p.m. on Friday. By then, the DOA had released over 5,000 Judicial Branch emails to the Legislature. *McLaughlin 5/12/21*, ¶ 2. That Saturday, April 10, McLaughlin sent a letter to Director Giles, requesting she temporarily stay action on the subpoena until an "orderly process"

---

[2] Due process considerations generally require minimum safeguards of notice and an opportunity to present objections to safeguard private, privileged, work product, or irrelevant information. *See, e.g.*, *Dorwart v. Caraway*, 1998 MT 191A, ¶ 93, 290 Mont. 196, 966 P.2d 1121, (*overruled in part on other grounds by Trs. of Ind. Univ. v. Buxbaum*, 2003 MT 97, ¶ 46, 315 Mont. 210, 69 P.3d 663); *see also* M. R. Civ. P. 45(c)(1), (d)(2)(B), (e)(2) (providing process for notice, objections, and assertion of privilege to subpoenaed documents in civil litigation); *McLaughlin v. Mont. State Legislature*, 2021 MT 178, ¶ 48, 405 Mont. 1, 493 P.3d 980 (*McLaughlin 7/14/21*).

could be determined to ensure a wide variety of legitimately protected emails were not disclosed. Director Giles responded that evening, advising McLaughlin her letter should be directed to the Legislature. In response to further questions about her intent to immediately comply with the subpoena, Director Giles informed McLaughlin on Sunday "DOA is complying with the scope of the subpoena as written. As the third party holder of these documents, DOA is not well suited to ascertain which [documents] fall within the [privacy, protection, and privilege] concerns you raise." Director Giles stated she would provide McLaughlin the copies of emails given to the Legislature and emails DOA planned to deliver on Monday.

¶17 On Saturday night, McLaughlin, styling herself as an intervenor of right,[3] filed an emergency motion in the *Brown* litigation seeking to quash and enjoin the Legislature's subpoena due to the large amount of private, privileged, and protected material sought by the subpoena already being produced. On Sunday, after receiving Giles' emails, McLaughlin filed a motion for leave to supplement her motion to quash, informing the Court Giles had already complied with the subpoena in part on Friday and intended to turn over the remaining documents on Monday. Neither the Legislature nor DOA were parties to the *Brown* case at that time. McLaughlin's motions were ex parte; there is no record of prior notice to counsel for the Legislature or DOA.

---

[3] M. R. App. P. 2(1)(f) defines an intervenor as "[o]ne who, because of an asserted interest in the outcome, has voluntarily entered into an action or who, on motion, is granted leave to enter a proceeding before this court, despite not being named originally as a party." McLaughlin styled herself as an intervenor under the first clause of the rule. The Supreme Court interpreted the motion as a request to intervene in addition to a motion to quash. *See Bradley v. Gianforte*, No. OP 21-0125, Temporary Order (Mont. April 11, 2021).

¶18 That same day, this Court entered a Temporary Order quashing the subpoena until we could address the scope and parameters of the Legislature's subpoena power when privileges have been asserted. *McLaughlin 5/12/21*, ¶ 2. We noted "serious procedural questions" including whether the motion was properly filed and neither the Legislature nor DOA were a party in *Brown*. *Bradley v. Gianforte*, No. OP 21-0125, Temporary Order (Mont. April 11, 2021). Nonetheless, we temporarily quashed the subpoena "to address these various issues, and to prevent the infliction of harm in the meantime." *Bradley v. Gianforte*, No. OP 21-0125, Temporary Order (Mont. April 11, 2021). We granted McLaughlin seven days to demonstrate the propriety of filing a motion in *Brown* instead of initiating a new proceeding and granted the Legislature and DOA 14 days thereafter to respond to the motion and the request to intervene in *Brown*. McLaughlin never informed the Court of any barrier preventing her from filing for injunctive and declaratory relief, including emergency temporary restraining orders, in district court instead of in the Supreme Court.

¶19 The day after the Temporary Order was issued, DOJ "Lieutenant General" Kristin Hansen sent a letter to Acting Chief Justice Rice noting the Attorney General's office had reviewed the Temporary Order "presuming to temporarily quash the Legislature's duly authorized subpoena . . . and simultaneously, attempting to cure the multiple procedural irregularities." The letter noted procedural irregularities such as the Legislature and DOA not being parties in the *Brown* litigation[4] and the motion not being properly filed. After

---

[4] The Legislature intervened in the *Brown* case on April 14, 2021.

asserting the Legislature's broad subpoena power and corresponding duty to redact private information, the letter declared, "The Legislature does not recognize this Court's Order as binding and will not abide it.[5] The Legislature will not entertain the Court's interference in the Legislature's investigation of the serious and troubling conduct of members of the Judiciary. The subpoena is valid and will be enforced." *See also McLaughlin 5/12/21*, ¶ 3.

¶20 That same day, April 12, McLaughlin filed an original proceeding against the Legislature and DOA seeking to quash the legislative subpoena. The Office of the Attorney General, representing the Legislature, moved to dismiss McLaughlin's petition on April 14. In concluding the motion, the Attorney General's office reiterated that the Temporary Order from *Brown* was "not binding on the legislative branch and will not be followed. . . . McLaughlin's current Petition seeks yet another Court order which will not bind the Legislature and will not be followed." On April 15, the Legislature issued a revised subpoena, which McLaughlin also moved to quash.

¶21 On April 16, this Court issued another Order in the *Brown* and *McLaughlin* cases. *See Brown v. Gianforte*, No. OP 21-0125, Order (Mont. April 16, 2021); *McLaughlin v. Mont. State Legislature*, OP 21-0173, Order (Mont. April 16, 2021). The Order temporarily enjoined the Legislature's subpoenas until the scope of the subpoena power could be adjudicated. The Order further dismissed McLaughlin's filings in the *Brown* case

---

[5] Other proceedings have interpreted this statement as "will not abide [by] it," *McLaughlin 5/12/21*, ¶ 3, as in, the Legislature will not obey the Order. Given the next sentence, the meaning appears equally likely to be the Legislature will not tolerate the Order's interference in its business. *See Abide*, The American Heritage Dictionary 4 (Joseph M. Patwell ed., 3rd ed. 1996) ("To put up with; tolerate . . . To conform to; comply with").

and therefore denied the Governor's motion to strike and vacate McLaughlin's motions as moot. On April 18, Hansen sent another letter from the Office of the Attorney General[6] stating the Court's temporary stay to provide due process was a "ludicrous" statement "wholly outside the bounds of rational thought." This letter maintained "[t]he Legislature has issued valid subpoenas" and continued to seek their enforcement despite the Court's temporary stay. We summarized the status and the Court's thinking as the drama unfolded in real time:

> At the time, and in light of the representations made by Hansen, Oestreicher, and the Legislature, it was unclear whether the release of judicial e-mails to the Legislature was ongoing and would continue indiscriminately. The Department of Administration has since retained counsel who immediately assured this Court that it will abide by the Court's orders and would not release any more judicial communications unless directed by the Court to do so. On April 19, 2021, every justice of the Montana Supreme Court appeared before the Legislature and answered, to the extent permitted by the Montana Code of Judicial Conduct, questions propounded by the Special Joint Select Committee on Judicial Transparency and Accountability, a newly formed legislative committee to investigate alleged misconduct in the Judicial Branch.

*McLaughlin 5/12/21*, ¶ 6.

¶22 Through the Attorney General's office, the Legislature filed a motion on April 30, 2021, to disqualify all justices, asserting a conflict of interest because they oversee the

---

[6] Hansen sent the letters on behalf of the Legislature. Although Hansen represented the Legislature in the *McLaughlin* proceedings, she never appeared on behalf of the Legislature in the *Brown* proceedings, where the Legislature was represented by private counsel Emily Jones. The Department of Justice represented the Governor in *Brown*. Hansen's status as a DOJ advocate for the Legislature but *not counsel of record in the Brown litigation* possibly furthers Knudsen's claim that her conduct and messages related to the orders in that case (presumably approved by Knudsen) were intended as inter-branch political communications to enforce the separation of powers, not rogue statements by an attorney defying court orders. If valid, that reasoning cuts the other way in *McLaughlin* when DOJ was counsel of record for the Legislature.

Court Administrator. Invoking the Rule of Necessity and noting the Legislature "unilaterally attempted to create a disqualifying conflict for every duly constituted and elected member of this Court," we denied the Legislature's motion to disqualify each justice. *McLaughlin 5/12/21*, ¶¶ 15–16. The political branches objected and criticized this decision on the grounds the Court Administrator is an employee of the Judiciary and works at the pleasure of the Supreme Court. *Compare* §§ 3-1-130, -701, MCA (2021), *with* 2025 Mont. Laws ch. 387, §§ 1-2 (amending sections to make court administrator position at the pleasure of the Chief Justice, thereby confining any potential conflict to only the Chief Justice). Critics also asserted the Supreme Court previously recused itself and appointed substitute judges in situations where the entire Court had a conflict. *E.g.*, *State v. Kirkbride*, No. DA 07-0431, Order (Mont. Feb. 15, 2008); *State v. Rickman*, No. DA 07-0364, Order (Mont. Feb. 15, 2008).

¶23 Knudsen personally responded with objections "to some of the Court's statements, which appear to me nothing more than thinly veiled threats and attacks on the professional integrity of attorneys in my office." Knudsen explained his attorneys "have delivered strong statements from the Legislature regarding the Court's lack of jurisdiction, the invalidity of resultant orders, and the impropriety of this Court presuming to 'settle' its dispute with a coordinate branch of government." Knudsen took offense at this Court's statement "[t]hese representations from counsel that the Court's orders would not be followed were disruptive to the Court's functioning as a tribunal and the administration of justice, particularly because the Court was dealing with the unrestrained and ongoing dissemination of thousands of Judicial Branch e-mails." *McLaughlin 5/12/21*, ¶ 3.

12

Knudsen argued this Court was issuing "menacing warning[s]" and charged the Court with behaving with impropriety. Knudsen concluded by asking this Court to "refrain from threatening or maligning the integrity of my attorneys."

¶24 On June 10, this Court concluded SB 140 did not violate the Montana Constitution. *Brown*, ¶ 51. On July 14, we ultimately held the legislative subpoenas did not have a valid legislative purpose, sought information it could have obtained elsewhere, and were broader than reasonably necessary to serve the stated goals. *McLaughlin 7/14/21*, ¶ 49. We ordered the subpoenas quashed, enjoined further compliance with them and any further dissemination of documents produced pursuant to them, and ordered the immediate return of all documents or copies produced pursuant to the subpoenas. *McLaughlin 7/14/21*, ¶ 57. Knudsen, representing the Legislature, petitioned this Court for a rehearing on August 11, 2021, which was denied. *McLaughlin v. Mont. State Legislature*, No. OP 21-0173, Order (Mont. Sept. 7, 2021).

¶25 Knudsen availed himself of his right to petition the United States Supreme Court for a writ of certiorari to review our decision. *Mont. State Legislature v. McLaughlin*, 142 S. Ct. 1362 (Mar. 21, 2022). But he failed to seek a stay of this Court's Order to return the material received from the subpoena, either from this Court or from the United States Supreme Court. *See* M. R. App. P. 16; Sup. Ct. R. 23. While waiting for the United States Supreme Court decision on his Petition, Knudsen and his subordinates, with Knudsen's knowledge, continued to disobey this Court's order to "immediately return any materials produced pursuant to the subpoenas." Knudsen ultimately returned the documents eight months later, after the United States Supreme Court denied a writ of certiorari.

13

¶26 On June 8, 2021, a licensed Montana attorney filed a grievance with ODC, alleging Knudsen's conduct fell outside the M. R. Pro. Cond. Special Counsel Daniel McLean was appointed to review the grievance for ODC. On May 27, 2022, McLean filed a recommendation to the review panel of the Commission. McLean recommended a finding that Knudsen had violated Rule 5.1 (ratifying M. R. Pro. Cond. violations by his subordinates), Rule 8.2 (false statements or reckless disregard for the truth of statement regarding integrity of the judiciary), Rule 8.4 (conduct prejudicial to administration of justice), and MRLDE 8A(7) (contempt of court or the Commission) through "his own" conduct and by ratifying Hansen's and Oestreicher's conduct. He recommended "Knudsen's violations of the [M. R. Pro. Cond.] be made public," but a private letter of admonition be sent to Knudsen because "a formal complaint, investigation, and hearing would exacerbate the issues between the Legislature and the Judiciary, which likely would be played out in public."

¶27 The Commission's Review Panel referred the matter back to ODC for further investigation. There is some dispute as to the Commission's directive. Chief Disciplinary Counsel Pamela Bucy noted in her request for a Review Panel that it had previously reviewed McLean's recommendation and it was "referred back to ODC for further investigation. ODC appointed Special Disciplinary Counsel Timothy Strauch to assist in further review, investigation, and potential prosecution." According to Strauch's report, "the Review Panel referred the matter back to ODC for further investigation, citing the conduct as outlined likely warranting public discipline." Strauch went on to state, "The undersigned understands that Special Counsel McLean was unable to try a formal hearing,

14

so he withdrew." After further investigation, Strauch sought leave from the Commission's Review Panel to file a formal complaint against Knudsen.

¶28 On September 5, 2023, ODC filed a complaint to the Commission, alleging 41 violations of the M. R. Pro. Cond.—specifically that Knudsen violated Rules 3.4(c), 5.1(c), 8.2(a), 8.4(a), and 8.4(d) by his actions and those of the lawyers under his supervision in the *Brown* and *McLaughlin* cases. ODC summarized:

> Knudsen and lawyers under his supervision routinely and frequently undermined public confidence in the fairness and impartiality of our system of justice by attempting to evade the authority of the Montana Supreme Court and assaulting the integrity of the judiciary and the individual Justices who were duly elected by Montana citizens to make decisions.

¶29 Knudsen filed an Answer on November 27, 2023, generally denying his conduct was a violation of the M. R. Pro. Cond. and raising several affirmative defenses. After hearing competing scheduling suggestions, the Commission set the hearing for July 17-19, 2024, at the Supreme Court. On May 28, 2024, Knudsen filed a partially opposed motion for continuance requesting the July 2024 adjudicatory hearing "be rescheduled for the Commission's next sitting in October" 2024. On June 13, 2024, the Commission issued a scheduling order resetting the hearing for October 9-11, 2024.

¶30 On July 8, 2024, Knudsen filed a motion for summary judgment, arguing that disciplining him for official actions violates the separation of powers by infringing on the Executive Branch. After briefing, the Commission denied Knudsen's motion for summary judgment on September 10, 2024. On September 12, 2024, the Commission notified the parties of the members who would sit on the upcoming October 2024 Adjudicatory Panel, which included "attorney member" Patricia Klanke and "lay member" Lois Menzies.

¶31 On September 19 and October 2, 2024, Knudsen filed motions to disqualify the above two members of the Commission's adjudicatory panel based on alleged conflicts of interest. The motions also sought to cure any prejudice resulting from the members' involvement in proceedings thus far, including by vacating the order denying Knudsen's motion for summary judgment. The two members voluntarily recused after each motion was filed. The Commission informed Knudsen the two members had not participated in the matter in any capacity and denied the motion to vacate the order denying summary judgment.

¶32 On September 26, Knudsen filed an expert witness disclosure, designating Thomas Lee as an expert to offer opinions "concerning generally accepted norms or standards of the rhetoric and forms of advocacy that are widely employed by attorneys in various settings." The next day, ODC filed a motion in limine to exclude Knudsen's proposed expert on the ground that, although he framed his opinion as antecedent questions, his opinions provided legal opinions, interpretations, and conclusions that invaded the province of the Commission and this Court. Before receiving a response from Knudsen, the Commission granted ODC's motion and excluded Lee as an expert witness.

¶33 Knudsen filed a M. R. Civ. P. 60(a)–(b) motion for relief from the Commission's order excluding his expert witness on the grounds (1) the Commission did not allow him "the statutorily allotted time to respond" (citing MUDCR 2(b); MRLDE 12C(3), 22A); and (2) Lee's testimony was admissible under M. R. Evid. 702, to "assist the trier of fact," and Rule 704, not as a legal conclusion, but rather as testimony regarding "accepted

professional legal standards, reasonable attorney behavior, and opinions on how specific behavior interacts with those standards."

¶34 On October 3, less than a week before the hearing, Knudsen filed another motion to vacate or stay the hearing, arguing the Commission had committed multiple due process violations in the proceedings—by failing to perform adequate conflicts checks on its members, failing to exercise independent judgment, preventing Knudsen from being heard on pretrial evidentiary issues, and violating its own rules—raising questions of its impartiality. The Commission denied Knudsen's motion.

¶35 On October 7, 2024, two days before the scheduled hearing in this matter, Knudsen filed a Petition for Writ of Supervisory Control with this Court. This Court denied Knudsen's petition, holding he had an adequate remedy on appeal for any alleged erroneous Commission rulings under MRLDE 16. *See Knudsen v. Comm'n on Prac. of the Sup. Ct.*, No. OP 24-0595, 420 Mont. 394, 561 P.3d 573 (Oct. 8, 2024).

¶36 On October 9 and 10, the matter proceeded to hearing on ODC's Complaint. During the hearing, the presiding officer sustained ODC objections to evidence he claimed was precluded under this Court's prior rulings in *Brown* and *McLaughlin*. The evidence was offered by Knudsen to address the factual basis for several of his statements critical of the Court. During the hearing, ODC Special Counsel Strauch focused heavily on the content of Knudsen's and his subordinate attorneys' statements critical of this Court, but Strauch failed to prove the statements were false or made with reckless disregard for the truth or falsity thereof. A key exchange during Strauch's direct examination of Knudsen illustrates:

17

Q: These statements in a brief, not the Judicial Standards Committee [sic], are disrespectful to the Montana Supreme Court, aren't they?

A: No.

Q: They're intemperate, aren't they?

A: No.

Q: They're contemptuous, aren't they . . . ?

A: No.

Q: They're insulting, aren't they?

A: No, sir.

Q: They were undignified of our profession, and particularly undignified of the legal officer of this state, aren't they?

A: No.

Q: This does not uphold the dignity of the Montana Supreme Court, does it?

A: Yes, it does.

Q: Are you aware that Rule of Professional Conduct 8.2, alpha, provides that a lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge[?] Are you aware of that rule?

A: I am aware of that rule.

Q: Now, you understand the purpose of that rule is to preserve public confidence in our far – and fairness and impartiality of our system of justice; right?

A: That's probably one of the reasons for it. Yes.

Q: Now your statement [(referring to exhibit)] . . . . Your statement here willfully and knowingly undermine the presumed integrity and qualifications of the justices, didn't it?

A: No. These were not knowingly false or reckless disregarding truth statements.

Q: When you accuse a judge of violating the rules of judicial – the code of judicial conduct, you don't think that undermines their integrity and their qualifications?

A: This was not a knowingly false statement, nor one made with reckless disregard for the truth.

Q: I haven't gotten to the falsity or reckless part of it yet.

¶37 Strauch repeatedly asked Knudsen a series of questions about various statements, and whether they were disrespectful, intemperate, contemptuous, undignified, or failing to uphold the dignity of the Court. But he never returned to the crucial element of falsity or reckless disregard for the truth. Strauch solely relied upon this Court's prior rulings in *Brown* and *McLaughlin* to assert Knudsen's statements were false and violated M. R. Pro. Cond. 8.2(a), without obtaining an admission from Knudsen as to the essential element of falsity or otherwise proving the necessary fact of the falsity of these statements.

¶38 On October 23, the Commission filed its Findings of Fact, Conclusions of Law, and Recommendation, finding Knudsen's conduct violated five rules of professional conduct and recommending this Court impose a 90-day suspension from the practice of law. Knudsen was the incumbent Montana Attorney General at the time, running for reelection in the November 2024 election. Election Day was November 5, 2024. Pursuant to MRLDE 16 Knudsen objects.

**STANDARD OF REVIEW**

¶39 This Court possesses "original and exclusive jurisdiction and responsibility" in all matters involving the disciplining of attorneys in Montana pursuant to Article VII,

19

Section 2(3), of the Montana Constitution, and Title 37, chapter 61, MCA, and its inherent jurisdiction. Introduction, MRLDE. Thus, we review de novo the Commission's findings of fact, conclusions of law, and recommendations. *In re Neuhardt*, 2014 MT 88, ¶ 16, 374 Mont. 379, 321 P.3d 833 (citation omitted). This includes a duty to weigh the evidence upon which the Commission's findings rest, though "we remain reluctant to reverse the decision of the Commission when its findings rest on testimonial evidence," as the Commission stands in a better position to weigh conflicting statements by observing the character of the witnesses and their statements. *Neuhardt*, ¶ 16 (quotation omitted). Matters of trial administration are reviewed for an abuse of discretion. *Neuhardt*, ¶ 16.

## DISCUSSION

¶40 *1. Whether the Commission on Practice's discipline of the Attorney General for alleged violations of the Montana Rules of Professional Conduct in the course of his elected official duties violates the separation of powers under the Montana Constitution.*

¶41 It is undisputed that during the above-recited events, Knudsen was the elected and sworn Montana Attorney General, and he engaged in the above conduct in the course and capacity of his office. The other attorneys involved were also all DOJ attorneys under Knudsen's supervision. During the *Brown* and *McLaughlin* proceedings, he represented either the Governor or the Legislature, or both. Knudsen and his clients—some of the duly elected and sworn officers[7] of the two political branches—argued members of the Judiciary

---

[7] There are six elected Executive Branch officers: the governor, lieutenant governor, attorney general, secretary of state, auditor, and superintendent of public instruction. *See* Mont. Const. art. VI, §§ 1–2. Two of these were involved in these cases. The majority, but not all, of the members of the Montana House and Senate were represented through the majority-elected Speaker and President, respectively.

improperly pre-judged legislation likely to head to litigation (as indeed some did), withheld information from the Legislature, judged their own case and their own employee, and did so for a political purpose. In this context and under the Montana Constitution, the Attorney General has very broad authority to determine how he exercises the powers and responsibilities of his office, including how he prosecutes cases in courts. But "very broad" authority does not mean unlimited authority; he is still an attorney at law. Mont. Const. art. VI, § 3(2). This Court has not yet addressed the question of how the Attorney General may be regulated by the Commission on Practice—and ultimately this Court—without intruding into his separate constitutional duties and prerogatives. We do so now.

¶42     The Attorney General is an executive officer elected by the people. Mont. Const. art. VI, §§ 1–2. In addition to his many duties executed in his capacity as an attorney, the Attorney General has many non-legal duties, including: discharging the duties of a member of the board of examiners and the state board of land commissioners, § 2-15-501(8), MCA, and leading the department of justice, § 2-15-2001, MCA, the Montana highway patrol, §§ 44-1-101, -102, MCA, the state crime lab, § 44-3-301, MCA, the law enforcement academy, § 44-10-201, MCA, and others.

¶43     He also has many duties as an attorney. Under the Montana Constitution, the Attorney General is unique among all other lawyers in the State. He represents the State in legal proceedings, including "prosecut[ing] or defend[ing] all causes in the supreme court in which the state or any officer of the state in the officer's official capacity is a party or in which the state has an interest," and in certain bankruptcy proceedings. Sections 2-15-501(1), (2), MCA. He also exercises supervisory authority over county

21

attorneys in their duties prosecuting crimes on behalf of the State of Montana. Section 2-15-501(5), (6), MCA.[8] The Attorney General may hire assistant attorneys general, who "must be duly licensed to practice law in the state of Montana." Section 2-15-502, MCA.

¶44 Courts in the United States have long regulated attorneys, who "are officers of the court, admitted as such by its order, upon evidence of their possessing sufficient legal learning and fair private character." *Ex parte Garland*, 71 U.S (4 Wall.) 333, 378 (1867). "The admission and regulation of attorneys in Montana is a matter peculiarly within the inherent power of this Court, subject, of course, to constitutional guaranties, which the Court has always zealously guarded." *Goetz v. Harrison*, 153 Mont. 403, 404, 457 P.2d 911, 912 (1969); *see also In re Best*, 2010 MT 59, ¶ 15, 355 Mont. 365, 229 P.3d 1201. "From [the entry of admission] the parties become officers of the court, and are responsible to it for professional misconduct. They hold their office during good behavior, and can only be deprived of it for misconduct ascertained and declared by the judgment of the court after opportunity to be heard has been afforded." *Ex parte Garland*, 71 U.S. at 378. "The attorney and counsellor being, by the solemn judicial act of the court, clothed with his office, does not hold it as a matter of grace and favor. . . . It is a right of which he can only be deprived by the judgment of the court, for moral or professional delinquency." *Ex parte Garland*, 71 U.S. at 379.

> And it has been well settled, by the rules and practice of common-law courts, that it rests exclusively with the court to determine who is qualified to

---

[8] In addition to a county attorney's prosecutorial functions, a county attorney has separate civil functions on behalf of the county, subject to the county commission. *See* § 7-4-2711, MCA.

become one of its officers, as an attorney and counsellor, and for what cause he ought to be removed. The power, however, is not an arbitrary and despotic one, to be exercised at the pleasure of the court, or from passion, prejudice, or personal hostility; but it is the duty of the court to exercise and regulate it by a sound and just judicial discretion, *whereby the rights and independence of the bar may be as scrupulously guarded* and maintained by the court, as the rights and dignity of the court itself.

*Ex parte Secombe*, 60 U.S. (19 How.) 9, 13 (1856) (emphasis added).

¶45 The Montana Constitution has recognized since before statehood that education, experience, and conduct as an attorney is an inextricable qualification for the position of attorney general, hence the requirement that to be eligible for the office, the Attorney General must be an attorney *in good standing* with experience practicing law. Mont. Const. art. VI, § 3(2) ("Any person with the foregoing qualifications is eligible to the office of attorney general *if an attorney in good standing* admitted to practice law in Montana who has engaged in the active practice thereof for at least five years before election." (emphasis added)); *see also* Mont. Const. art. VII, § 3 (1889) ("No person shall be eligible to the office of . . . Attorney General unless he shall have attained the age of thirty years, and have been admitted to practice in the Supreme Court of the State, or Territory of Montana, *and be in good standing* at the time of his election." (emphasis added)); Mont. Const. art. V, § 3 (1884) (same).

¶46 Knudsen argues the constitutional separation of powers preempts the Commission's regulation of him as an attorney, to the extent the regulation arises from his conduct as the Attorney General. Because the Commission is ultimately responsible to the Supreme Court, Knudsen argues such regulation necessarily violates the separation of powers because it allows this Court to pass judgment on the exercise of his executive office.

23

¶47 Knudsen's point is persuasive, as explained further below. But we cannot agree entirely with his view without excising words from the Constitution, which we are unable to do. The Constitution requires the Attorney General to be an attorney in good standing, which necessarily requires him to be subject to the regulation of the legal profession under the Court's authority. Mont. Const. art. VII, § 2(3); *see generally In re President of Mont. Bar Ass'n*, 163 Mont. 523, 518 P.2d 32 (1974) (per curiam) (establishing the Unified Bar of Montana); *see also, e.g.*, *In re Bailey*, 248 P. 29, 30 (Ariz. 1926). This is not an anomaly, it is a continuation of the well-established American tradition and practice of attorneys being subject to regulation by the Judiciary.

¶48 Indeed, given the concession at oral argument that the Attorney General likely supervises more attorneys than any other lawyer in Montana and has an outsized influence over the legal profession, it would be not only unconstitutional but also unwise to grant the Attorney General authority to supervise hundreds of attorneys while exempting him from the basic ethical and competence standards expected of every lawyer.

¶49 Knudsen argues he is not subject to the Commission's regulation because of the constitutional separation of powers, which is a threshold issue. We now cross that threshold: the Attorney General is subject to regulation under the Commission and this Court's authority to regulate the practice of law.

¶50 In exercising that authority, however, we must still respect the constitutional prerogatives of other constitutional branches, even of an officer who is partially subject to our regulation, and with whom we may disagree from time to time. We must carefully

identify the line between permissible regulation and impermissible exercise of powers assigned to another governmental branch. Mont. Const. art. III, § 1.

¶51 Knudsen's arguments invoking the now-dismissed disciplinary proceedings against the Texas Attorney General are illustrative of the dangers courts may wade into if they construe the regulation of lawyers to mean control over an executive branch officer's discretionary choice to institute litigation or appeal on behalf of the State. Knudsen cites to *Webster v. Comm'n for Law. Discipline*, 704 S.W.3d 478 (Tex. 2024), and *Paxton v. Comm'n for Law. Discipline*, 704 S.W.3d 584 (Tex. App. 2024), to argue a state supreme court may not discipline an attorney general for his or her conduct and only the court before which that attorney general is currently arguing may discipline him with sanctions or contempt orders.

¶52 In *Paxton* and *Webster*, Paxton (the Texas Attorney General) and Webster (Texas First Assistant Attorney General) were alleged to have made false statements in a pleading before the United States Supreme Court. *Webster*, 704 S.W.3d at 486. The district court dismissed the Texas commission on practice's complaint, finding the separation of powers doctrine deprived it of subject-matter jurisdiction. *Webster*, 704 S.W.3d at 486. The Texas court of appeals reversed. The Texas Supreme Court affirmed the district court's dismissal on separation of powers grounds, holding:

> When filing suit on behalf of the State without any allegation of criminal or *ultra vires* conduct [(of the attorney general)], the attorney general (and hence the first assistant) is not subject to collateral review of either the choice to file a lawsuit *or* the representations in the suit's initial pleadings. Instead, if the contents of the pleadings are objectionable, whether for legal or ethical reasons, only *direct* scrutiny—that is, by the court to whom the pleadings are presented—is permissible under the separation-of-powers doctrine.

25

*Webster*, 704 S.W.3d at 497 (emphases in original).[9]

¶53 We do not fully adopt Texas' holding because the Montana Constitution expressly requires the Attorney General to be subject to regulation by the Court, contrary to the Texan basis for Attorney General regulation. *Compare* Mont. Const. art. VII, § 2(3) (Supreme Court jurisdiction extends to "admission to the bar and the conduct of its members") *and* Mont. Const. art. VI, § 3(2) (requiring Attorney General to be "an attorney *in good standing* admitted to practice law in Montana" (emphasis added)), *with State Bar v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994) (Texas Supreme Court's power to regulate the practice of law is derived from statute and "its inherent power, [which] is not secured by any legislative grant or specific constitutional provision, but is necessarily implied to enable the Court to discharge its constitutionally imposed duties.") *and* Tex. Const. art. IV, §§ 1–2, 22–23 (no such similar provision for Texas' Attorney General) *and* Tex. Gov't Code § 81.011 (legislative statutes "in aid of the judicial department's powers under the constitution to regulate the practice of law").

¶54 *Webster* dealt only with the Texas Attorney General's alleged misrepresentations in a court filing, *Webster*, 704 S.W.3d at 498, not with the direct refusal to comply with a court order, which we find to be a violation of the M. R. Pro. Cond. today. The potential dangers the Texas Supreme Court warned of, therefore, are persuasive but not directly on

---

[9] Following the holding in *Webster*, the Texas commission on practice filed a motion to dismiss the appeal in *Paxton* as moot, which the Texas Supreme Court granted as the issues were nearly identical. It then vacated the court of appeals' opinion in *Paxton*. *Paxton v. Comm'n for Law. Discipline*, 707 S.W.3d 115, 117 (Tex. 2025).

point here. *See Webster*, 704 S.W.3d at 501; *accord Webster*, 704 S.W.3d at 503 (all lawyers are bound by the rules of professional conduct and the judiciary remains fully capable of enforcing them in any context, but "[i]n the narrow circumstance before" it— alleged violations based solely on representations made in initial pleadings—the separation of powers requires the court to whom the representations are presented to directly address any violations).

¶55    Similar to the narrow issue before the Texas Supreme Court in *Webster*, we agree the Attorney General must be free to discharge his duties as an Executive Branch officer, including taking controversial positions or issuing critical statements of courts, without continual concern about the Commission's, and ultimately this Court's, approval of his tactics. Every appellate case necessarily includes at least some criticism of a judge. The Attorney General and his attorneys—or for that matter the Office of Public Defender— could not do their job without criticizing the rulings and reasoning of judges; personal attacks upon judges are not only unnecessary to effective legal advocacy, but rightly sanctioned by the M. R. Pro. Cond. and the inherent authority of courts.[10]

---

[10] There is a difference between criticizing the state of the law or its application, which is an inherent part of the legal profession, and crossing the line into personal attacks on members of the judiciary. *Compare* M. R. Pro. Cond. 8.2(a) ("A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge . . . ."), *with In re Sawyer*, 360 U.S. 622, 635, 79 S. Ct. 1376, 1383 (1959) ("If Judge Wiig was said to be wrong on his law, it is no matter; appellate courts and law reviews say that of judges daily, and it imputes no disgrace. Dissenting opinions in our reports are apt to make petitioner's speech look like tame stuff indeed."), and *Dunlap v. Bd. of Prof. Resp. of Sup. Ct. of Tenn.*, 595 S.W.3d 593, 612 (Tenn. 2020) (finding rule violation for contemptuous comment about a judge with no "objectively reasonable basis" for such comments).

¶56 We decline to adopt the Texas rule that a complaint from a disinterested third party cannot be the genesis of a Commission action against the Attorney General or another lawyer. In 2023, the Texas Supreme Court changed the definition of "Complaint" in the Texas Rules of Disciplinary Procedure to allow only certain enumerated persons the ability to file a complaint, including "any other person who has a cognizable individual interest in or connection to the legal matter or facts alleged in the Grievance." *See* Order of the Supreme Court of Texas, Misc. Docket No. 23-9100 (Tex. Dec. 18, 2023), *but see* MRLDE 10A(2) ("assuring that any member of the public who wishes to make a grievance against a lawyer is able to do so."). With the MRLDE, just as with any statute, we interpret the meaning according to the Rule's plain text. Section 1-2-101, MCA ("the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted."). Here, because MRLDE 10A(2) explicitly allows "any member of the public who wishes to make a grievance against a lawyer," we refuse to interpret into the Rule a restriction that is absent from the text.[11] The purpose of the "anyone may file" Rule in the MRLDE is to encourage the ethical practice of law by eliminating the standing or personal involvement requirement. But every grievance is necessarily subjected to scrutiny and tested for merit before a complaint, hearing, or discipline may proceed. *See, e.g.*, MRLDE 5B(5) (defining disciplinary counsel's duty to "[d]ismiss a grievance that Disciplinary Counsel determines does not warrant disciplinary action.").

---

[11] This is not to say that MRLDE 10A(2) could not be changed, only we will not interpret further restrictions into the Rule until they are included into its text.

¶57 We also agree that in many circumstances a court should immediately address disrespectful or improper conduct with its contempt powers. The Attorney General concedes this Court and any court has that authority. It constitutes less interference with the separation of powers, because it concerns the immediate conduct of a lawyer, necessarily linked to a specific proceeding, and promotes the effective functioning of the courts. Similarly, it is not a violation of the separation of powers to require the Attorney General and his attorneys to comply with the M. R. Civ. P. or the M. R. Evid. In this case, the Attorney General's conduct at some point likely qualified as contempt, *e.g.*, *Brown*, ¶¶ 52–65 (Rice, J., concurring) (arguing the Legislature's and DOJ's actions in *Brown* could have qualified for sanctions), but no party sought a contempt order and this Court did not sua sponte initiate it.

¶58 We disagree, however, with Knudsen's assertion that contempt is the only remedy for a court to discipline a recalcitrant or unruly government lawyer—even the Attorney General. There is no rule that M. R. Pro. Cond. is a double jeopardy of contempt. Both sanctions may even be imposed for the same conduct. *See* MRLDE 9D ("Upon receipt of a certified copy of an order of contempt . . . the Supreme Court may, in its discretion, issue an order to show cause why the lawyer's license to practice law should not be suspended or other discipline should not be imposed."); *accord State ex rel. Okla. Bar Ass'n v. Braswell*, 1998 OK 49, 975 P.2d 401 (finding violations of rules of professional conduct stemming from a contempt order in another court); *Bassichis v. Flores*, 189 N.E.3d 640, 648 (Mass. 2022); *Featherstone v. Schaerrer*, 2001 UT 86, ¶ 18, 34 P.3d 194; *Dunlap*, 595 S.W.3d at 615 (affirming one-year suspension in disciplinary proceeding for conduct

29

attorney had already been sanctioned for at trial court).  Contempt deals with the court's authority to control its proceedings, whereas the M. R. Pro. Cond. deals with the attorney's compliance with the rules of professional conduct and fitness to continue to practice law. They may arise from the same events, but they have different purposes and mechanisms.

¶59   Having held the Attorney General is subject to the M. R. Civ. P. and this Court's regulation under the Montana Constitution, we now turn to the specific rules of professional conduct Knudsen is alleged to have violated.

¶60   *2. Whether the Commission on Practice correctly found Knudsen violated the Montana Rules of Professional Conduct.*

## I.  Rule 3.4(c) and Violation of this Court's July 14, 2021 Order

¶61   M. R. Pro. Cond. 3.4(c) states "[a] lawyer shall not . . . knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."  On July 14, 2021, the Montana Supreme Court ordered the Legislature "to immediately return any materials produced pursuant to the subject subpoenas, or any copies or reproductions thereof, to Court Administrator Beth McLaughlin." *McLaughlin 7/14/21*, ¶ 57.  Counts 37 and 38 allege the failure of Knudsen and the attorneys in his office to do so constitutes violations of Rule 3.4(c).  Knudsen contends there is no violation of Rule 3.4(c) due to an open assertion there was no valid obligation by petitioning the Montana Supreme Court for rehearing and by petitioning the United States Supreme Court for a writ of certiorari.  We discuss these procedures in turn and analyze whether Knudsen's actions satisfied the requirements of an open refusal.

30

¶62     Knudsen quotes *In re Ford*, 128 P.3d 178, 181–82 (Alaska 2006), for the proposition, "[a]n attorney may challenge a court order by motion, appeal, or other legal means, but may not simply disregard it." *See also People v. Head*, 332 P.3d 117, 132 n.125 (Colo. Off. Pres. Disc. Judge 2013) (the attorney in the *Ford* case did "not challenge the order, seek a stay, or seek an expedited ruling from the appellate court."). In a disciplinary action involving Rule 3.4(c), the Supreme Court of Maryland listed the various ways an attorney could openly challenge a writ for garnishment: moving to quash, answering the writ, or filing "an appropriate motion, once the proceedings became contested." *Att'y. Griev. Comm'n of Md. v. Levin*, 69 A.3d 451, 469–70 (Md. 2013). These cases persuasively recognize attorneys have a variety of available methods to openly assert lack of a valid obligation; however, ignoring the court's order is not a proper method.

¶63     Knudsen filed a petition for rehearing, which constitutes "an[other] legal means," a challenge to the order, or "an appropriate motion." *See Ford*, 128 P.3d at 182; *Head*, 332 P.3d at 132 n.125; *Levin*, 69 A.3d at 469–70. ODC argues these filings did not "notify this Court . . . that [Knudsen] refused to return the emails until those petitions were decided." We disagree. The petition for rehearing "respectfully request[ed] this Court withdraw the Opinion and Orders, dismiss the case, and enter the field of negotiation and accommodation." If the Court's opinions and orders were withdrawn and *McLaughlin* dismissed, Knudsen would be under no obligation to return anything. *Accord State ex rel. Okla. Bar Ass'n v. Smith*, 2024 OK 64, ¶ 20, 556 P.3d 996 (filing motion to vacate and appealing its denial not disobedience of court order).

31

¶64　ODC also argues the open refusal exception does not apply because Knudsen and his office did not seek a stay with the Montana Supreme Court while the petition for rehearing was pending. Both parties quote *Gilbert v. Utah State Bar*, 2016 UT 32, ¶¶ 24–35, 379 P.3d 1247 (Utah 2016). *Gilbert* states the attorney "had a duty to openly contest the order by filing a request to stay the order in court." *Gilbert*, ¶ 32. Importantly, though, the attorney in *Gilbert* took no further action to challenge the order he did not want to obey. *See Gilbert*, ¶ 30 (the attorney "ignore[d the] court order"). Knudsen's conduct is distinguishable as it relates to the petition for rehearing, which sought withdrawal of the opinions and orders. This is the opposite of ignoring an order.

¶65　Furthermore, "an[other] legal means," a challenge to the order, or "an appropriate motion" is broad language incompatible with requiring a specific motion, such as a motion to stay. *See Ford*, 128 P.3d at 182; *Head*, 332 P.3d at 132 n.125; *Levin*, 69 A.3d at 469–70; *Smith*, ¶ 20. ODC's position exceeds the position taken by the Commission. The Commission's conclusion referenced Knudsen not "seeking a Stay *or other appropriate relief*." (Emphasis added.) The petition for rehearing before this Court constituted other appropriate relief and Knudsen did not violate Rule 3.4(c) while petitioning this Court for rehearing.

¶66　ODC also charged Knudsen with violating Rule 3.4(c) for disobeying this Court's order to immediately return all materials while he petitioned the United States Supreme Court for certiorari. Rule 3.4(c) requires "an open refusal." *See People v. Brown*, 461 P.3d 683, 695–96 (Colo. Off. Pres. Disc. Judge 2019) ("[C]ommentators suggest that such a refusal is premised on *good faith* and *open* noncompliance in order *to test an order's*

32

*validity. . . .* [A] lawyer cannot unilaterally and surreptitiously flout a court order." (emphasis added and quotations omitted)). This permits the court to assess the attorney's arguments and allows opposing counsel an opportunity to protect his or her client. *Brown*, 461 P.3d at 696. Thus, communication is critical to invoke the exception. State appellate courts applying the rule have recognized this. *See Gilbert*, ¶¶ 30–32; *Ford*, 128 P.3d at 181. *Gilbert* additionally states "[a]n open refusal permits the district court to assess the attorney's argument and allows opposing counsel to take action to protect her client from the opposing attorney's noncompliance." *Gilbert*, ¶ 38. Knudsen recognizes the importance of communication to an attorney's open refusal; his brief quotes both *Gilbert* and *Ford* and admits Rule 3.4(c) forbids "secret, unannounced disobedience."

¶67 Furthermore, in assessing whether an attorney effectuated an open refusal under Rule 3.4(c), a court assesses the facts and circumstances of the case, not just any one action taken therein. *In re Disciplinary Proceedings Against Pangman*, 574 N.W.2d 232, 236 (Wis. 1998) (per curiam) ("[i]t was clear that he took every possible action consistent with openly disobeying those orders in the belief that they were not valid. [He] made it clear on the record in several circuit court proceedings that he did not agree with the orders, took seven appeals from those orders, brought a petition for a supervisory writ, two petitions for review, and four state and one federal habeas corpus proceedings.")

¶68 Knudsen's and his office's actions in this case, including writing pugnacious letters, show their full embrace of the critical issue of open communication. However, on September 8, 2021, (one day after denial of rehearing), McLaughlin's counsel emailed Hansen and Oestreicher asking about immediate return of materials. On September 10,

33

2021, Oestreicher responded "[w]e received your letter and I will talk to [Hansen] about it next week." McLaughlin's counsel recalled hearing from Oestreicher that a petition for writ of certiorari would be filed. Notwithstanding the lack of evidence on the vital issue of when this communication occurred, communication *to this Court* ceased after denial of the Petition for Rehearing. This stands in stark and unexplained contrast with the multiple earlier letters to this Court coupled with ongoing filings discussed above.

¶69     This Court acknowledges a petition for writ of certiorari constitutes "an[other] legal means," a challenge to the order, or "an appropriate motion." *Ford*, 128 P.3d at 182; *Head*, 332 P.3d at 132 n.125; *Levin*, 69 A.3d at 469–70. A petition for certiorari is how a litigant obtains review of a Montana Supreme Court decision. *See* 28 U.S.C. § 1257. Thus, a petition for certiorari is analogous to appealing the denial of the motion to vacate in *Smith*. *See Smith*, ¶ 20.

¶70     Seeking a stay is not necessarily required to satisfy an open refusal under Rule 3.4(c) in every case—particularly where litigation is active, ongoing, and transparent—such as when petitioning this Court for rehearing as Knudsen did here. Nevertheless, *Ford* (again a case Knudsen applies) recognizes timeliness can be an aspect of an open refusal. *Ford*, 128 P.3d at 181 (attorney first sought a stay with the Alaska Supreme Court "three weeks after he . . . placed [the subject of the order in question] beyond the reach of the Alaska courts.") M. R. App. P. 20(2)(a) gives a party fifteen days after filing of a decision to file for rehearing. But the deadline for a petition for writ of certiorari is 90 days and a justice can grant up to 60 additional days for good cause shown. Sup. Ct. R. 13.1; Sup. Ct. R. 13.5; *see also* 28 U.S.C. § 2101(c). It is neither guaranteed nor automatic that a petition

34

for writ of certiorari will be granted. *See Camreta v. Greene*, 563 U.S. 692, 709, 131 S. Ct. 2020, 2033 (2011).

¶71 Critically, the United States Supreme Court envisions a party petitioning for certiorari to seek a stay for a reasonable time of the challenged judgment or decree to enable the party to obtain a writ. *See* 28 U.S.C. § 2101(f); Sup. Ct. R. 23.

> In any case in which the final judgment or decree of any court is subject to review by the Supreme Court on writ of certiorari, the execution and enforcement of such judgment or decree may be stayed for a reasonable time to enable the party aggrieved to obtain a writ of certiorari from the Supreme Court. The stay may be granted by a judge of the court rendering the judgment or decree or by a justice of the Supreme Court . . . .

28 U.S.C. § 2101(f).

¶72 The need for a stay makes sense given the timelines—up to five months—when petitioning for a writ of certiorari. Here, this Court denied the petition for rehearing on September 7, 2021. The petition for writ of certiorari was not filed until December 6, 2021, and was not denied until March 21, 2022. Knudsen did not seek or obtain a stay of this Court's order during these months from either this Court or the United States Supreme Court. Accordingly, Knudsen and his office engaged in the "secret, unannounced disobedience" that his own brief concedes violates Rule 3.4(c). Nor was Knudsen relieved of his direct duty to comply with this Court's order because other attorneys in his office were also working on the case under his supervision. *Accord In re Weston*, 442 N.E.2d 236, 238–39 (Ill. 1982) ("An attorney cannot avoid his professional obligations . . . by the simple device of delegating work to others." (internal quotation omitted)).

¶73    Knudsen violated Rule 3.4(c) when he failed to seek a stay of this Court's order while petitioning for certiorari from the United States Supreme Court. If this Court and the United States Supreme Court denied a motion to stay, the proper course would be to comply with the order while the petition was being decided and during any potential review of our decision. *Chapman v. Pac. Tel. & Tel. Co.*, 613 F.2d 193, 197 (9th Cir. 1979) ("An attorney who believes a court order is erroneous is not relieved of the duty to obey it. The proper course of action, unless and until the order is invalidated by an appellate court, is to comply and cite the order as reversible error should an adverse judgment result."); *Fla. Bar v. Wishart*, 543 So. 2d 1250, 1252 (Fla. 1989) ("The documents are presumptively valid and he is obligated to obey them until such time as they are properly and successfully challenged."). Simply notifying the Court of Knudsen's plan to disobey an order via letter (favored by Knudsen and his office during the pendency of the *Brown* and *McLaughlin* proceedings) would be insufficient during the pendency of a petition for certiorari to constitute an open refusal.

¶74    ODC also charged the failure to return the materials as a violation of Rules 3.4(c) and 5.1(c) for ordering or allowing the attorneys in his office to not return the materials. We agree. Knudsen argues that because there was no underlying violation of Rule 3.4(c), there can be no violation of Rule 5.1(c). As discussed above, both Knudsen and the attorneys in his office violated Rule 3.4(c).

¶75    Rule 5.1(c) makes a supervisory lawyer responsible for another lawyer's violation of the M. R. Pro. Cond. if (1) the lawyer orders the conduct or ratifies or ignores the conduct with knowledge of it; or (2) "knows of the conduct at a time when its consequences can be

36

avoided or mitigated but fails to take reasonable remedial action." The issue here is whether Knudsen violated Rule 5.1 "by failing to satisfy the ethical responsibilities of a . . . supervisory lawyer in relation to *the other* supervised attorney's misconduct." *In re Anonymous Member of S.C. Bar*, 552 S.E.2d 10, 12 (S.C. 2001) (emphasis added). If he did so "by actions or omissions, that attorney violates the Rules of Professional Conduct and can be sanctioned completely separate from any sanction issued for the underlying actions or omissions of the supervised attorney." *In re Anonymous Member of S.C. Bar*, 552 S.E.2d at 12. The record shows Oestreicher merely notified McLaughlin's counsel that a petition for certiorari would be filed and took no other action seeking a stay of this Court's order for several months. Knudsen admitted he was aware of Oestreicher's omission. "Once [the supervising attorney is] on notice[12] of another attorney's misconduct, [Rule 5.1(c)] imposes a clear duty to take remedial measures to avoid or mitigate the consequences of that behavior." *In re Anonymous Member of S.C. Bar*, 552 S.E.2d at 13.

¶76   It is undisputed Knudsen knew about and did not take remedial measures to avoid or mitigate Oestreicher's misconduct. As Oestreicher's supervisor, Knudsen had an independent duty to avoid or mitigate this misconduct, which he failed to do. Knudsen's omission was an independent violation of Rule 5.1(c).

---

[12] Importantly for our separation of powers analysis above, Rule 5.1(c) has guardrails on it so the rule cannot be weaponized as a harassment tool against the Attorney General for any potential misconduct of his employees. As discussed above, the Attorney General supervises more lawyers than any other lawyer in the state. It is unlikely he is aware of every act or omission taken by every attorney under his supervision. As such, Rule 5.1(c) requires ODC to prove Knudsen (1) ordered or, with knowledge of the specific conduct violating the M. R. Pro. Cond., (2) ratified or ignored the conduct, or (3) knew of the conduct at a time when its consequences could still be avoided or mitigated but failed to take reasonable remedial action.

## II.  Rule 3.4(c) and the Oath of Attorney

¶77    ODC charged Knudsen with multiple counts of violating his oath as an attorney. Counts 1, 3, 7, 10, 12, 15, 19, 21, 25, 29, and 33 each alleges a violation of Rule 3.4(c). ODC asks us to affirm the Commission's finding that Knudsen violated his oath under Rule 3.4(c).  But it is not at all clear from the Findings, Conclusions, and Recommendation that the Commission made a finding that Knudsen's Rule 3.4(c) violation was due to a violation of his oath as an attorney.  Instead, our review of the Commission's Findings of Fact and Conclusions of Law convinces us the Rule 3.4(c) violation was due to Knudsen's failure to obey this Court's order to return the subpoena material, as discussed above.

¶78    ODC cites no caselaw supporting the proposition a Rule 3.4(c) violation can be grounded only in violation of an attorney's oath.  Some of ODC's quoted caselaw such as *In re Jordan*, 518 P.3d 1203, 1225 (Kan. 2022), *Cleveland Metro. Bar Ass'n v. Donchatz*, 2017 Ohio 2793, ¶ 16–20, 80 N.E.3d, and *In re Snyder*, 472 U.S. 634, 644–45, 105 S. Ct. 2874, 2881 (1985), does not reference an oath of attorney as a basis to find a violation of Rule 3.4(c).  ODC also quotes, *inter alia*, *Jacobson v. Garaas* (*In re Garaas*), 2002 ND 181, ¶ 28, 652 N.W.2d 918 (N.D. 2002) (per curiam), and *In re Coe*, 903 S.W.2d 916, 917 (Mo. 1995) (en banc).  Along with not referencing an oath, *In re Garaas* regards violations of Rules of Professional Conduct 3.5(a), 3.5(b), 4.4, and 8.4(e) as well as a North Dakota Rule of Lawyer Discipline.  *In re Garaas*, ¶ 9.  *In re Coe* likewise does not analyze or apply the Missouri oath of attorney and analyzes Rule 3.5(c).  *See In re Coe,*  903 S.W.2d at 916. These are not rules Knudsen is charged with violating.

¶79     We decline to provide arguments for ODC, and we decline to affirm a Commission recommendation or finding it did not actually make.  We do not find a Rule 3.4(c) oath violation by Knudsen.

**III. ODC Did Not Prove any Rule 8.2(a) Violations**

¶80     Rule 8.2(a) states "[a] lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office."  ODC argues the Commission generally found the following statements of Knudsen or the attorneys in his office violated Rule 8.2(a), as indicated by ODC added italics to the offending portions:

In the April 12, 2021 Letter

- "[T]he Legislature will not entertain the Court's interference in the Legislature's investigation of the *serious and troubling conduct of members of the Judiciary*."

In the April 30, 2021 Motion to Disqualify

- "Members of this Court have an obligation to promote confidence in the independence, integrity, or impartiality of the judiciary, see MCJC 1.2, *but these actions do precisely the opposite*."

- "This matter has arisen because *evidence of judicial misconduct has come to public light*."

- "*The self-interest is so apparent, any attempt by this Court to decide the question runs afoul of state law and the MCJC*."

- "*We are well beyond the point where the Court's impartiality and independence might 'reasonably be questioned.'  This is not merely the appearance of impropriety. This is actual impropriety*."

In the May 19, 2021 Letter

- "[M]uch can be said about *the impropriety of the Court*, the State's highest disciplinary authority, bandying such warnings under circumstances like this."

- "That statement is *inaccurate almost to a word*."

- "*It assumes facts and ascribes malintent so brazenly, it betrays a self-admission that the Court's posture in this matter is adversarial—not adjudicatory*."

In the August 11, 2021 Petition for Rehearing

- "*Simply ignoring why we're here doesn't change why we're here—questionable judicial conduct*."

- "*That is a stunning, counterfactual denial*."

- "[*T*]*he Opinion contains numerous misstatements . . . .*"

In the December 6, 2021 Petition for Writ of Certiorari

- "It [the Montana Supreme Court] reached out to facilitate a case brought by its appointee *to conceal its misbehavior*."

- "[Referencing *McLaughlin*, ¶¶ 9, 11], 'In addition to *being untrue*, these statements—a panegyric to insincerity—came after the nonparty Justices stayed their own subpoenas.'"

- "From the first, the six *McLaughlin Justices determined to pilot this dispute to their desired outcome*."

- "They [the six *McLaughlin* Justices] charged ahead, ensuring a result that bailed themselves out of an investigation prompted *by their own inappropriate behavior*."

- "It permitted them [the Montana Supreme Court] to resolve the legal question of legislative subpoena power, and by emasculating that power, *to conceal judicial branch misbehavior* from the light of day."

¶81    ODC failed to prove, and the Commission failed to find, these statements were factually incorrect.  ODC instead focused on whether the statements were insulting,

40

demeaning, inflammatory, etc. to the Justices or to the Court. But statements about a judge may be simultaneously true and insulting, demeaning, or inflammatory. The violation occurs when the attorney/speaker issues statements that are false and he either had knowledge of their falsity or made them with reckless disregard for the truth or falsity thereof. Because the Commission did not find the statements were false, it failed to issue a legally or supportable finding of violation.

### A. *Yagman* and Implied False Assertions of Fact

¶82 ODC argues Rule 8.2(a) covers Knudsen's and his office's accusations "because they imply a false assertion of *fact*." (Emphasis in original.) ODC quotes *Iowa Sup. Ct. Att'y Discipline Bd. v. Weaver*, to support its position that the statements warrant discipline, "a *specific* statement about *specific* wrongdoing by the judge, capable of being proved true or false" is not an opinion. 750 N.W.2d 71, 86 (Iowa 2008) (emphasis in original). In rebuttal, Knudsen contends ODC improperly seeks to discipline him for mere opinions. This inquiry, whether the statements imply false factual assertions, is step one to determine whether discipline is appropriate.

¶83 *Standing Comm. on Discipline v. Yagman* is the lodestar in analyzing the application of Rule 8.2(a) to implied false factual assertions. 55 F.3d 1430, 1438 (9th Cir. 1995) [hereinafter *Yagman*]; *see also Idaho State Bar v. Topp*, 925 P.2d 1113, 1115 (Idaho 1996); *Weaver*, 750 N.W.2d at 85–86. *Yagman* regards attorney Stephen Yagman's suspension for statements he made about federal district court Judge William Keller. *Yagman*, 55 F.3d at 1434–35, 1440. In *Yagman*, Local Rule 2.5.2 prohibited attorneys "from engaging in

41

any conduct that 'degrades or impugns the integrity of the Court.'" *Yagman*, 55 F.3d at 1436. This Rule is comparable to Montana's Rule 8.2(a).

¶84 The following statements by Yagman were alleged as violations of the Rule: (1) "Judge Keller 'has a penchant for sanctioning Jewish lawyers: me, David Kenner[,] and Hugh Manes. I find this to be evidence of anti-semitism.'"; (2) "Judge Keller was 'drunk on the bench.'"; and (3) "Judge Keller was 'dishonest.'" *Yagman*, 55 F.3d at 1434, 1440.

¶85 In analyzing whether the statements justified discipline, the Ninth Circuit applied the standards of *United States District Court v. Sandlin*, 12 F.3d 861, 864, 867 (9th Cir. 1993), which incorporated the objective standard from *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710 (1964). *Yagman*, 55 F.3d at 1437–38. Accordingly, the Ninth Circuit affirmed Local Rule 2.5.2 "prohibit[s] only false statements made with either knowledge of their falsity or with reckless disregard as to their truth or falsity, judged from the standpoint of a 'reasonable attorney.'" *Yagman*, 55 F.3d at 1437. This Court, citing *Sandlin*, has similarly instructed "[t]he standard to be applied regarding Rule 8.2(a) is . . . an objective standard: what a reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances." *In re Miller*, No. PR 18-0139, Order (Mont. Nov. 20, 2019) (citing *Sandlin*, 12 F.3d at 867).

¶86 Continuing, the Ninth Circuit found, "[s]tatements impugning the integrity of a judge may not be punished unless they are capable of being proved true or false; statements of opinion are protected by the First Amendment unless they 'imply a false assertion of fact.'" *Yagman*, 55 F.3d at 1438. *Yagman's* example of an implied false statement of fact—from the Restatement (Second) of Torts § 566, cmt. c, illus. iii—is stating someone

42

is an alcoholic without also stating the basis for the statement. *Yagman*, 55 F.3d at 1439.

While not in the context of attorney discipline, this Court has also applied § 566 of the

Restatement (Second) of Torts and cmt. c. and determined whether "the statement implied

a knowledge of facts far beyond those disclosed." *Hale v. City of Billings*, 1999 MT 213,

¶¶ 27–28, 295 Mont. 495, 986 P.2d 413.

¶87     In contrast, '"[a]n opinion which is unfounded reveals its lack of merit when the

opinion-holder discloses the factual basis for the idea'; readers are free to accept or reject

the author's opinion based on their own independent evaluation of the facts." *Yagman*,

55 F.3d at 1439 (quoting *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985)).

*See also Hale*, ¶ 29 (stating a factual basis for the statement in question that would have

precluded a defamation claim); *Sapper v. Sapper*, 951 A.2d 5, 8 n.3 (Conn. App. Ct. 2008)

("Raising a claim of bias on the part of a judge against a particular party is a serious

business and should not be undertaken without a sound basis in the record.").

¶88     In applying these principles to the challenged statements in *Yagman*, the Ninth

Circuit first examined the charge of antisemitism. *Yagman*, 55 F.3d at 1438. Disagreeing

with the district court, the Ninth Circuit found "the statement contains both an assertion of

fact and an expression of opinion." *Yagman*, 55 F.3d at 1438. "Yagman's claim that he,

Kenner and Manes are all Jewish and were sanctioned by Judge Keller is clearly a factual

assertion . . . . had the Standing Committee proved that Yagman, Kenner or Manes were

not sanctioned by Judge Keller, or were not Jewish, this assertion might have formed the

basis for discipline." *Yagman*, 55 F.3d at 1438. Where the statement of opinion is based

upon fully disclosed facts, the statement may be punished "only if the stated facts are

43

themselves false and demeaning." *Yagman*, 55 F.3d at 1439; *see also Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998); *Goguen v. NYP Holdings, Inc.*, 2024 MT 47, ¶ 57, 415 Mont. 356, 544 P.3d 868 ("If an opinion is based on expressly stated facts, then it can only be defamatory if the facts themselves are false and defamatory.").

¶89     In *Yagman*, the Standing Committee's and the district court's lack of factual analysis precluded the Ninth Circuit from determining whether the factual assertions were actually false. "The committee, however, didn't claim that Yagman's factual assertion was false, and the district court made no finding to that effect. We proceed, therefore, on the assumption that this portion of Yagman's statement is true." *Yagman*, 55 F.3d at 1438. *See also Biospherics*, 151 F.3d at 185 ("[I]ndeed, these three sentences state the factual basis for the entire article and Biospherics does not challenge their accuracy."); *Lee v. Traxler*, 2016 MT 292, ¶ 26, 385 Mont. 354, 384 P.3d 82 ("Appellants do not contest the facts relating to what occurred at the Rest Area, nor do they contest that the conduct at issue occurred while they were at the Rest Area.").

¶90     The Ninth Circuit pointed out the statements regarding the three lawyers' prior discipline and Jewish identity, taken as true, formed a basis for the opinion's declaration of antisemitism. *Yagman*, 55 F.3d at 1440. The Court additionally observed the attorney's accusation "did not imply the existence of additional, undisclosed facts [and] was carefully phrased" to tell the audience it was "an inference drawn from the facts specified." *Yagman*, 55 F.3d at 1440; *see also Biospherics*, 151 F.3d at 185–86 (the words chosen can convey the communicator is interpreting fact which triggers application of the implied statement of fact framework to analyze the statement); *Young v. Wilham*, 406 P.3d 988, 997 (N.M.

44

Ct. App. 2017) (citing 1 Robert D. Sack, Sack on Defamation § 4:3.2 at 4–52 (4th ed. 2016)) ("[P]ublication of the predicate facts upon which the writer's subjective surmise is based transforms what may otherwise be an allegation of defamatory fact into nothing more than the writer's pure opinion with which the reader is free to agree or disagree."). Therefore, the Ninth Circuit found this statement was not subject to discipline. *Yagman*, 55 F.3d at 1440.

¶91 Like the charge of antisemitism, the Ninth Circuit similarly found Yagman's claim that "Judge Keller was 'drunk on the bench'" could serve as the basis for discipline. *Yagman*, 55 F.3d at 1441. The Ninth Circuit explained the claim was unquestionably fact based and could be proven true or false. *Yagman*, 55 F.3d at 1441. The claim "implie[d] actual facts that are capable of objective verification." *Yagman*, 55 F.3d at 1441. Once again though, the Ninth Circuit found sanctions were not warranted, because the Standing Committee failed to prove the statement was false. *Yagman*, 55 F.3d at 1441–42.

¶92 Like *Yagman*, this case has a similar lack of critical fact-finding. The Commission's findings and conclusions merely recite what Knudsen or the attorneys in his office said without ascertaining whether the factual basis for any of those statements was false. Applying *Yagman*, this Court does not litigate actual falsity. That was for the Commission to do. The question for this Court is whether the factual basis for the challenged statements was sufficiently communicated to enable the reader's independent evaluation of the facts, empowering the reader to evaluate the merit of the speaker's opinion statements. This Court's independent review of the statements—in context of the record—shows each is a constitutionally protected opinion due to a sufficiently stated factual basis, which ODC

failed to prove false. Since ODC failed to prove the statements false, we need not address whether Knudsen or his attorneys made the statements knowing they were false, or with reckless disregard for the truth or falsity thereof. Rule 8.2(a).

¶93 Furthermore, to determine whether an implied false assertion of fact violates Rule 8.2(a), the factfinder must review the entirety of the litigation (not just the portion of the communication alleged to violate the Rule) to determine whether its factual basis was also communicated to the listener thereby enabling an independent evaluation. Communication does not exist in a vacuum. ODC does not explain, for any of the communications alleged to violate Rule 8.2(a), why the factual basis therein is insufficient, nor does it identify what needed to be in the factual basis but was missing.

¶94 As stated above, ODC charged as a Rule 8.2(a) violation, the April 12, 2021 letter stating, "[t]he Legislature will not entertain the Court's interference in the Legislature's investigation of the *serious and troubling conduct of members of the Judiciary*." (Emphasis in original.) The letter states a sufficient factual basis by identifying the conduct: "delet[ion of] public records and information in violation of state law and policy . . . and whether current policies and processes of the Judicial Standards Commission are sufficient to address the serious nature of polling members of the Judiciary to prejudge . . . [matters] before" deciding them. The Commission failed to explain why those claimed factual bases are false.

¶95 A representative statement[13] in the April 30, 2021 Motion to Disqualify is "[m]embers of this Court have an obligation to promote confidence in the independence, integrity, or impartiality of the judiciary, see MCJC 1.2, *but these actions do precisely the opposite.*" (Emphasis in original.) The April 30, 2021 Motion to Disqualify sufficiently states its factual basis to enable independent evaluation thereof. The motion states "Administrator McLaughlin—who was appointed by *this Court* . . . who performs duties assigned by this Court, and who serves at the pleasure of *this Court*—filed this Petition to prevent the production of *this Court's* public records." (Emphasis in original; footnote omitted.) Referencing *Brown v. Gianforte*, No. OP 21-0125, Order (Mont. Apr. 11, 2021) the motion also states, "the Court granted an unnoticed motion to McLaughlin over a weekend, when neither she nor the entity she sought to enjoin—the Legislature—were yet parties to the action" and stated this necessarily involved communications that the motion characterized as ex parte. Additionally, the motion informs the reader: "All Supreme Court Justices, save Justice James Rice, ruled on Legislative *subpoenas issued to the Justices themselves.*" (Emphasis in original.) Except for the fact that Justice Beth Baker did not rule on the legislative subpoenas, these factual bases are true, based upon the record and this Court's prior rulings in *Brown* and *McLaughlin*. We fail to understand why Knudsen should be punished for sharp opinions based on sufficiently recited facts criticizing the Court's conduct.

---

[13] For brevity, where the factual basis applies to multiple statements in one document alleged as Rule 8.2(a) violations, we quote a representative statement from the document, rather than reciting all statements.

¶96    As stated above, ODC charged as a Rule 8.2(a) violation, the May 19, 2021 letter stating "[m]uch can be said about the *impropriety of the Court*, the State's highest disciplinary authority, bandying such warnings under circumstances like this." (Emphasis in original.)  The sufficient factual basis for this statement was the letter identifying the impropriety, the Court stating Hansen's and Oestreicher's representations "disrupt[ed] the Court's functioning as a tribunal and the administration of justice," and the letter identifying the circumstances, i.e., when these attorneys were representing the Legislature "in an unprecedented and contentious separation of powers dispute."  Accusing this Court of impropriety is a serious allegation.  One would think it would not be difficult for the Commission to explain why this statement was false based upon the factual basis for the opinion.  But it failed to do so.

¶97    ODC charged a footnote in the May 19, 2021 letter describing a portion of this Court's May 15, 2021 Order Denying the Legislature's Motion to Disqualify as "inaccurate almost to a word . . . [and] assumes facts and ascribes malintent so brazenly" that it admits this Court is adversarial.  However, the footnote was responding to the Court's opinion below:

> The Legislature's blanket request to disqualify all members of this Court appears directed to disrupt the normal process of a tribunal whose function is to adjudicate the underlying dispute consistent with the law, the constitution, and due process.

The challenged statements are Knudsen's opinion responding in strong opposition to the Court's inference of impropriety.  *Yagman* and *Biospherics* instruct inferences from facts are not disciplinable if the audience can comprehend the speaker is making an inference.

48

ODC has failed to show the underlying facts are false. Therefore, the footnote cannot violate Rule 8.2(a).

¶98 A representative statement in the May 26, 2021 Petition for Rehearing charged as a Rule 8.2(a) violation is "*the Justices are institutionally and personally interested in the outcome, so their ability to be impartial is justifiably suspect.*" (Emphasis in original.) The May 26, 2021 Petition also suffices to inform the reader of its factual basis to enable independent evaluation thereof. The petition not only references *McLaughlin*, the subpoenas, and their purpose but also states "the Court sua sponte quashed the Justices' individual subpoenas issued to the members of the Court. . . . The Court cannot reach outside this case, stay its own subpoenas, and then argue that this case doesn't involve those subpoenas." The petition additionally states "[t]he Legislature has repeatedly stated that the Court's failure to disclose and produce ex parte communications between the justices and the Court Administrator demonstrates actual bias. And the Chief Justice's emails betray a disdain for the Legislature that amounts to actual bias." The petition attached the emails. This is again a troubling accusation against the Court, but some of it has been deemed accurate by our *Brown* and *McLaughlin* rulings, and its ruling on the Rule of Necessity, which admits a conflict for all Justices. *McLaughlin 5/12/21*, ¶¶ 15–16. The statement that the Court has failed to disclose any ex parte communications between McLaughlin and the Justices asserts the existence of undisclosed communications which have never been proven to exist. However, ODC failed to prove why this is a violation by establishing no ex parte communication occurred, and by further proving reckless disregard for the truth or falsity of the statement if it was in fact false. The statement characterizing

49

the Chief Justice's email is an opinion drawn from the disclosed email itself. ODC has failed to convince us any of these are violations because either ODC failed to prove the facts were incorrect or they were statements of opinion.

¶99 ODC alleged as a Rule 8.2(a) violation the August 11, 2021 Petition for Rehearing characterizing a statement of this Court "*is a stunning, counterfactual denial.*" (Emphasis in original.) The petition quotes the statement of this Court: "'[N]either has the Legislature explained how the practice of responding to Montana Judges Association polls could suggest partiality for or against any given party or a lack of open-mindedness by district court judges.'" *McLaughlin 7/14/21*, ¶ 45. The petition references Judge Krueger's recusal, the emails, that deleted emails contained prejudicial statements, and—to support deletion—the petition cites the Initial Report of the Montana Legislature's Joint Select Committee on Judicial Accountability and Transparency.

¶100 Knudsen moved to admit this report as evidence likely probative to the issue of whether his statements were factually correct. However, the Commission could not have examined this report in making its findings, conclusions, and recommendation because it sustained ODC's objection to admittance of the report. That exclusion of Knudsen's offered evidence excluded part of the factual basis for an implied factual statement, thereby undermining ODC's ability to prove the rule violation.

¶101 ODC also charged as a Rule 8.2(a) violation the August 11, 2021 Petition for Rehearing stating, "[t]he Opinion contains numerous misstatements . . . ." The Petition quotes *McLaughlin 7/14/21*, ¶ 27, and page 19 of the Initial Report. The petition also quotes *McLaughlin 7/14/21*, ¶ 51, and then states "*but see McLaughlin*, ¶ 3." The petition

identifying the statements from the opinion and providing two citations enables the reader to make his or her own comparison to determine whether, and to what extent, misstatement occurred. The end of that same paragraph states the contested statements are what is numerous (and by implication undisclosed): "This isn't an exhaustive list of the Opinion's contested statements of fact." The Commission therefore had a clear roadmap of examining each alleged misstatement to determine whether in fact they were factual or false. The Commission failed to do so and therefore cannot credibly find a violation for these statements.

¶102 ODC alleged as a Rule 8.2(a) violation the following representative statement in the December 6, 2021 Petition for Writ of Certiorari: "[t]hey [the six *McLaughlin* Justices] charged ahead, ensuring a result that bailed themselves out of an investigation prompted *by their own inappropriate behavior*." The petition spends nearly 17 pages exhaustively and in detail recounting the facts and procedural history of *McLaughlin*, McLaughlin's relationship with the Montana Supreme Court, and the actions and statements of the Montana Supreme Court and individual Justices.

¶103 Moreover, the petition's Appendix is comprehensive and includes *inter alia* the opinions and orders of the Montana Supreme Court, the motion to disqualify the Justices, the petitions for rehearing, the motion to disqualify Judge Kurt Krueger, the emergency Motions to quash subpoenas, the Initial Report referenced herein, the Legislature's subpoenas, and the emails. It defies credulity that a reader could read the entire Petition and all documents attached in the Appendix and conclude the author's statements were based on facts the author knew and did not disclose. *See also In re Dixon*, 994 N.E.2d

51

1129, 1139 (Ind. 2013) (per curiam) (while not referencing *Yagman* or disclosure of the factual basis, in explaining why other statements to support a motion for change of judge did not violate Rule 8.2(a), the court stated *inter alia* the attorney supported his argument "with a lengthy recitation of facts, in documents totaling 40 pages in length.").

¶104 We do not affirm the Commission's finding that Knudsen violated Rule 8.2(a). Any such finding requires the Commission to prove the statement was false or made with reckless disregard for truth or falsity. Where the statement is an opinion based upon disclosed factual and not hidden assertions, that opinion is protected speech unless the Commission finds the factual bases for the opinion are false. The Commission failed to undertake that examination and therefore did not, and could not, prove Knudsen violated Rule 8.2(a) by the numerous statements in this case.

B. Beyond the *Yagman* implied statement of fact issues and related deficiencies of the Commission's Findings of Fact and Conclusions of Law, the statements ODC charged as Rule 8.2(a) violations are not subject to discipline on additional grounds

i.   *Some of the statements are hyperbole*

¶105 *Yagman's* analysis of the claim "Judge Keller was 'dishonest'" is another reason many of Knudsen's challenged statements cannot violate Rule 8.2(a). The Ninth Circuit found this claim constituted "rhetorical hyperbole, [was] incapable of being proved true or false," and thus could not be the subject of discipline. *Yagman*, 55 F.3d at 1440–41. We agree with Knudsen's contention that some of the challenged statements cannot violate Rule 8.2(a) because they are hyperbole.

¶106 Applying United States Supreme Court precedent, *Yagman* earlier states the words "traitor" and "blackmail" are examples of hyperbole. *Yagman*, 55 F.3d at 1438. While not

52

in the context of attorney discipline, this Court has similarly stated it was hyperbole to describe testimony as "perjured." *Gratzer v. State*, 2003 MT 169, ¶ 13, 316 Mont. 335, 71 P.3d 1221; *see also In re Green*, 11 P.3d 1078, 1084 (Colo. 2000) (en banc) (per curiam) ("[F]or example, if an attorney criticizes a judge's ruling by saying it was 'incoherent,' he may not be sanctioned."); *Weaver*, 750 N.W.2d at 90 (accusing a court of improper balancing of interests would receive constitutional protection); *McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) ("The lack of precision [in the meaning of 'scam'] makes the assertion 'X is a scam' incapable of being proven true or false."); *McConkey v. Flathead Elec. Coop.*, 2005 MT 334, ¶ 48, 330 Mont. 48, 125 P.3d 1121 (While not in the context of attorney discipline, "[s]tatements such as '[m]anagement has led the co-op . . . into one hell of a mess' are hyperbolic . . . .").

¶107 "[S]erious and troubling," "impropriety," "questionable," "unprecedented," and "inaccurate" have meanings that heavily depend on the perspective of the person evaluating the term. What is serious and troubling or questionable to one person can be trivial and inconsequential to another person. Similarly, what is improper or inaccurate to one can be perfectly acceptable to another. Relatedly, generally referencing judicial misconduct, judicial misbehavior, or inappropriate judicial behavior is hyperbole. Some may define those terms as any deviation from the highest ideals. Others may define those terms as significant departure from minimum standards. Reference to Maslow's hammer does not convey a factual assertion. The phrase cannot be taken literally. At most, the reference is a colorful paraphrase of the term single-minded which does not impugn integrity. None of these statements violate Rule 8.2(a).

53

*ii. Other statements either argue error or apply the elements of disqualification to the specific facts of the case to support disqualification*

¶108 "Of course, contentions that adjudicatory bodies acted illegally are the staple of appellate briefs, and cannot without more constitute ethical violations." *Berry v. Schmitt*, 688 F.3d 290, 304 (6th Cir. 2012). We acknowledge some of the statements charged as Rule 8.2(a) violations go beyond just arguing illegal action. Both parties reference *U.S. v. Cooper*, 872 F.2d 1, 3–4 (1st Cir. 1989). "[A]n attorney [may not] seek refuge within his own First Amendment right of free speech to fill a courtroom with a litany of speculative accusations and insults which raise doubts as to a judge's impartiality." *Cooper*, 872 F.2d at 3. Knudsen recognizes that even when an attorney's goal is disqualifying the adjudicator, insults and *ad hominem* attacks have no place and will violate Rule 8.2(a).

¶109 Nevertheless, this Court agrees with the First Circuit that a statement's setting is vital to applying Rule 8.2. *See Cooper*, 872 F.2d at 3–4; *see also Yagman*, 55 F.3d at 1437 (Washington's Rule 8.2 "consider[s] th[e] nature [of the attorney's statements] and the context in which they were made."); *Att'y Grievance Comm'n of Md. v. Dyer*, 162 A.3d 970, 1023 (Md. 2017) ("Respondents' statements were based on the circumstances of the underlying litigation, and their assessment that the consolidation of the cases had resulted in the closure of their individual cases.").

¶110 Here, Knudsen was contesting this Court presiding over an issue that implicated the separation of powers. The United States Supreme Court and this Court have explained the vital importance of separation of powers. "The Framers of the Federal Constitution . . . viewed the principle of separation of powers as the absolutely central guarantee of a just

Government." *United States v. Munoz-Flores*, 495 U.S. 385, 394, 110 S. Ct. 1964, 1970 (1990) (quoting *Morrison v. Olson*, 497 U.S. 654, 698, 108 S. Ct. 2597, 2622 (1988)). "The ultimate purpose of this separation of powers is to protect the liberty and security of the governed." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252, 272, 111 S. Ct. 2298, 2310 (1991) (superseded by statute on other grounds). This Court has "consistently held for over a century that the Montana conception of separation of powers 'is designed to prevent a single branch from claiming or receiving inordinate power . . . .'" *O'Neill v. Gianforte*, 2025 MT 2, ¶ 16, 420 Mont. 125, 561 P.3d 1018 (quoting caselaw dating back to 1913). "[S]eparation of powers is fundamental to the existence of a constitutional government." *Seubert v. Seubert*, 2000 MT 241, ¶ 34, 301 Mont. 382, 13 P.3d 365; *see also State ex rel. Morales v. City Comm'n of Helena*, 174 Mont. 237, 240–41, 570 P.2d 887, 889 (1977) (partially superseded by statute on other grounds) (Separation of powers "prevent[s] the tyranny and oppression which would be the inevitable result of a lodgment of all power in the hands of one body.") (quoting precedent evaluating the 1889 Montana Constitution).

¶111    Reinforcing this, "[a] motion to recuse a trial judge is inherently offensive to the sitting judge because it requires the moving party to allege and substantiate bias and prejudice—traits contrary to the impartiality expected from a mortal cloaked in judicial robe." *Cooper*, 872 F.2d at 3–4 (footnote omitted); *see also Holt v. Virginia*, 381 U.S. 131, 137, 85 S. Ct. 1375, 1378 (1965) ("[I]f the charges were 'insulting' it was inherent in the issue of bias raised . . . ."). "Attorneys should be free to challenge, in appropriate legal proceedings, a court's perceived partiality without the court misconstruing such a challenge

55

as an assault on the integrity of the court." *United States v. Brown*, 72 F.3d 25, 29 (5th Cir. 1995).  Furthermore, even when the issue did not involve seeking disqualification or raising judicial partiality or bias, in explaining why an attorney's criticism of a judge was not constitutionally protected, the Iowa Supreme Court stated he "did not simply disagree with [the] Judge['s] reasoning or factual premises or argue [his] decision was inconsistent with precedent . . . or was contrary to history, tradition, and common sense."  *Weaver*, 750 N.W.2d at 90.

¶112  In Montana, disqualification requires "actual evidence of bias, prejudice, or unethical conduct on the part of any justice or judge sitting on this case." *Reichert v. State*, 2012 MT 111, ¶ 50, 365 Mont. 92, 278 P.3d 455.  "[A]n 'interest' necessary to disqualify a judge must be a present pecuniary interest in the result, or actual bias or prejudice, and not some indirect, remote, speculative, theoretical or possible interest."  *Reichert*, ¶ 46 (citing cases); *see also State v. Gleed*, 220 Mont. 56, 60, 713 P.2d 543, 545 (1986) (conclusory arguments do not establish judicial bias warranting disqualification). Therefore, a party in Montana cannot prevail on a disqualification motion without raising uncomfortable, specific issues involving an adjudicator.

¶113  The purpose of disqualification is to assure "a litigant's constitutional right to a fair and impartial tribunal."  *Draggin' Y Cattle Co. v. Junkermier*, 2017 MT 125, ¶ 36, 387 Mont. 430, 395 P.3d 497.  M. R. Pro. Cond. 1.2 is an example of a "rul[e] and standar[d] meant to ensure that parties have their cases decided by an impartial judge." *Draggin' Y Cattle Co.*, ¶ 35.  M. C. Jud. Cond. 1.2 cmt. 5 states "[a]ctual improprieties include violations of law, court rules, or provisions of this Code."  Therefore, several of

the statements alleged as Rule 8.2(a) violations that are not hyperbole involve applying the standard to disqualify an adjudicator to the specific facts of the case to advocate for disqualification.

¶114  We acknowledge the charged statements are pointed.  Nevertheless, even regarding summary criminal contempt of court, a lawyer's vehement language is not decisive. *See In re McConnell*, 370 U.S. 230, 236, 82 S. Ct. 1288, 1293 (1962) ("The arguments of a lawyer in presenting his client's case strenuously and persistently cannot amount to a contempt of court so long as the lawyer does not in some way create an obstruction which blocks the judge in the performance of his judicial duty.").  Compounding this point, terseness does not redefine advocacy to support disqualification.  *In re Dixon*, 994 N.E.2d 1129 (Ind. 2013) (per curiam), is persuasive.  Like Montana, Indiana attorneys must aver "the facts and the reasons for" believing the judge is personally biased or prejudiced to change the adjudicator.  *See In re Dixon*, 994 N.E.2d at 1137 (emphasis omitted) (quoting Ind. R. Crim. P. 12(B) (2013)).  In *In re Dixon*, the attorney made the following statement in the Motion to Change Judge:

> Judge Manier's inability to admit the intellectual and political (in the sense of policy setting) consanguinity between her husband's career mission and Notre Dame's current mission, *calls into profound question her ability to navigate the waters of defendants' legal defenses* related to their contractual rights to be where they were when they were arrested.

*In re Dixon*, 994 N.E.2d at 1132–33, 1139 (emphasis in original).  This statement is pointed.  Nevertheless, the statement did not violate Indiana's Rule 8.2(a) because the statement related to the attorney's burden to achieve disqualification.  *In re Dixon*, 994 N.E.2d at 1139.

57

¶115 This principle applies a fortiori to the statements in the Petition for Writ of Certiorari charged as Rule 8.2(a) violations. Sup. Ct. R. 10 provides guidance on when it will grant a petition for writ. Since the Montana Supreme Court is a state court, to establish the disqualification issue in the Petition, Rule 10 required Knudsen to identify "an important federal question." The United States Supreme Court does not resolve questions only involving state law even if a party requests. *See Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 586 U.S. 347, 357, 139 S. Ct. 1000, 1010 (2019) ("[The United States Supreme] Court is bound by the Washington Supreme Court's interpretation of Washington law."). Also, showing the lower court erred often is insufficient for grant of certiorari. *See Halbert v. Michigan*, 545 U.S. 605, 618–19, 125 S. Ct. 2582, 2591 (2005) (comparing Rule 10 to a state's highest court "not [sitting] to correct errors in individual cases, but to decide matters of larger public import"); *Ross v. Moffitt*, 417 U.S. 600, 617, 94 S. Ct. 2437, 2447 (1974) (Certiorari "is discretionary and depends on numerous factors other than the perceived correctness of the judgment we are asked to review.").

¶116 The principle Knudsen chose to identify in the Petition for Writ of Certiorari as the important federal question is the United States Supreme Court's rule "that no man may be a judge in his own cause." *Walker v. Birmingham*, 388 U.S. 307, 320, 87 S. Ct. 1824, 1832 (1967). To apply the rule, it was necessary for the petition to provide specific facts regarding the personal involvement of the *McLaughlin* justices with the subpoenas and the resulting litigation. Moreover, the United States Supreme Court applied the idea no one can judge their own case in *Caperton v. A. T. Massey Coal Co.*, which reversed the West Virginia Supreme Court, overturning a $50 million jury verdict because a justice did not

recuse himself.  556 U.S. 868, 880, 888–90 129 S. Ct. 2252, 2261, 2266–67 (2009).  Since the statements that were not hyperbole either argue for error or apply the elements of disqualification to the specific facts of the case to support disqualification, the statements did not violate M. R. Pro. Cond. 8.2(a).

## IV. Knudsen did not violate Rule 8.4(d)

### A. Prejudice to an identifiable proceeding is an element of a Rule 8.4(d) violation

¶117   Rule 8.4(d) states "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice."  Knudsen contends he did not violate this rule because the "Commission did not attempt to explain how [his] conduct in any single count, much less all thirteen counts, had a 'nexus' to a tangible 'adverse effect' on ongoing proceedings."  ODC counters "such a nexus can also be established by conduct that injures or harms the justice system more generally."

¶118   "In order to establish a violation of [Rule 8.4(d)], . . . ODC must demonstrate some nexus between Olson's conduct and an adverse effect upon the administration of justice." *In re Olson*, 2009 MT 455, ¶ 32, 354 Mont. 358, 222 P.3d 632 (citing *People v. Jaramillo*, 35 P.3d 723, 731 (Colo. Off. Pres. Disc. Judge 2001)).  "The Commission determined that Olson's conduct had no adverse effect on the administration of justice, and did not affect the federal case against the Mortensons." *In re Olson*, ¶ 22.  This is language referencing harm to a specific proceeding, not harm to the justice system generally.

¶119   Also, *In re Olson's* citation to *Jaramillo* is crucial.  *Jaramillo* cites caselaw referencing prejudice to a specific case, i.e., "delayed and altered the course of court proceedings concerning an income assignment" and "a direct disruption of pending

59

proceedings." *Jaramillo*, 35 P.3d at 731. This Court has previously required a causal nexus of harm to a specific case. *See In re Morin*, No. PR 17-0448, Order (Mont. Feb. 26, 2019). Morin's conduct was an attorney enlisting another attorney "to obtain access to J.A.L. and gain representation of [her] via subterfuge and manipulation, while [the attorney] knew" she already had representation. *In re Morin*, No. PR 17-0448, Order (Mont. Feb. 26, 2019).

¶120   ODC cites numerous cases to support its "harm to the justice system . . . generally" position; however, most of these cases instead support Knudsen's position. ODC quotes *Matter of Keiler*, 380 A.2d 119, 126 (D.C. Ct. App. 1977) (per curiam) (overruled on the issue of sanctions), and *State v. Nelson*, 504 P.2d 211, 214 (Kan. 1972) (per curiam), to support its argument Rule 8.4(d) is not void for vagueness. The conduct in *Matter of Keiler* undeniably prejudiced a specific proceeding. *Matter of Keiler* instructs "harm results to the administration of justice when the conduct of a judicial or quasi-judicial proceeding is such as to render that proceeding a bogus one." *Matter of Keiler*, 380 A.2d at 123. In *Nelson*, the Kansas Supreme Court disagreed with the Board of Law Examiners that the attorney's statement violated Rule 8.4(d). *Nelson*, 504 P.2d at 212, 215. The court observed the case was over before the attorney's statement occurred. *Nelson*, 504 P.2d at 215. This is language requiring harm to an identifiable proceeding. Continuing, ODC cites *Mississippi Bar v. Lumumba*, 912 So.2d 871 (Miss. 2005), regarding the oath of attorney. However, in *Lumumba*, the attorney's statements that violated Rule 8.4(d) "directly affected the judicial proceeding" or regarded "a matter *connected* to a judicial

proceeding which was ongoing and continuing." *Lumumba*, 912 So.2d at 882–83 (emphasis in original).

¶121 ODC quotes *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1066, 111 S. Ct. 2720, 2740 (1991). *Gentile* analyzed attorney speech within the confines of the First Amendment. Ultimately, the United States Supreme Court found speech regulatable only if it affected the proceeding. *Gentile*, 501 U.S. at 1075–76, 111 S. Ct. at 2745 (speech likely to influence a trial's outcome and speech "likely to prejudice the jury venire" can be limited but only until the trial ends). Again, this limitation supports Knudsen's position. ODC references this Court's decision in *In re Myers*, No. PR 16-0245, Order (Mont. Dec. 28, 2017). Myers' offending conduct was "making legal arguments without a sound basis in law or fact, . . . defaming and denigrating witnesses and other participants in the court proceedings, and . . . squandering his client's appeal by failing to file an opening brief." *Myers*, No. PR 16-0245, Order (Mont. Dec. 28, 2017). This conduct indisputably seriously harms an identifiable proceeding. While ODC references *In re Miller*, No. PR 18-0139, Order (Mont. Nov. 20, 2019), the attorney was not charged with violating M. R. Pro. Cond. 8.4(d).

¶122 Other state appellate courts persuasively have required prejudice to an identifiable proceeding, as an element of a Rule 8.4(d) violation. "[M]isconduct result[ing] in additional court proceedings or caus[ing] court proceedings to be delayed or dismissed" violates Iowa's Rule 8.4(d). *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Kingery*, 871 N.W.2d 109, 121 (Iowa 2015) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Lickiss*, 786 N.W.2d 169, 180 (Iowa 2013)). Administering justice has two components: "1) The procedural

61

functioning of the proceeding; and 2) the substantive interest of a party in the proceeding."
*In re Conduct of Lawrence*, 256 P.3d 1070, 1073 (Or. 2011) (en banc) (per curiam).

¶123   ODC also cites *In re Kline*, 311 P.3d 321, 349 (Kan. 2013). *In re Kline* instructs Rule 8.4(d) "encompasses conduct that injures, harms, or disadvantages the justice system generally, regardless of the context in which that conduct occurs or whether it prejudiced a particular proceeding." *In re Kline*, 311 P.3d at 340. This Court respectfully disagrees with adopting this interpretation. There needs to be a limit to Rule 8.4(d)'s otherwise extremely broad scope. Therefore, we hold prejudice to an identifiable proceeding is an element of a Rule 8.4(d) violation. Given this holding requiring prejudice to a specific proceeding, we reject Knudsen's vagueness claims.

### B. When attorney speech is the basis of a Rule 8.4(d) violation, *Yagman's* principles regarding implied factual statements apply

¶124   Knudsen has identified another reason the Rule 8.4(d) violations against him are unsustainable. Knudsen characterizes ODC's complaint as utilizing Rule 8.4(d) "as a duplicative add-on through which it can charge [him] with additional counts for the same conduct already discussed" via, *inter alia*, Rule 8.2(a). We agree. Counts 5, 17, 23, 27, 31, and 35 plainly charge statements as Rule 8.4(d) violations when Counts 4, 16, 22, 26, 30, and 34 charge some of those same statements as Rule 8.2(a) violations. "[U]nnecessary 'stacking' or 'piling on' of rule violations for the same conduct is discouraged." *Gerber v. Disciplinary Bd. of the N.D. Sup. Ct.*, 2015 ND 217, ¶ 16, 868 N.W.2d 861.

62

¶125  By pleading every statement allegedly violating Rule 8.2(a) as also violating Rule 8.4(d), ODC enabled the Commission to find these statements violated the M. R. Pro. Cond. without finding knowing falsity or reckless disregard for truth or falsity. Remarkably, ODC's response twice emphasizes this point: "Rule 8.4(d) also does **not** require proof of fraud, knowledge of falsity, or reckless disregard for the truth."; "unlike Rule 8.2(a), Rule 8.4(d) does *not* require proof of falsity."  We reject this premise. Repackaging identical conduct under a different rule does not evade the need for First Amendment scrutiny consistent with *Yagman* and *New York Times*.  The local rule at issue in *Yagman* also forbade "conduct that 'interferes with the administration of justice.'" *Yagman*, 55 F.3d at 1442.  The Ninth Circuit held the First Amendment limited the ability to utilize the rule to regulate an attorney's speech.  *Yagman*, 55 F.3d at 1442, 1444; *see also State ex rel. Okla. Bar Ass'n v. Porter*, 1988 OK 114, 766 P.2d 958 (applying the First Amendment even though the attorney was charged with violating Oklahoma's equivalent of Rule 8.4(d) (but not Rule 8.2(a)) for speech).

¶126  "*New York Times* [*v. Sullivan*] forbids . . . punish[ing] false statements, unless made with knowledge of their falsity or in reckless disregard of whether they are true or false." *Garrison v. La.*, 379 U.S. 64, 78 (1964).  The United States Supreme Court held this test applied to a criminal defamation charge against "[t]he District Attorney [for] disparaging th[e] judicial conduct" of eight criminal trial court judges.  *Garrison*, 379 U.S. at 64–65, 76, 78, 85 S. Ct. at 210–11, 216–217 (Louisiana Supreme Court characterized the attorney's statement as "contain[ing] personal attacks upon the integrity and honesty of the eight judges.").  *Sandlin* and *Thompson v. Fla. Bar* support that the knowing falsity or

63

reckless disregard element of Rule 8.2(a) is of constitutional importance. *Sandlin*, 12 F.3d at 866, *Thompson v. Fla. Bar*, 526 F. Supp. 2d 1264, 1281–82, (S.D. Fla. 2007) (citing cases). We can think of no principled reason why constitutionally regulating attorney speech under Rule 8.2(a) would require this element, but attorney speech can be constitutionally regulated via Rule 8.4(d) without requiring this element, especially considering Rule 8.4(d) would more broadly regulate attorney speech.

¶127 Persuasive decisions of other courts support requiring ODC demonstrate knowing falsity or reckless disregard for truth or falsity when speech is alleged to violate Rule 8.4(d). Regarding an attorney charged with violating Rule 8.4(d) (but not Rule 8.2(a)), the Colorado Supreme Court reasoned "disciplining an attorney for criticizing a judge is analogous to a defamation action by a public official for the purpose of this First Amendment analysis." *Green*, 11 P.3d at 1082, 1084. The court accordingly "agree[d] with those jurisdictions that have applied a version of the *New York Times* standard when considering discipline of attorneys who criticize judges." *Green*, 11 P.3d at 1085. While defending Rule 8.4(d) against vagueness claims, ODC cites *Comm. on Legal Ethics of W. Va. State Bar v. Douglas*, 370 S.E.2d 325, 328–29 (W. Va. 1988). *Douglas* states "[i]t is apparent that when a personal attack is made upon a judge or other court official, such speech is not protected if it consists of knowingly false statements or false statements made with a reckless disregard of the truth." *Douglas*, 370 S.E.2d at 332.

¶128 Compounding this point, after quoting West Virginia's Equivalent of Rule 8.4(d), *Douglas* states "general criticism of judges, their opinions, and court procedures, even if harsh and strident, will not result in a violation of the Code of Professional Responsibility."

*Douglas*, 370 S.E.2d at 328; *see also Cleveland Metro. Bar Ass'n v. Morton*, 2021 Ohio 4095, ¶ 24, 185 N.E.3d 65 (per curiam) (citing cases stating Rule 8.4(d) violations that referenced the attorney's recklessness); *In re Madison*, 282 S.W.3d 350, 359 (Mo. 2009) (en banc) (per curiam) (referencing knowing falsity or reckless disregard in explaining why an attorney's allegations against two judges violated Rule 8.4(d)); *Bd. Of Prof. Resp. v. Davidson*, 2009 WY 48, ¶ 19, 205 P.3d 1008 ("It almost goes without saying that this recklessness as to the truth is prejudicial to the administration of justice, and therefore also violates Rule 8.4(d).").

¶129 ODC quotes *Off. Of Disciplinary Couns. v. Gardner*, "These narrow restrictions are justified by the integral role that attorneys play in the judicial system, which requires them to refrain from speech or conduct that may obstruct the fair administration of justice." 2003 Ohio 4048, ¶ 14, 793 N.E.2d 425. However, the very next paragraph of *Gardner* cites *Garrison* and states, "Such false statements, whether by attorneys or others, enjoy no constitutional protection when they are made with knowledge of their falsity or reckless disregard for their truth." *Gardner*, ¶ 15. ODC repeatedly quotes *In re Snyder*, 472 U.S. 634, 644–45, 105 S. Ct. 2874, 2881 (1985). Crucially, *In re Snyder* avoided addressing the attorney's constitutional arguments against regulating his speech. *In re Snyder*, 472 U.S. at 642–43, 647, 105 S. Ct. at 2880. Moreover, the Court found the attorney's speech—a letter about his pay documentation—was not subject to discipline. *In re Snyder*, 472 U.S. at 636–37, 647, 105 S. Ct. at 2877, 2882. Therefore, this Court holds a Rule 8.4(d) violation based on speech is subject to *Yagman's* principles regarding implied factual statements.

<u>C. A violation of Rule 3.4(c) is not also a violation of Rule 8.4(d) for the same conduct</u>

¶130   ODC charged Knudsen and the attorneys in his office failing to immediately return the materials as the Court ordered also as violations of Rule 8.4(d).  Among the authorities ODC cites to support this claim is *In re Johnson*, 877 N.E.2d 249 (Mass. 2007).  The case against the attorney in *In re Johnson* grouped violations of Rules 3.4(c), 8.4(d), 8.4(h), and 4.4 from noncompliance with a court order as part of a single count against the attorney. *In re Johnson*, 877 N.E.2d at 251.  As stated above, we have found a single violation of Rule 3.4(c).  Furthermore, we are persuaded by an earlier decision of the Supreme Judicial Court of Massachusetts: "The better course, where possible, is to deal with alleged professional misconduct under specific rules, such as those that we have already discussed, rather than to invoke the general language of" Massachusetts' equivalent of Rule 8.4(d). *In re Discipline of Two Att'ys*, 660 N.E.2d 1093, 1097 n.6, 1099 (Mass. 1996): *see also In re PRB Docket No. 2007-046*, 2009 VT 115, ¶¶ 14–15, 989 A.2d 523 (two different rules of professional conduct do not bar the same conduct).  Accordingly, a violation of Rule 3.4(c) cannot also constitute a violation of Rule 8.4(d) when based on the same conduct.

¶131   The Concurrence and Dissent criticizes this holding on the grounds that we have narrowed the Rule 8.4(d) nexus requirement from *In re Olson*, and that Knudsen's disobedience to return the materials as ordered in *McLaughlin* created an effect prejudicial to the administration of justice.  Concurrence and Dissent, ¶¶ 251-54.  This holding is direct progeny of *In re Olson* and *In re Morin*, applied squarely to these facts.  To adopt ODC's argument, "such a nexus can be established by conduct that injures or harms the justice

system more generally," would depart from *In re Olson*, ¶ 32, and run us straight into the merits of a void-for-vagueness challenge. Second, the Concurrence and Dissent's point is well taken that Knudsen may have been found in violation of Rule 8.4(d) for failing to return the ordered materials, had his misconduct not already been addressed by another rule. In this case, we found above that Knudsen violated Rules 3.4(c) and 5.1(c) for his own and his ratified subordinates' disobedience of the Court's Order to return the materials. As explained above, we reject ODC's argument to pile on additional violations under Rule 8.4(d) for conduct more appropriately sanctioned under a specific rule.[14] Finally, it is worth noting the Commission never actually informed us of its basis to conclude Knudsen violated Rule 8.4(d), discussed in more detail below when reviewing Knudsen's due process objections.

**V. A violation of Rule 3.4(c) is not also a violation of Rule 8.4(a) for the same conduct**

¶132  Lastly, Count 41 of the Complaint charges Knudsen with violating Rule 8.4(a) via "[a] finding that Knudsen violated any [of Rules 3.4(c), 5.1(c) in combination with 3.4(c), 8.4(d), or 5.1(c) in combination with Rule 8.4(d)] in connection with the failure to return [the] materials" as this Court ordered. Rule 8.4(a) states "[i]t is professional misconduct for a lawyer to . . . violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another." However, this Court agrees with the hearing committee in *In re Sharp* that a Rule 8.4(a)

---

[14] For example, a litigant who loses or allows spoliation of an item in its possession (and therefore is unable to return it to a court or another party) could be found to engage in conduct prejudicial to the administration of justice, instead of being accused of knowingly disobeying a court's order to return an item.

violation does not exist when it "would . . . only . . . duplicat[e] prior violations" and not involve an independent violation. 802 So. 2d 588, 591 (La. 2001) (per curiam); *see also Att'y Grievance Comm'n of Md. v. Yates*, 225 A.3d 1, 8 n.8 (Md. 2020) ("[To the extent] we find a violation of Rule 8.4(a) based solely on a violation of another rule, it is simply an echo of the other violation that has no independent effect on the sanction we impose and arguably is not worthy of the several sentences devoted to it in the text and footnote of this opinion.")[15]; *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 769 (Iowa 2010) ("The purpose of [Iowa's Rule 8.4(a)] was not to create a separate violation. Therefore, once the board proves a violation of the Iowa Rules of Professional Conduct, we will not discipline an attorney for violating" the Rule.); *Johnson v. Off. of Prof. Conduct, Utah State Bar*, 2014 UT 57, ¶ 8 n.4, 342 P.3d 280 ("A violation of rule 8.4(a) based solely on an attorney's violation of another rule will not be considered a separate violation."); *Carey v. Bd. of Overseers of the Bar*, 2018 ME 119, ¶ 5 n.2, 192 A.3d 589 ("Because Rule 8.4(a) makes violation of any other Rule of Professional Conduct a separate violation of Rule 8.4(a), the violation of Rule 8.4(a) cannot be considered a distinct violation of the Rules of Professional Conduct."). Significantly, the Ohio Supreme Court recently departed from precedent and refused to make a finding of fact regarding violation of Rule 8.4(d) because specific disciplinary rules already covered the conduct alleged to violate the Rule. *Disciplinary Couns. v. Grendell*, 2025 Ohio 5239,

---

[15] *Yates* is significant because the Supreme Court of Maryland otherwise agrees with ODC's position that multiple rules can cover the same conduct. *See Att'y Grievance Comm'n of Md. v. Lanocha*, 896 A.2d 996, 1001 (Md. 2006).

¶ 184, n.8 (slip op.). The court explained *inter alia* "piling on general rule violations to expand the number of disciplinary charges for the same violation does not advance the ends of the disciplinary process." *Grendell*, ¶ 184, n.8. We adopt this sound reasoning. Violation of Rule 8.4(a) cannot be based on the same conduct establishing violation of another rule.

¶133    *3. Whether the Commission on Practice violated Knudsen's Due Process rights in the investigation and adjudication of his alleged misconduct.*

¶134    Knudsen contends the Commission on Practice (Commission) violated his due process rights in the following ways:

I.    The Review Panel acted as a prosecutor by rejecting ODC's initial recommendation and re-referring it for further investigation and formal charging;

II.    The Commission violated its rules when denying Knudsen's motion for summary judgment;

III.    The Commission granted ODC's motion to exclude Knudsen's expert witness without allowing Knudsen an opportunity to respond; and

V.    The Commission's Findings of Fact and Conclusions of Law are inadequate for appellate review.

¶135    In the context of a lawyer disciplinary proceeding, due process requires notice and an opportunity to be heard. *In re Engel*, 2008 MT 215, ¶ 23, 344 Mont. 219, 194 P.3d 613. Due process also requires a fair hearing before a fair and impartial tribunal. *In re Doud*, 2024 MT 29, ¶ 29, 415 Mont. 171, 543 P.3d 586 (citing *In re Best*, ¶ 22). "Rather than depriving lawyers of due process, our rules provide for an orderly method of preserving to the attorney accused before the Commission, and later before us, his denials and defenses to the charges made against him in the widest latitude." *In re Wyse*, 212 Mont. 339, 346,

69

688 P.2d 758, 762 (1984). *Accord Goldstein v. Comm'n on Prac. of the Sup. Ct.*, 2000 MT 8, ¶¶ 20–22, 297 Mont. 493, 995 P.2d 923.

**I. The Commission did not violate the *Best* rule when it re-referred the investigation back to ODC for further investigation and formal filing**

¶136 Knudsen argues the Commission improperly acted in a prosecutorial capacity by "dismissing the recommendation of no discipline and ordering the new special counsel to bring a complaint seeking discipline." Knudsen alleges the Commission violated this Court's rule from *In re Best*, prohibiting the Commission from acting as both a prosecutor and adjudicator of ethics complaints against an attorney.

¶137 In 2001, this Court created the Office of Disciplinary Counsel, *see In re Creation of Off. of Disciplinary Couns. (In re Creation of ODC)*, 2001 MT 257, 307 Mont. 210, 53 P.3d 861,[16] and prescribed ODC's function and powers, to wit:

> The Office of Discipline Counsel shall perform certain "central intake" functions including: receiving . . . complaints regarding lawyers from members of the public[.]
>
> .   .   .
>
> Discipline Counsel shall preliminarily review each written complaint received by the Office of Discipline Counsel and shall determine whether the complaint involves a matter of lawyer discipline over which the Commission has jurisdiction. . . . Where the complaint appears to be within the jurisdiction of the Commission or where the complainant otherwise wishes to proceed with the complaint, Discipline Counsel shall: send a copy of the complaint for response to the attorney against whom the complaint is made; if appropriate, request a reply to the response from the complainant; in each case, prepare an intake summary and recommendation to the Commission, including a recommendation of dismissal where the complaint is not within the jurisdiction of the Commission; and, if warranted under the Rules of

---

[16] *See also Goldstein*, ¶ 8 (prior to creation of ODC in 2001, the Commission had both investigative and adjudicatory powers).

Lawyer Disciplinary Enforcement, recommend temporary suspension of the lawyer to the Commission, which then may or may not recommend temporary suspension to this Court.

Additionally, Discipline Counsel shall: investigate complaints referred from the Commission Review Panel(s); present written reports of investigation and appear before the Commission to orally supplement reports of investigation; draft and prosecute . . . formal complaints filed before the Commission; recommend discipline to the Commission; and advocate findings of fact and conclusions of law resulting from Commission discipline proceedings.

*In re Creation of ODC*, ¶¶ 9–11; *accord* MRLDE 1, 5B(8), 10E(1).[17]

¶138 In addition to creating ODC in 2001, this Court made "structural changes" to the Commission on Practice, including ordering the Commission "organize itself and operate in one or more Review Panels and in one or more Adjudicatory Panels." *In re Creation of ODC*, ¶ 14; *accord* MRLDE 2G(3), (4), (6).[18] This Court divided the respective roles of the Commission panels as follows:

The Review Panel(s) shall: review the complainant's complaint, the response from the attorney against whom the complaint was made and any reply from the complainant along with relevant documents, Discipline Counsel's intake summary, and any report of investigation and recommendations by Discipline Counsel; determine and decide preliminary and procedural matters; *refer the complaint to Discipline Counsel for further investigation or filing of a formal complaint* and, if appropriate, a complaint requesting interim suspension, *when the facts appear to warrant disciplinary action*; or dismiss the complaint when the facts do not appear to warrant disciplinary action.

---

[17] MRLDE 1 (ODC "shall perform central intake functions and shall process, investigate, and prosecute those grievances against lawyers which are within the disciplinary jurisdiction of the Court"); MRLDE 5B(8) (ODC "shall . . . prosecute [complaints] before Adjudicatory Panels and the Court"); MRLDE 10E(1) (ODC "shall [d]raft and prosecute complaints").

[18] MRLDE 2G(3), (4), (6) (Commission shall establish Review and Adjudicatory panels and assure Review Panel member does not also sit on Adjudicatory Panel for the same case).

*In re Creation of ODC*, ¶¶ 16, 18 (emphasis added); *accord* MRLDE 3B(2); Commission

on Practice Operating Rule 4 (promulgated pursuant to MRLDE 2G(1)).

¶139   By contrast, the Commission Adjudicatory Panels "shall . . . hear, determine and

make findings of fact, conclusions of law and recommendations to this Court as to all

formal complaints and complaints for interim suspension filed against lawyers by

Discipline Counsel."  *In re Creation of ODC*, ¶¶ 16, 19; *accord* MRLDE 1, 4B.[19]

¶140   Upon investigating a grievance, ODC may, among other things: (1) dismiss the

grievance where "the facts do not appear to warrant disciplinary action"; (2) "issue a letter

of caution to [the] lawyer"; (3) "request a Review Panel to approve a private admonition

or issue a letter of caution"; or (4) "request leave of a Review Panel to . . . file a Complaint."

MRLDE 10C(1); 10D(1); 3B.[20]   The Review Panel reviews and considers ODC's request

together with the grievance, lawyer response, grievant reply, other relevant documents, and

ODC's intake summary, investigative report, and recommendations.  MRLDE 3B(1), 3C.

¶141   On review, the Commission Review Panel "may approve, disapprove, or modify

[ODC's] disposition."  MRLDE 10C(3); 3B(1)–(4), 3C.  "[A]t the request of a Review

Panel," ODC shall "[p]rovide additional information to [the Panel] or conduct further

---

[19] MRLDE 1 ("The Commission on Practice, which shall be divided into Review and Adjudicatory Panels, shall approve the filing of Complaints by the Office of Disciplinary Counsel, shall hear and decide Complaints and, in appropriate cases, shall make recommendations to the Court for discipline."); MRLDE 4B ("Adjudicatory Panels shall . . . [h]old hearings on Complaints," "dismiss the Complaint," "make findings of fact, conclusions of law, and recommendations to the Montana Supreme Court," or "order discipline" under the MRLDE).

[20] A lawyer subject to "corrective action" by ODC's disposition may seek review by the Review Panel, which, in turn, may "approve, disapprove, or modify [ODC's] determination as to corrective action."  MRLDE 10C(3).

investigation." MRLDE 10D(2); *see also* 3B(2) ("Review Panel shall . . . [r]efer the grievance to [ODC] for any further investigation, if needed, to determine whether a Complaint is appropriate.").

¶142 The record shows Special Counsel McLean submitted a May 2022 report in which he determined Knudsen violated M. R. Pro. Cond. 5.1, 8.2, 8.4, and MRLDE 8A(7) "on his own" conduct and by "specific ratification of Hansen's and Oestreicher's" conduct. McLean "believe[d] Knudsen's violations of the [M. R. Pro. Cond. should] be made public." However, because a formal complaint, investigation, and hearing would likely exacerbate the issues between the Legislature and the Judiciary, which would be played out in public, McLean recommended "a private letter of admonition by the Review Panel of the Commission." McLean appeared to both recommend some mechanism to inform the public of Knudsen's conduct, but keep the admonition confidential, which he felt would avoid further political inflammation, and simultaneously "send a clear message to the Attorney General and his staff attorneys." Knudsen argues McLean dismissed the grievances, and therefore the Commission improperly remanded with a directive to file a formal complaint.

¶143 McLean's Report therefore appears to be both a recommended dismissal of formal discipline as well as a recommendation for private admonition, which is likely a common occurrence before the Review Panel.[21] In either scenario (dismissal, recommendation of a private admonition, or both), ODC's recommended disposition was properly before the

---

[21] The "ODC Case Information" attached to McLean's report indicates an "Appeal" from "ODC Dismissal to COP."

73

Commission Review Panel, and it was within its authority to review McLean's recommended disposition and to approve, disapprove, or modify that recommendation based on existing M. R. Pro. Cond. violations ODC identified. MRLDE 10C(3); 3B(1)–(4), (C).

¶144 *In re Best* is distinguishable. There, the Commission "sua sponte, charge[d] a lawyer with a violation of [M. R. Pro. Cond.] outside of any violation alleged in a complaint or report by the ODC." *In re Best*, ¶ 2. After investigating alleged violations of M. R. Pro. Cond. 3.1, 3.3, 3.4, and 4.1, ODC presented its conclusion to the Review Panel, recommending the complaint be dismissed with a letter of caution. *In re Best*, ¶¶ 8–9. The Review Panel agreed those allegations should be dismissed but "concluded that the undisputed evidence clearly and convincingly proved" a violation of Rule 4.2, which had not been charged by ODC and of which Best had no notice. *In re Best*, ¶ 9. The Review Panel then "draft[ed] its own complaint and then act[ed] on its own complaint" by "recommend[ing] a private admonition" to the Adjudicatory Panel, which approved the sanction. *In re Best*, ¶¶ 9–10, 32. We held the Commission's conduct violated due process because (1) it adjudicated a violation of which the attorney had no notice and (2) it was unfair for the Commission to act as both investigator and adjudicator. *In re Best*, ¶¶ 28, 33 (citing *Goldstein*, ¶ 27).

¶145 Thus, in *In re Best*, the Commission initiated entirely new charges (Rule 4.2) that ODC had not alleged and violated due process by independently formulating and prosecuting new charges without notice to the attorney. *In re Best*, ¶¶ 28–29. Additionally, *In re Best*, ¶ 32, specifically noted the MRLDE contemplates a Review Panel "requesting

that *the ODC draft a formal complaint* for further action" after review.  *See* MRLDE 3B(2), 10D(2).  There, the Review Panel improperly usurped ODC's prosecutorial functions by acting outside the four corners of the complaint and charging Best with a violation of a completely different rule and gave Best no opportunity to respond to the new charge.  *In re Best*, ¶ 33.  *Cf. State v. Partain*, 2025 MT 83, ¶¶ 32–33, 421 Mont. 375, 567 P.3d 932 (explaining difference between prosecutorial and judicial functions and holding judge had improperly usurped prosecutor's role by charging a crime prosecutor had already dismissed).

¶146   Unlike *In re Best*, however, the Commission here referred the matter back to ODC to conduct further investigation and file a formal complaint.  The Review Panel did not mandate or specify additional charges that must be brought.  Knudsen had notice and the opportunity to respond to the allegations and contemplated complaint up to this point.  Had McLean concluded there was no basis to find any M. R. Pro. Cond. violations and the Review Panel remanded it with a directive to file a formal complaint, then Knudsen's argument would  be well-taken.  But that was not the case here.  A disagreement between ODC and the Commission on what punishment these violations warrant is also within the Commission's and this Court's purview.  *E.g.*, *In re Engel*, ¶ 25 (rejecting Commission's recommendation of a private admonition and directing Engel to appear for a public censure, suspension, and costs).

¶147   Given that the Review Panel was provided a finding of ethical violations but confronted with the question of whether it wanted to go through the political turmoil of a public proceeding, we agree the Review Panel was within its authority to refer the matter

75

back to ODC for further investigation or the filing of a formal complaint, consistent with its explicit authority under MRLDE 10C(2) and 3B(2). Knudsen's due process rights were not violated when the Review Panel referred the grievance matter back to ODC for further investigation and filing of a formal complaint under these circumstances.

**II. The Adjudicatory Panel Chairman violated the Commission's rules and violated due process when he denied Knudsen's Summary Judgment Motion without a quorum**

¶148 Knudsen argues the Commission violated its operating rules and his due process rights in denying his motion for summary judgment in one of two ways. Either the Adjudicatory Panel voted to deny his motion while containing two members who subsequently recused themselves for possible bias, or the Commission ruled on the motion without a quorum. ODC informed this Court at oral argument that the two members who were subsequently recused did not participate in the decision to deny Knudsen's motion for summary judgment. And according to Commission orders denying the motions to disqualify Menzies and vacate the adjudicatory hearing, no other member of the Adjudicatory Panel besides the chair had participated in any manner in the proceedings to date. The record therefore indicates only the chair of the Adjudicatory Panel ruled on Knudsen's motion for summary judgment, which Knudsen argues is a violation of the MRLDE because such a decision requires a quorum.

¶149 MRLDE 4C states, "Five members of an Adjudicatory Panel . . . shall constitute a quorum; however, *any act of an Adjudicatory Panel* shall require the vote of a majority of the members present." (Emphasis added.) MRLDE 12D(2) states, "In the conduct of a hearing, the Chairperson of an Adjudicatory Panel shall have authority to rule on all

76

motions, objections, and *other matters presented in connection with the hearing.*" (Emphasis added.) The question is whether a ruling on a summary judgment motion is "any act of an Adjudicatory Panel," requiring a quorum of members to decide, or whether it is an "other matter[] presented in connection with the hearing," which the chair has authority to rule on alone.

¶150 To correctly interpret the rules, they must be read together and in the context of neighboring rules. *Accord Mont. Sports Shooting Ass'n v. State*, 2008 MT 190, ¶ 11, 344 Mont. 1, 185 P.3d 1003. Prior to the rule discussing quorums, MRLDE 4 defines the powers and duties of Adjudicatory Panels; the quorum rule applies to them. MRLDE 4B(3) requires Adjudicatory Panels to "[h]ear and determine preliminary and procedural matters incidental to the exercise of its powers and duties." On the other hand, Rule 12D deals with hearings, findings, conclusions, and dispositions or recommendations.

¶151 While there may be certain occasions where a pretrial motion is one "presented in connection with the hearing," Knudsen's motion for summary judgment was one which would cause the Adjudicatory Panel to determine a preliminary matter incidental to its exercise of powers and duties. Knudsen's entire motion for summary judgment argued the Commission did not have the power to discipline him for any actions taken while defending the Legislature due to the separation of powers, which is a jurisdictional issue. *See Seubert*, ¶ 34 (recognizing separation of powers deprives branches of exercising power properly belonging to other branches). As such, because Knudsen's motion for summary judgment challenged the Adjudicatory Panel's exercise of powers and duties, a quorum was required to decide the matter, which did not happen here.

¶152   Having found the Adjudicatory Panel Chair violated the rules of procedure, we must determine whether Knudsen suffered prejudice from that violation.  We review the grant or denial of summary judgment de novo, applying M. R. Civ. P. 56 standards.  *Kipfinger v. Great Falls Obstetrical and Gynecological Assocs.*, 2023 MT 44, ¶¶ 13, 43, 411 Mont. 269, 525 P.3d 1183.  Summary judgment is proper only when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  M. R. Civ. P. 56(c)(3).  Subject-matter jurisdiction is the threshold power of an adjudicatory body to consider and adjudicate certain types of cases or controversies.  *North Star Dev., LLC v. Mont. Pub. Serv. Comm'n*, 2022 MT 103, ¶¶ 21–22, 408 Mont. 498, 510 P.3d 1232.  The existence of subject-matter jurisdiction is a question of law we review de novo for correctness.  *North Star*, ¶ 11.

¶153   We have held here that the Montana Attorney General is subject to regulation under the Montana Rules of Professional Conduct.  We have held further that the M. R. Pro. Cond. cannot be used as a political muzzle or regulatory straitjacket on the Attorney General's duty and authority to exercise the duties of his office vis-à-vis the other branches of the Montana government.

¶154   Given the posture of Knudsen's summary judgment motion before the Commission, it is difficult to determine the prejudice he suffered from this violation.  The basis for his motion was a purely constitutional question of first impression, arguing the separation of powers precluded the Commission's proceeding to enforce the M. R. Pro. Cond. against him.  We have decided that question only partly in his favor, but we are not persuaded the Commission was in error not to do so.  The Commission's writ runs to enforcing the

M. R. Pro. Cond., not issuing first impression opinions on issues of major constitutional importance.

¶155   Had the Adjudicatory Panel agreed with Knudsen's motion to the extent we do here, it would have saved him from presenting that portion of his defense in the contested hearing.  But this Court would have been required to address the ruling de novo on appeal, in any event.  *See* MRLDE 10E(1), 14, 16; *see also In re Olson*, ¶¶ 2–3 (ODC appealing Commission's recommended dismissal).  As such, the Chairman's denial of Knudsen's summary judgment motion was a due process violation but carried minimal prejudice.

### III. The Commission violated Knudsen's due process when it granted a motion to exclude his expert witness without giving him an opportunity to respond

¶156   On September 26, 2024, Knudsen disclosed he would present the testimony of former Utah Supreme Court Justice Thomas R. Lee at the adjudicatory hearing and submitted Lee's "report, exhibits, and summary disclosures" to the Commission.  The next day, ODC filed a motion to exclude Lee's testimony.  The Commission granted ODC's motion to exclude Lee on September 30, 2024, without giving Knudsen an opportunity to respond to ODC's motion and brief.  The Commission justified the expedited order on the grounds there was a "short time remaining" before the scheduled adjudicatory hearing.[22]

¶157   We agree the Commission denied Knudsen due process by ruling on ODC's motion in limine to exclude Knudsen's proposed expert witness without a response from Knudsen.

---

[22] The schedule in this case required Knudsen to file expert witness disclosures "not later than" 10 business days prior to the schedules hearing date, which he did.  Objections to experts were required to be filed not later than 5 business days prior to the hearing.  We recommend the Commission establish prehearing disclosure deadlines that allow the parties full briefing and argument before a decision on these motions.

Due process requires notice and an opportunity to be heard. *See In re C.B.*, 2019 MT 294, ¶ 18, 398 Mont. 176, 454 P.3d 1195.

¶158 ODC argues even if Knudsen was initially deprived of due process, the violation was cured because Knudsen filed a motion to reconsider pursuant to M. R. Civ. P. 60(a)–(b), wherein he was fully heard before the Commission declined to reconsider its prior ruling. In its order denying the motion to reconsider, the Commission noted it "thoroughly considered" and reviewed Knudsen's motion and denied the merits of the issue for the same reasons as set forth in its prior order, and ODC therefore argues Knudsen received due process. ODC bravely makes this argument in the face of our contrary authority.

¶159 In *Fennessy v. Dorington*, both a motion to continue a hearing and a motion to dismiss had been filed by Dorrington. 2001 MT 204, ¶ 4, 306 Mont. 307, 32 P.3d 1250. Fennessy filed a brief in opposition to the motion to continue and stated he had not received nor had an opportunity to review a motion to dismiss if it had been filed. *Fennessy*, ¶ 4. The court granted the motion to dismiss the same day, and Fennessy filed a motion to reconsider, including affidavits that neither he nor his lawyers had ever received the motion to dismiss. *Fennessy*, ¶ 4. The district court denied Fennessy's motion to reconsider, finding he had not met his burden under Rule 60(b). *Fennessy*, ¶ 6. We reversed, holding the district court abused its discretion because Fennessy not receiving the motion was a sufficient basis to reconsider as he was unable to review or respond to it prior to the court's ruling. *Fennessy*, ¶¶ 8, 14.

¶160 Knudsen filed his motion to reconsider under either Rule 60(a) (mistake) or 60(b) (substantive error), citing caselaw applicable to either. The theory is that if the ruling prior to Knudsen's response was a clerical oversight, the Commission could reconsider under Rule 60(a). But if the Commission's ruling was not an oversight but a necessity due to the short timeframe, that was a legal error by the tribunal, to be reconsidered under Rule 60(b)(1) mistake, inadvertence, surprise, or excusable neglect, or (b)(6), any other reason that justifies relief. *Fennessy*, ¶ 8. Under either theory, the Commission's original ruling denied Knudsen due process and its refusal to reconsider prejudiced him.

¶161 ODC argues Knudsen was heard on the matter pursuant to his motion to reconsider, and therefore there was no prejudice. In doing so, ODC ignores the burdens of persuasion at play in these motions. A party offering an expert witness to testify must demonstrate the necessity for the expert opinion, the witness's qualifications to testify, and the substance and underlying data of the proffered testimony. The expert witness may not testify to the ultimate issue of fact in a proceeding. M. R. Evid. 702–705. If the opposing party wishes to exclude any of this offered testimony, it shall make an appropriate motion and the tribunal shall weigh the arguments and exclude, admit, or limit the testimony. The burdens of persuasion under M. R. Evid. 702–705 apply to each party in the proceeding, requiring each to show a threshold condition before requiring a response from the other.

¶162 Not so with M. R. Civ. P. 60. To win a motion to reconsider under Rule 60(a), the moving party must carry the burden of showing the existence of a mistake to set aside the order, unless the tribunal does so sua sponte. To set aside a final judgment or order under Rule 60(b), the movant must demonstrate (1) diligence, (2) excusable neglect, (3) injurious

81

effect of the judgment or order, and (4) meritorious defense. *Bartell v. Zabawa*, 2009 MT 204, ¶ 14, 351 Mont. 211, 214 P.3d 735.[23]

¶163 Similar to *Fennessy*, the United States Supreme Court reversed in *Armstrong v. Manzo*, where a hearing on a subsequent motion to set aside the decree did not cure the initial due process violation because of real—"not purely theoretical"—burdens that were placed on petitioner to overcome the initial order. 380 U.S. 545, 550–52, 85 S. Ct. 1187, 1191 (1965). Here, the Commission's order granting ODC's motion to exclude the witness prior to Knudsen's response shifted the burdens of persuasion. Rather than the back and forth of Knudsen's and ODC's motions and the proffered expert's testimony through M. R. Evid. 702–705, the Commission granted ODC's motion and excluded the witness in toto. Knudsen therefore had to carry the burden of persuasion pursuant to M. R. Civ. P. 60 to convince the Commission to reverse its hasty order.

¶164 The Concurrence and Dissent finds error in this analysis, noting "[t]he Commission did not apply Rule 60, did not reference a heightened standard, and did not require Knudsen to meet any burden beyond the one he already bore as the proponent of expert testimony." Concurrence and Dissent, ¶ 268. If so, then the Commission incorrectly applied Rule 60 based upon its text and our precedent interpreting the Rule. In any event, the Commission abused its discretion in ruling before Knudsen had an opportunity to respond, and in

---

[23] Where a movant can seek relief under Rule 60(b)(1)–(5), relief is not available under 60(b)(6). *Wittich Law Firm, P.C. v. O'Connell*, 2013 MT 122, ¶19-20, 370 Mont. 103, 304 P.3d 375 ("A movant cannot prevail under Rule 60(b)(6) unless they meet the higher burden of proving extraordinary circumstances while showing that they were blameless and acted within a reasonable amount of time.")

denying his motion to reconsider. *Fennessy*, ¶ 14. The Commission's order granting a motion without affording Knudsen a response created a real—not hypothetical—burden-shifting whereby Knudsen had to convince the Commission of its error under Rule 60. Doing so violated Knudsen's due process right to a fair hearing.

**IV. The Commission's October 23, 2024 Findings of Fact, Conclusions of Law, and Recommendation were inadequate for appellate review and denied Knudsen sufficient notice to prepare his objections**

¶165 Knudsen contends the Commission's October 23, 2024 decision is insufficient for appellate review because the Commission failed to articulate legal standards or sufficient factual bases for its conclusions, thereby precluding this Court's ability to ascertain whether ODC met its burden of proof.

¶166 We review Commission findings of fact, conclusions of law, and recommendations de novo, including independently weighing the evidence upon which the Commission findings rest. *In re Potts*, 2007 MT 81, ¶ 32, 336 Mont. 517, 158 P.3d 418; *In re Wyse*, 212 Mont. at 345–46, 688 P.2d at 762. The litmus test for sufficiency of a tribunal's findings of fact and conclusions of law is whether the tribunal sets forth its reasoning in a manner sufficient to allow informed appellate review. *In re Doud*, ¶ 33 (citing *Snavely v. St. John*, 2006 MT 175, ¶ 11, 333 Mont. 16, 140 P.3d 492).

¶167 In its 31-page decision, the Commission thoroughly outlined the extensive procedural and factual background leading up to the ODC complaint, and the procedural details and factual record of the Commission proceeding. The first 25 pages of the decision are an appropriately thorough recounting of the factual background. The problem begins

on page 25, in the Conclusions of Law section. The Commission reached the following legal conclusions:

1. Respondent's conduct constitutes a violation of Rule 3.4(c).

2. Respondent's conduct constitutes a violation of Rule 5.1(c).

3. Respondent's conduct constitutes a violation of Rule 8.2(a).

4. Respondent's conduct constitutes a violation of Rule 8.4(a).

5. Respondent's conduct constitutes a violation of Rule 8.4(d).

¶168 Nothing follows. There is no analysis, typically found in the conclusions of law section of any court or tribunal order, explaining how the detailed facts are applied to reach the conclusions of law. There is no analysis of the legal standards for each of these rules with an application of how Knudsen violated them. And there is no finding, in either the facts section or law section, of the essential elements of each of these violations.

¶169 Further troubling, ODC completely misconstrues the Commission's findings, bare as they are. In its response brief, ODC argued the Commission found two different violations of Rule 3.4(c), one for a violation of the lawyer's oath and one for disobeying the Supreme Court's Order. We have no idea how ODC reached that argument when the Commission says there was "a" violation of Rule 3.4(c), referencing both possible violations in its conclusion, and does not specify whether it was for an oath violation or for disobeying the Court's order.

¶170 But ODC's creative reinterpretation of the Commission's decision gets worse. For each rule violation, it argues the Commission found multiple violations, when the Commission did no such thing. For example:

84

a. Rule 3.4(c): Commission found "a" violation. On page 1 of its brief, ODC claims the Commission found two violations, one for violating the oath and one for disobeying this Court's order. Then on page 36 of its brief, ODC argues the Commission found three violations by Knudsen personally, and another ten committed through his subordinate attorneys.

b. Rule 5.1(c): Commission found "a" violation. ODC asserts the Commission concluded Knudsen had 26 violations.

c. Rule 8.2(a): Commission found "a" violation. But ODC claims the Commission found Knudsen personally committed one violation, and he committed five more through the misconduct of his subordinates.

d. Rule 8.4(d): Commission again found "a" violation. ODC tries to convince us the Commission found two violations for Knudsen's personal conduct, and eleven violations for his subordinates' conduct.

e. Rule 8.4(a): Commission found "a" violation. But ODC argues the "Commission concluded that the AG committed nine violations of [M. R. Pro. Cond.] 8.4(a)." ODC apparently argues each violation of any rule committed by Knudsen automatically constitutes a separate violation of Rule 8.4(a).

¶171 The preceding paragraph illustrates the problem for this Court and the Respondent when reviewing the Commission's decision. We don't know how or why the Commission concluded Knudsen committed any of these violations. And we are absolutely dumbfounded by ODC's claims of 41 violations; that is not only inconsistent with the Commission's decision, but also internally inconsistent within ODC's brief. As explained above, we find a basis to conclude Knudsen violated 3.4(c) once himself for disobeying this Court's Order, and he violated 5.1(c) once via the conduct of his subordinates for disobeying our Order. The Commission found Knudsen violated Rule 3.4(c) but did not state whether the violation was for violation of the Court's Order, or for violating his oath as an attorney, since facts relating to both allegations are within the record (and ODC claims Knudsen committed both violations). The Commission's finding of a Rule 5.1(c)

85

violation for Knudsen's subordinates is similarly without specificity. ODC alleged many more violations of these rules in its brief without citing the actual Commission findings, because the findings do not exist.

¶172   If the Commission's findings are insufficient to inform us how Knudsen committed these alleged violations, we cannot hold it sufficiently informed Knudsen of the violations. If the Court is mystified by the decision and appellate record, imagine how the Respondent struggles to prepare an appeal and hit a target that is not only moving, but also a mirage. Due process requires more than that.

¶173   When queried at oral argument on this point, ODC Counsel responded this Court has de novo review, so any inadequacy can be addressed by the Court's final word on the subject. But de novo review does not mean de novo trial; we sit as an appellate body to review the legal conclusions of the Commission, not to supply them.

¶174   This due process violation alone is sufficiently serious to vacate the Commission's decision and remand it for a new proceeding or entry of an amended decision explaining its conclusions of law. In *Del Duca v. Skydancer*, after the lower court failed to explain its conclusions of law, we remanded the case instructing the Court to "specif[y] with particularity the grounds underlying its rulings." 2025 MT 156, ¶¶ 20–22, 423 Mont. 115, 572 P.3d 804. Given the time, expense and turmoil that have exceeded all expectations in this proceeding, we have no intention of remanding this matter for another round. The Commission's violation of due process in this instance prompts us to dismiss the proceeding against Knudsen.

¶175   As discussed above, we agree that Knudsen violated Rules 3.4(c) and 5.1(c). At the same time, we have concluded that the Commission violated Knudsen's due process rights. We could remand this case to the Commission for further proceedings. However, this would serve no purpose except to increase the already significant amount of time, effort, and expense incurred. Prudence dictates this litigation must end. Therefore, we hereby dismiss this case and deny the Commission's bill of costs.

¶176   The Concurrence and Dissent argues this outcome departs from our precedent, weakens our authority to enforce attorney conduct standards, and ultimately erodes confidence in our system of laws. Concurrence and Dissent, ¶¶ 288, 331-32. If the Court had before it an appellate record that demonstrated the due process requirements we expect of any competent tribunal, and if the Court and the disciplined attorney had the opportunity to review findings of fact, conclusions of law, and recommendations that did not require us to guess or assume as to their conclusions, then the Concurrence and Dissent would be correct. But that is not what we have in this case. So our review and disposition must be appropriate not only to the conduct of the disciplined attorney, but also to the conduct of the disciplinary proceeding. When an attorney—from the newest associate in the smallest firm to the elected official who supervises more lawyers than any other in the state—faces a potential loss of professional licensing, then we expect the proceeding to carry the burden of persuasion and uphold the procedural due process standards written in the rules and in our caselaw. The Commission failed to do so in numerous respects here, and we only weaken our regulation of the practice of law if we overlook those violations.

¶177 Knudsen's actions throughout the saga of 2021 were beyond what we have seen any competent attorney, let alone the Attorney General, do. He used, and allowed his subordinates to use, extraordinarily inflammatory language against the Court and individual justices on multiple occasions. He repeatedly asserted he was not required to follow certain Court orders because they had been issued improperly, and he accused the Court of serious and ongoing personal conflicts in how it addressed alleged misconduct by its own employee and colleagues. Ultimately, he ignored for months a Court order to return materials obtained by an over-broad subpoena.

¶178 Yet at the end of this proceeding, we have not found his criticism of the Court to violate the M. R. Pro. Cond., because the Commission failed to find the critical statements, including allegations of misconduct and conflict, were false or were beyond opinion or hyperbole. That is a sobering thought. Any punishment of Knudsen must be tailored only to his proven violations and not an exactment of revenge or vindication for his criticism of the Court.

¶179 Regarding a penalty for the violations, we look to Special Counsel McLean's original analysis. McLean recommended the Commission issue a private admonition to Knudsen rather than further inflame the public and political tensions caused by a drawn-out public saga. How very prescient.

¶180 While we have dismissed this case with no further proceedings to occur, the extensive litigation with numerous hearings playing out in public for years, coupled with our Opinion and Order finding violations, is far worse and a more informative sanction than the originally contemplated private admonition would have been. Accordingly, this

Opinion and Order suffices as the Court's public admonition regarding the rule violations. Moreover, we plainly warn all Montana attorneys, including Knudsen and his subordinates, to obey lawful orders of all courts.

**CONCLUSION**

¶181   We hold the Montana Attorney General is subject to regulation under the Montana Rules of Professional Conduct for the performance of his duties as an attorney, as required by the Montana Constitution.  We recognize the Attorney General has inherent authority as an elected Executive Branch officer to exercise his constitutional duties.  The M. R. Pro. Cond. cannot be used as a political tool to punish the Attorney General for the independent—even controversial—exercise of his constitutional powers, so long as they conform to the M. R. Pro. Cond.

¶182   We find Knudsen violated Rule 3.4(c) and Rule 5.1(c) for personally disobeying and allowing his subordinates to disobey this Court's Order to return the subpoena materials without seeking a stay of that Order.  We hold the Commission failed to prove Knudsen's statements critical of the Court violated Rule 8.2(a).  The Commission did not prove Knudsen's conduct was prejudicial to a specific court proceeding and therefore did not violated Rule 8.4(d).  Finally, the Commission failed to provide legal justification to find a separate violation of Rule 8.4(a) for any other Rule violation, so we hold Knudsen did not violate Rule 8.4(a).

¶183   The Commission proceedings did not violate the *Best* rule by remanding the original Special Counsel report for further investigation and filing of a formal complaint.  The Commission Chairman violated Knudsen's due process and the Commission rules by

89

denying Knudsen's Motion for Summary Judgment in a solo ruling. The Commission violated Knudsen's due process by excluding his expert witness without allowing him time to respond to a motion to exclude him. And the Commission violated Knudsen's due process and this Court's expectations of an adequate record on appeal by issuing inadequate conclusions of law in its Order.[24]

¶184 We reject the Commission's recommendation for a 90-day suspension of Knudsen's law license and the bill of costs for the proceedings.

¶185 IT IS HEREBY ORDERED that this case is DISMISSED.

The Clerk of this Court is directed to provide a copy of this Opinion and Order to all counsel of record, the Office of Disciplinary Counsel, the Office Administrator for the Commission on Practice, and the State Bar of Montana.

DATED this 31st day of December, 2025.

/S/ CORY J. SWANSON

---

[24] The Concurrence and Dissent objects to the Court's procedural handling of this matter. We need spend little time on the complaint, as we are confident it would not affect the outcome of this decision. First, the matter required en banc review and is appropriate for oral argument pursuant to the Court's Internal Operating Rules because Knudsen has asserted a constitutional challenge to the Rules of Professional Conduct and the Rules for Lawyer Disciplinary Enforcement. Second, due to the appointment of five District Court Judges to this panel, scheduling case administration matters was abnormally difficult. The Chief Justice received confirmation from multiple appointed members of the panel that an oral argument was necessary, and scheduling the matter required more expediency and less ceremony than normal. The undersigned extends apologies to any panel member who felt left out; no such complaint was received prior to the final draft of the Opinion and Order. Third, we fully agree with the view that overlength briefs are not favored. However, MRLDE 16 does not require the filings to conform to the brief page limits of the Rules of Appellate Procedure. Justice Bidegaray is correct that Rule 16 does not provide for a reply brief, and ODC objected to the reply. However, ODC merely objected. It failed to file a motion to strike Knudsen's reply brief, and therefore the Court did not sua sponte complete ODC's task for it, much like other shortcomings in this case.

We Concur:

/S/ JESSICA T. FEHR
District Court Judge Jessica T. Fehr
Sitting by designation

/S/ ROD SOUZA
District Court Judge Rod Souza
Sitting by designation

/S/ LUKE BERGER
District Court Judge Luke Berger
Sitting by designation

/S/ GREGORY L. BONILLA
District Court Judge Gregory L. Bonilla
Sitting by designation

/S/ PAUL SULLIVAN
District Court Judge Paul Sullivan
Sitting by designation


District Court Judge Paul Sullivan, concurring.

¶186   While I join the majority's decision in full, I write separately because I believe prudential considerations warrant dismissal prior to my colleagues' substantive analysis. Reasonable minds can disagree about whether Knudsen's conduct warrants discipline. My position is that the extraordinary circumstances giving rise to these proceedings, combined with the procedural deficiencies below, counsel against reaching that question. The separation of powers endures not through the triumph of one branch over another, but through mutual recognition of institutional limits.

¶187 The Attorney General is unquestionably subject to the Rules of Professional Conduct, and he plainly failed to comply with this Court's order directing immediate return of judicial-branch emails. Given our plenary authority to oversee attorney conduct, he is properly before us and subject to our decision. However, the ability to impose discipline is independent of the wisdom of doing so.

¶188 This case emerges from a constitutional confrontation that saw all three branches of Montana's government depart from established norms. While each believed itself to be defending fundamental principles, the breakdown of regular order threatened the very structure of separated powers. Under these extraordinary circumstances, where institutional boundaries blurred and normal processes collapsed, exercising our disciplinary authority over the State's chief legal officer would compound, rather than remedy, the damage. On the basis of separated powers and the proud tradition of judicial restraint, I would dismiss this matter in its entirety and decline the invitation to have the last word.

## I. Factual Background

¶189 The events giving rise to this proceeding emerged from a constitutional confrontation that embroiled Montana's legislative, executive, and judicial branches during the 2021 legislative session.

¶190 Early in the session, the Montana Legislature considered Senate Bill 140 (SB 140), legislation that would fundamentally alter the state's judicial selection process by eliminating the Judicial Nomination Commission in favor of direct gubernatorial appointment to fill judicial vacancies. Then-Chief Justice Mike McGrath lobbied publicly

against SB 140 before Governor Gianforte signed it into law. During that same time, Court Administrator Beth McLaughlin, using government email accounts, conducted a poll of Montana district court judges soliciting their positions, which one judge answered by stating he was "adamantly oppose[d]" to the bill.

¶191 The day after the Governor signed SB 140, challengers filed an original action contesting its constitutionality. McGrath recused himself and appointed a judge who had expressed opposition to the bill in the poll. When the judicial polling became public, the State moved to disqualify that judge, who then recused.

¶192 After learning of the MJA poll, the Legislature requested information about it from McLaughlin who provided the final tally but indicated that some of the responses had been deleted. On April 8, 2021, after McLaughlin confirmed she had deleted the requested emails and blamed "sloppiness," the Legislature issued an investigative subpoena to the Department of Administration for virtually all of McLaughlin's emails from the legislative session, demanding production by 3:00 p.m. the next day. The Department complied before McLaughlin learned of the subpoena, producing over 5,000 judicial branch emails containing confidential employee medical information, child abuse case details, and Judicial Standards Commission matters.

¶193 Against this unusual backdrop, the procedural irregularities multiplied. Over the weekend, McLaughlin's attorney contacted multiple justices ex parte, first calling Justice Sandefur, then Justice Rice. On Sunday, April 11, McLaughlin filed an emergency motion in the pending SB 140 case despite neither her, the Legislature, nor DOA being parties.

93

This Court convened in an unprecedented Sunday session and temporarily quashed the legislative subpoena.

¶194 The Legislature retained Attorney General Austin Knudsen, who immediately adopted a radical approach that departed dramatically from ordinary practice. His office sent a letter to this Court declaring that the Legislature "does not recognize this Court's Order as binding and will not abide it." Subsequent filings characterized the Court's reasoning as "ludicrous," "wholly outside the bounds of rational thought," and suffering from "the bias of Maslow's Hammer." The Attorney General accused the Court of "actual impropriety" and making statements "inaccurate almost to a word," while describing its analysis as "perverse."

¶195 Meanwhile, the substantive dispute proceeded to a resolution. This Court upheld SB 140's constitutionality in the original challenge, ruling in favor of the State on the merits. *Brown v. Gianforte*, 2021 MT 149, ¶ 51, 404 Mont. 269, 488 P.3d 548. The Legislature then withdrew its subpoenas in an unsuccessful attempt to moot McLaughlin's case. Nevertheless, the Court issued its Opinion and Order in *McLaughlin*, quashing the withdrawn subpoenas and ordering the Legislature to "immediately return any materials produced pursuant to the subject subpoenas, or any copies or reproductions thereof, to Court Administrator Beth McLaughlin." *McLaughlin v. Mont. State Legislature*, 2021 MT 178, ¶ 57, 405 Mont. 1, 493 P.3d 980.

¶196 Despite this explicit order requiring immediate return, the Attorney General retained possession of the USB drives containing over 5,000 judicial emails and all processed copies. After months of inflamed rhetoric, Knudsen's silence was deafening. On July 22,

94

2021, McLaughlin's counsel sent a letter acknowledging the logistical challenges of compliance and expressing willingness to discuss a reasonable timeline. Counsel's disappointment at hearing nothing in the eight days since the order was palpable, but he remained professional: "Please advise as soon as possible what steps are being taken to comply with the Supreme Court's Order."

¶197 After denial of the rehearing petition, McLaughlin's counsel renewed his inquiry two months later on September 8, 2021, noting the Court's directive was clear and reiterating his willingness to "discuss logistics with respect to compliance." The Attorney General's office responded only that staff would discuss the matter "next week." McLaughlin's counsel testified to being told a petition for certiorari would be filed, though the timing and nature of this communication remains unclear.

¶198 Instead of seeking a stay, Knudsen petitioned for certiorari, claiming "[j]udicial self-dealing on this scale might be unprecedented in the Nation's history." The writ was denied March 21, 2022, and Knudsen returned the first of the materials March 22, 2022, over eight months after the order requiring immediate return.

¶199 The procedural posture cannot be ignored. With ex parte weekend communications, emergency Sunday proceedings, and intervention by McLaughlin as a non-party, the irregularities were highly unusual. Moreover, the Attorney General represented a coordinate branch against the Judiciary in a fundamental clash over separated powers. And finally, no party moved for contempt or filed a motion to compel. McLaughlin's counsel, while appropriately persistent, maintained professional collegiality throughout. This

restraint by all parties suggests the possibility of a tacit forbearance while these constitutional issues were considered by the United States Supreme Court.

¶200   When opposing counsel maintains professional collegiality despite clear violations, when no contempt motions are filed despite defiant rhetoric, and when parties only discuss logistics rather than threatening judicial enforcement, the absence of adversarial escalation speaks volumes about the understood nature of this dispute.

¶201   Nonetheless, these events prompted an ethics complaint against Knudsen filed by an attorney who was not directly involved in the case.  ODC appointed outside special counsel Daniel McLean who, after ten months of investigation, recommended dismissal with a private admonition, concluding that formal proceedings "would exacerbate the issues between the Legislature and the Judiciary, which likely again would be played out in public, and allow a political fight to undermine confidence in the judicial system."

¶202   The Commission's review panel rejected this recommendation and directed further investigation.  A second special counsel, Timothy Strauch, was appointed in February 2023.  After completing his investigation, Strauch sought and received leave to file a 41-count complaint alleging violations of Rules 3.4(c), 5.1(c), 8.2(a), 8.4(a), and 8.4(d) of the Montana Rules of Professional Conduct.

¶203   The procedural path to hearing was contentious.  After initially being scheduled for hearing in July 2024, hearing was delayed several times.  Knudsen filed a motion for summary judgment arguing that disciplining him for official actions violated separation of powers, challenged two Commission members for alleged conflicts of interest (both voluntarily recused), sought exclusion of ODC's evidence, proposed an expert witness

96

(which the Commission excluded without allowing him to respond), and filed multiple motions to vacate or stay the proceedings alleging due process violations. Two days before the scheduled hearing, Knudsen petitioned this Court for supervisory control, which was denied on grounds that he had an adequate remedy on appeal.

¶204 The hearing proceeded October 9–10, 2024, less than a month before the November 5 election in which Knudsen was seeking reelection as Attorney General. On October 23, with less than two weeks to the general election, the Commission issued truncated findings which the majority Opinion and Order aptly addresses. Ultimately, the Commission concluded that Knudsen violated five rules of professional conduct and recommended a 90-day suspension from practice.

¶205 These events reveal systemic departures from normal processes by all three branches. The Judiciary considered the Court Administrator's challenge to the Legislature's authority through irregular weekend proceedings. The Legislature issued sweeping subpoenas with compressed deadlines and openly declared its refusal to recognize judicial orders. The Executive Branch abandoned established procedures for challenging court orders in favor of direct defiance and inflammatory rhetoric, retaining judicial emails for eight months despite an explicit order requiring immediate return. What began as a dispute over judicial selection evolved into a constitutional crisis challenging the foundations of separated powers and the rule of law itself.

## II. Montana's Attorney General

¶206 The Montana Attorney General occupies a unique position in our constitutional structure. Unlike his federal counterpart who serves at presidential pleasure, Montana's

Attorney General is independently elected, answering directly to the people rather than the Governor. Mont. Const. art. VI, §§ 1–4. The 1972 Constitutional Convention deliberately preserved this independence, rejecting proposals that would have aligned the Attorney General with the Governor's political party. Yet the Constitution also requires the Attorney General to be "an attorney in good standing admitted to practice law in Montana." Mont. Const. art. VI, § 3(2). While Knudsen serves as a counterbalance to the Governor, this Court's disciplinary oversight is a counterbalance to him.

¶207 In the *McLaughlin* matter, Knudsen represented the Legislature against the Judiciary in a fundamental clash over separated powers. He wore the hats of two branches in a dispute with the third. His actions, while intemperate, occurred within that representation. This context does not excuse his conduct, but it bears directly on whether exercising disciplinary authority over an independently elected executive officer, acting in his official capacity as counsel for a coordinate branch, would compound rather than remedy the institutional damage.

## III. The Doctrine of Separation of Powers

¶208 The Constitution provides a direct and unambiguous command from the people of Montana: "The power of the government of this state is divided into three distinct branches—legislative, executive, and judicial. No person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others . . . ." Mont. Const. art. III, § 1. This structure is our primary safeguard against the concentration of power in any single entity and is designed

to protect our citizens' liberties by creating a dynamic tension between the three co-equal branches of government.

¶209　The constitutional architecture of Montana's government reflects a fundamental truth recognized by the framers of both federal and state constitutions: the concentration of power in any single branch threatens liberty itself.　As this Court has consistently held, Montana's conception of separation of powers "is designed to prevent a single branch from claiming or receiving inordinate power."　*O'Neill v. Gianforte*, 2025 MT 2, ¶ 16, 420 Mont. 125, 561 P.3d 1018 (citation omitted).

¶210　Yet the doctrine speaks to more than just the dangers of concentrated authority; it also invokes the virtue of institutional humility.　As early as *Marbury v. Madison*, the judiciary has recognized that it must occasionally yield authority in order to preserve the delicate balance that preserves the union.　5 U.S. 137 (1803)

¶211　The wisdom in *Marbury* is in its recognition that the authority to declare laws unconstitutional must be balanced with discretion, when doing so would improperly intrude upon coordinate branches and violate the Constitution.　After establishing Marbury's right to his commission and the general availability of mandamus as a remedy, the United States Supreme Court ultimately recognized that it lacked jurisdiction to issue the requested writ because Congress' attempt to grant authority to issue mandamus exceeded the constitutional scope provided in Article III of the United States Constitution. *Marbury*, 5 U.S. at 173–80.　This act of judicial humility, declining to provide relief despite finding a legal wrong, exemplifies the restraint necessary to maintain the separation of powers.

¶212 After *Marbury*, the doctrine blossomed into a proud, and well developed, tradition. In *Spalding v. Vilas*, the United States Supreme Court determined that executive officers must be absolutely immune from suit for their official acts, reasoning that "[t]he interests of the people" required such immunity to ensure that officials would exercise their discretion without fear of personal liability. 161 U.S. 483, 498, 16 S. Ct. 631, 637 (1896). Even with allegations of malicious motives, subjecting the official communications of executive officers to judicial scrutiny chills the exercise of executive discretion.

¶213 The principle evolved through the *Nixon* cases, which established a framework for balancing executive prerogatives against judicial process, recognizing a "presumptive privilege" for presidential communication that "relates to the effective discharge of a President's powers. . . ." *United States v. Nixon*, 418 U.S. 683, 708–09, 711, 94 S. Ct. 3090, 3108–09 (1974). Later, interpreting that decision, the United States Supreme Court emphasized that judicial intervention into executive decision-making should occur only when there is "imperative constitutional necessity." *Nixon v. Fitzgerald*, 457 U.S. 731, 761, 102 S. Ct. 2690, 2707 (1982) (Burger, C.J., concurring).

¶214 The *Nixon* framework recognizes that while no branch is immune from judicial oversight, each must be afforded deference to exercise its core constitutional functions. The separation of powers is designed to ensure that each branch retains the degree of autonomy necessary to discharge its constitutional duties. This autonomy is not absolute, but it demands that the judiciary exercise its oversight with measured restraint.

¶215 While these federal precedents address immunity from suit rather than professional discipline, they illuminate a broader constitutional principle: courts must exercise

particular care when their actions implicate the constitutional prerogatives of coordinate branches.

¶216 Contrary to Knudsen's argument, the question is not whether separation of powers concerns render executive officers exempt from the professional rules, but whether they compel discretion when the judiciary considers exercising its disciplinary authority against an executive officer's exercise of his constitutional functions. Just as the Court in *Nixon* recognized that judicial intervention requires "imperative constitutional necessity," this Court must consider whether exercising disciplinary authority in this case, where all three branches departed from normal processes, would compound rather than remedy the institutional damage. The separation of powers doctrine does not merely allocate governmental functions; it demands institutional humility when one branch sits in judgment of another's official acts.

¶217 Montana's conception of separation of powers shares these fundamental concerns. While we have held the doctrine "is designed to prevent a single branch from claiming or receiving inordinate power," we have equally recognized it does not "bar cooperative action among the branches of government." *Powder River Cnty. v. State*, 2002 MT 259, ¶ 114, 312 Mont. 198, 60 P.3d 357.

¶218 The Attorney General occupies a unique position in this structure. Unlike his federal counterpart who serves at presidential pleasure, Montana's Attorney General is independently elected, answering directly to the people. When acting in his official capacity, particularly when representing a coordinate branch in constitutional litigation, the Attorney General exercises authority that is itself rooted in the separation of powers.

101

Whether exercising his own executive authority or representing a co-equal branch like the Legislature, his duty is not a professional obligation but a constitutional function, even when advocating against the judiciary. There is no question that such advocacy is subject to judicial oversight. But exercising that oversight requires balance, otherwise it risks transgressing the very boundaries the separation of powers exists to preserve.

¶219 The lesson from *Marbury* endures: the existence of judicial authority does not always counsel its exercise. Just as Marshall declined to issue mandamus despite finding a legal violation, this Court must consider whether these facts warrant exercising disciplinary authority over an executive officer's official acts. The separation of powers thus demands not only that each branch stay within its boundaries, but that each branch exercise wisdom when enforcing those boundaries against the others.

## IV. Judicial Restraint

¶220 "[W]hile unconstitutional exercise of power by the executive and legislative branches of the government is subject to judicial restraint, the only check upon our own exercise of power is our own sense of self-restraint." *United States v. Butler*, 297 U.S. 1, 78–79, 56 S. Ct. 312, 325 (1936) (Stone, J., dissenting). This principle recognizes that the existence of judicial authority does not always counsel its exercise, particularly when the balance between coordinate branches hangs in the balance.

¶221 The doctrine's necessity is not theoretical but practical.

> The Court's authority—possessed of neither the purse nor the sword—ultimately rests on sustained public confidence in its moral sanction. Such feeling must be nourished by the Court's complete detachment, in fact and in appearance, from political entanglements and by abstention from injecting itself into the clash of political forces in political settlements.

102

*Baker v. Carr*, 369 U.S. 186, 267, 82 S. Ct. 691, 737–38 (1962) (Frankfurter, J., dissenting). When courts enter the "political thicket," they risk transforming into just another partisan branch—precisely what the framers sought to prevent. *See Colegrove v. Green*, 328 U.S. 549, 556, 66 S. Ct. 1198, 1201 (1946).

¶222 History validates this wisdom. From *Marbury*'s demonstration that judicial authority is often strongest when declined, to the modern Court's recognition that legitimacy "flows from the perception—and reality—that we exercise humility and restraint," the principle endures. *Obergefell v. Hodges*, 576 U.S. 644, 708, 135 S. Ct. 2584, 2624 (2015) (Roberts, C.J., dissenting). "The citizen's respect for judgments depends in turn upon the issuing court's absolute probity. Judicial integrity is, in consequence, a state interest of the highest order." *Republican Party of Minn. v. White*, 536 U.S. 765, 793, 122 S. Ct. 2528, 2544 (2002) (Kennedy, J., concurring).

¶223 The doctrine of judicial restraint encompasses temporal as well as substantive considerations. Just as federal courts avoid election-eve interventions that could influence outcomes, disciplinary proceedings against elected officials require particular temporal sensitivity. *See Purcell v. Gonzalez*, 549 U.S. 1, 127 S. Ct. 5 (2006). Though we sit in review months after the election has concluded, it is impossible to ignore that the Commission's findings were issued while voters were deciding the Attorney General's fate. Those temporal concerns crystallized into the record before us now. When a disciplinary body issues findings recommending suspension of an incumbent constitutional officer twelve days before an election, the perception of political motivation becomes

embedded in the proceeding itself and appellate review does not cleanse this taint. The judiciary's legitimacy depends on its distance from such political entanglements, and that distance must be maintained not only in our own actions but in our assessment of the proceedings we review.

¶224 Between the procedural irregularities, the anomalous inter-branch dispute, timing concerns, and the underlying procedural shortcomings discussed by the majority, this case presents a unique and odd predicament. "Bad facts make bad law," and "odd facts make odd law." *Doggett v. United States*, 505 U.S. 647, 659, 112 S. Ct. 2686, 2694 (1992) (Thomas, J., dissenting). When extraordinary circumstances blur institutional boundaries, restraint is not weakness, but wisdom. The court that exercises such restraint does not abdicate its authority; it fortifies the constitutional role entrusted to it by the framers.

¶225 Alexander Hamilton understood this paradox when he described the judiciary as the "least dangerous" branch, possessing "neither FORCE nor WILL, but merely judgment." *The Federalist* No. 78 (1788). Yet this apparent weakness conceals enormous power— power that exists because of its limitations, not despite them. Our authority can be unfathomably vast, restrained only by discretion and the public's perception of our probity. In this paradox lies the essence of judicial power—it depends on judicious application: strongest when exercised sparingly, most enduring when deployed with humility, and most potent when selectively exercised.

## V. Dismissal

¶226 When a violation occurs within such extraordinary circumstances, when all three branches have departed from established norms, discretion counsels forbearance. In such

circumstances, this Court should not compound the damage. Instead, all three branches must return to regular order.

¶227 The words of Justice Brandeis resonate here: "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States*, 277 U.S. 438, 479, 48 S. Ct. 564, 573 (1928) (Brandeis, J., dissenting) *overruled by Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967). Each branch acted with zeal for its prerogatives. Each believed itself defending fundamental principles. Each contributed to the breakdown.

¶228 That same zeal, perhaps, explains the irregular path this disciplinary matter has taken. But for the constitutional dimensions of this case, would a routine violation of a court order with no practical harm and no application for contempt have prompted a grievance from a third-party attorney? Would it have justified rejecting special counsel's recommendation for private admonition after ten months of investigation? Would it have warranted rushing to hearing weeks before an election, with findings issued while ballots were being cast? These anomalies did not arise in a vacuum. They reflect the gravitational pull of the underlying constitutional crisis, distorting normal processes just as the original dispute distorted the behavior of all three branches.

¶229 I would therefore dismiss this complaint in its entirety. Not because the Attorney General's conduct was exemplary, or even acceptable; it was not. Nor because the violation was trivial or based on an open refusal. But because in these circumstances, where institutional boundaries are blurred and all branches departed from established norms, the wisest course is to decline the invitation to have the last word.

¶230 The separation of powers endures not through the triumph of one branch over another, but through mutual recognition of institutional limits. That recognition should begin here, with this Court exercising restraint in exercising our disciplinary authority over the Attorney General. Where all three branches departed from established norms, singling out one for punishment perpetuates rather than resolves the crisis. On the basis of separated powers and the proud tradition of judicial restraint, I concur in dismissal but would reach that conclusion without more.

/S/ PAUL SULLIVAN
District Court Judge Paul Sullivan
Sitting by designation

Justice Katherine M. Bidegaray, concurring in part and dissenting in part.

**Introduction**

¶231 After holding that Attorney General Knudsen violated the Montana Rules of Professional Conduct, the majority dismisses a disciplinary complaint against him, concluding that procedural imperfections in the proceedings before the Commission on Practice deprived him of due process. I cannot join that result. The record and Montana precedent do not justify nullifying a complete disciplinary record or insulating an elected attorney from professional accountability. The Commission acted within its lawful authority, provided adequate process, and reached findings that are reviewable and supported by clear and convincing evidence.

¶232 For the following reasons, I concur in the majority holding that (1) Knudsen is subject to this Court's constitutional authority to regulate the practice of law; (2) Knudsen

violated M. R. Pro. Cond. 3.4(c) and 5.1(c) when he knowingly disobeyed this Court's July 14, 2021 Order in *McLaughlin v. Mont. State Legislature*, 2021 MT 178, 405 Mont. 1, 493 P.3d 980, and allowed his subordinates to do the same; (3) ODC failed to prove any M. R. Pro. Cond. 8.2(a) or 8.4(a) violation; and (4) the Commission did not violate due process under *In re Best*, 2010 MT 59, 355 Mont. 365, 229 P.3d 1201. That is the extent of my agreement with the majority. The remaining issues—M. R. Pro. Cond. 8.4(d), due process, and remedy—require closer examination.

¶233 I believe Knudsen's conduct in disobeying this Court's order was prejudicial to the administration of justice in violation of Rule 8.4(d). Because the majority concludes otherwise, I dissent from holdings to the contrary. I would hold that Knudsen violated M. R. Pro. Cond. 3.4(c), 5.1(c), and 8.4(d).

¶234 I also disagree that any procedural irregularities in these disciplinary proceedings violated due process. The Commission's summary judgment decision, while made without a quorum, was nonetheless correct and did not result in substantial prejudice; the parties proceeded to a two-day hearing during which Knudsen presented evidence, cross-examined witnesses, and presented a full defense. The Commission's exclusion of inadmissible expert opinion testimony was not an abuse of discretion and did not result in substantial prejudice. Finally, the Commission's written decision, despite any imperfections, is nonetheless sufficient for appellate review, which Knudsen indisputably receives here.

¶235 Despite concluding that Knudsen violated Montana's Rules of Professional Conduct, the majority dismisses the complaint against Knudsen without discipline.

I dissent from that unprecedented and extraordinary decision. The majority bases its dismissal on the Commission's denying summary judgment, excluding expert witness opinion testimony, and rendering findings of fact and conclusions of law it deems insufficient for appellate review, all while conceding these Commission actions resulted in little or no prejudice. Because Knudsen violated the M. R. Pro. Cond. and received all process due under the law, I respectfully dissent from the majority's decision to dismiss the complaint.

## I. The Supreme Court's Standard of Review in Disciplinary Matters

¶236 The standard of review for Commission findings of fact, conclusions of law, and recommendations is de novo.[1] De novo means "anew"; it is thus a non-deferential standard that requires us to conduct an inquiry identical to the Commission's inquiry in disciplinary proceedings.[2] We have a "duty" to "weigh[] the evidence upon which the Commission's findings rest." *In re Potts*, 2007 MT 81, ¶ 32, 336 Mont. 517, 158 P.3d 418. Ultimately, we decide whether ODC proved rule violations by clear and convincing evidence.[3] We are not constrained by a Commission decision and may decide that the facts support contrary legal conclusions and different punishment.[4] *In re Wyse*, 212 Mont. 339, 346, 688 P.2d

---

[1] In contrast, in appeals from district courts, the standard of review for conclusions of law is de novo, and for factual findings, deferential review for clear error. *In re Kesler*, 2018 MT 231, ¶ 23, 392 Mont. 540, 427 P.3d 77.

[2] *Accord Cole v. Valley Ice Garden, LLC*, 2005 MT 115, ¶¶ 3-4, 327 Mont. 99, 113 P.3d 275; *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 52, 345 Mont. 12, 192 P.3d 186.

[3] MRLDE 12(D) and 22(B) (ODC's burden of proof).

[4] *See In re Engel (Engel I)*, 2007 MT 172, 338 Mont. 179, 169 P.3d 34; *In re Engel (Engel II)*, 2008 MT 42, 341 Mont. 360, 177 P.3d 502.

758, 762 (1984) (Commission "findings of fact are not attended by any special binding effect upon us and we have always maintained the right to accept or reject [its] findings of fact . . . and to accept, reject or modify its recommendations for discipline"). *Accord* MRLDE 16 ("[t]he Supreme Court shall consider the matter, issue its written decision, and impose such discipline, if any, as it considers appropriate").

## II. Separation of Powers and the Court's Constitutional Regulatory Authority

¶237 Article VII of the Montana Constitution vests the judicial branch with "[t]he judicial power of the state." The constitution also vests this Court with the exclusive power to "make rules governing . . . admission to the bar and the conduct of its members." Mont. Const. art. VII, § 2(3). Article VI, § 3(2) requires that the Attorney General be "an attorney in good standing admitted to practice law in Montana." These constitutional mandates place the Attorney General squarely within this Court's disciplinary jurisdiction.

¶238 Unlike Article VII of the Montana Constitution, which vests judicial power in the courts, Article VI does not vest the office of Attorney General with any enumerated powers; rather, it provides that "[t]he attorney general is the legal officer of the state and shall have the duties and powers provided by law." Mont. Const. art. VI, § 4(4); *compare* Mont. Const. art. VII, §§ 1, 2. Section 2-15-501, MCA, prescribes the duties of the Attorney General, which include representing the state in legal matters and supervising the criminal justice system as the head of Montana's Department of Justice. *See also* § 2-15-2001, MCA. We have long recognized that role: "The attorney general is the chief law-enforcement officer of the State." *State v. Tursich*, 127 Mont. 504, 509, 267 P.2d 641, 643 (1954). The Attorney General, as Montana's chief law-enforcement officer, bears a

heightened duty to model respect for court orders and the rule of law and to supervise subordinates to do the same.

¶239 Unlike the interbranch dispute underlying *McLaughlin*, there is no separation of powers conflict here. The Attorney General is the state's legal officer, with his "duties and powers" prescribed by law, Mont. Const. art. VI, § 4(4), who must be "in good standing admitted to practice law," Mont. Const. art. VI, § 3(2). The Supreme Court regulates admission to practice law and attorney conduct. Mont. Const. art. VII, § 2(3). I disagree with the majority to the extent it contends that Attorney General Knudsen's powers are constitutional; his powers and duties are "provided by law," not by the Montana Constitution. *See* Opinion, ¶¶ 41-43 (citing § 2-15-501, MCA); *compare* Mont. Const. art. VI. However, I agree with the majority's conclusion that this Court has sole constitutional authority to regulate the practice of law and that Attorney General Knudsen is subject to the M. R. Pro. Cond. and professional discipline by this Court. That authority applies uniformly to every attorney in Montana, including those who hold statewide office.

## III.  Violations of the Montana Rules of Professional Conduct

¶240  I agree with the majority that Knudsen violated M. R. Pro. Cond. 3.4(c) and 5.1(c) by knowingly disobeying this Court's order to return materials in *McLaughlin*. I also agree with the majority that Knudsen did not violate M. R. Pro. Cond. 8.4(a); the rule requires misconduct separate from that described in the other rules. The majority concludes that Knudsen did not violate M. R. Pro. Cond. 8.2(a); I agree. Though Knudsen unquestionably made statements in pleadings before this Court and the United States Supreme Court that impugned the integrity of the *McLaughlin* Justices, ODC either failed to prosecute those

110

statements properly as Rule 8.2(a) violations or, for the Rule 8.2(a) violations the ODC alleged, failed to prove that Knudsen made those impugning statements without any objectively reasonable basis in fact. Finally, the majority concludes that Knudsen did not violate M. R. Pro. Cond. 8.4(d). I disagree; failure to follow a court order is unquestionably prejudicial to the administration of justice.

### A. Rule 3.4(c): Failure to Obey Court Orders – Proven

¶241 M. R. Pro. Cond. 3.4(c), which the majority and I agree Knudsen violated, forbids a lawyer from "knowingly disobey[ing] an obligation under the rules of a tribunal." The narrow exception for an "open refusal based on an assertion that no valid obligation exists" applies only when an attorney challenges an order through proper judicial channels. *In re Ford*, 128 P.3d 178, 181-82 (Alaska 2006) ("[a]n attorney may challenge a court order by motion, appeal, or other legal means, but may not simply disregard it"). An attorney may not unilaterally decide that a court's order is invalid. *People v. Brown*, 461 P.3d 683, 695-96 (Colo. 2019) ("[u]nder the open refusal exception, a lawyer cannot unilaterally and surreptitiously flout a court order" (citation omitted)).

¶242 The United States Supreme Court has long held that "all orders and judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458-59, 95 S. Ct. 584, 591 (1975) (citing *Howat v. Kansas*, 258 U.S. 181, 189-90, 42 S. Ct. 277, 280-81 (1922)); *see also Walker v. City of Birmingham*, 388 U.S. 307, 314-15, 87 S. Ct. 1824, 1828-29 (1967); *United States v. United Mine Workers*, 330 U.S. 258, 293, 67 S. Ct. 677, 695-96 (1947). An attorney who believes an order is erroneous must seek a stay or appeal; absent such relief, the order must be obeyed. *Ford*, 128 P.3d at 181-82; *Brown*,

111

461 P.3d at 695-96. This principle preserves the judiciary's authority and the rule of law itself.

¶243 Knudsen's failure to seek a stay before refusing to comply with this Court's July 14, 2021 Order in *McLaughlin* removed his conduct from the "open refusal" safe harbor. Knudsen's deliberate noncompliance violated Rule 3.4(c). An attorney's disagreement with a judicial ruling, even one believed unconstitutional, must be resolved through lawful challenge, not through self-help. Obedience to judicial orders—particularly by the State's chief law-enforcement officer—is foundational to the rule of law.

### B. Rule 5.1(c): Ratifying Subordinates' Misconduct – Proven

¶244 M. R. Pro. Cond. 5.1(c), which the majority and I agree Knudsen violated, provides that "[a] lawyer within a firm shall be responsible for another lawyer in the firm's violation of the Rules of Professional Conduct if:" (1) "the lawyer orders or, with knowledge of the specific conduct, ratifies or ignores the conduct involved" or (2) "has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action." I concur that Knudsen violated Rule 5.1(c) via the conduct of his subordinates for disobeying the Court's July 14, 2021 Order in *McLaughlin*.

### C. Rule 8.2(a): Statements Impugning Integrity of Justices Made With Reckless Disregard as to Their Truth or Falsity – Not Proven

¶245 M. R. Pro. Cond. 8.2(a), which the majority and I agree ODC failed to prove Knudsen violated, prohibits a lawyer from making statements "that the lawyer knows to be false or with reckless disregard as to their truth or falsity concerning the qualifications or

112

integrity of a judge." The rule is grounded in First Amendment limitations that protect even sharp criticism of judges unless the statements are factual assertions made without any objectively reasonable basis. A statement is punishable only if it is capable of being proved true or false and is made with no reasonable factual basis. *Standing Comm. on Discipline of the U.S. Dist. Ct. v. Yagman*, 55 F.3d 1430, 1437 (9th Cir. 1995) ("[t]he inquiry focuses on whether the attorney had a reasonable factual basis for making the statements, considering their nature and the context in which they were made"); *In re Miller*, No. PR 18-0139, 2019 Mont. LEXIS 973 (Nov. 20, 2019); *Buckley v. Littell*, 539 F.2d 882, 893-94 (2d Cir. 1976). To establish a Rule 8.2(a) violation, ODC bears the burden to prove falsity and knowledge or reckless disregard[5] by clear and convincing evidence. *Accord Yagman*, 55 F.3d at 1438.[6]

---

[5] The rule prohibits either scenario—actual knowledge or reckless disregard as to truth or falsity. *United States Dist. Ct. v. Sandlin*, 12 F.3d 861, 866-67 (9th Cir. 1993). If the attorney knew his impugning statement was false, he violated Rule 8.2(a). Absent proof of actual knowledge, to answer whether the attorney made the impugning statement with "reckless disregard," we apply an objective standard, asking "what a reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances." *Miller*, No. PR 18-0139. *Accord Idaho State Bar v. Topp*, 925 P.2d 1113, 1116-17 (Idaho 1996) (objective reasonableness is the standard for "reckless disregard"); *Bd. of Prf'l Responsibility v. Davidson*, 2009 WY 48, ¶¶ 13-19, 205 P.3d 1008 (the "reckless disregard" standard "is whether a reasonable attorney would have made the statements, under the circumstances, not whether this particular attorney, with her subjective state of mind, would have made the statements").

[6] It goes without saying that false statements by a lawyer impugning the integrity of a judge undermine public confidence in the administration of justice and will therefore also necessarily violate M. R. Pro. Cond. 8.4(d). *See Yagman*, 55 F.3d at 1437-38 ("false statements impugning the integrity of a judge erode public confidence"); *In re McClellan*, 754 N.E.2d 500, 502 (Ind. 2001) ("the judicial institution is greatly impaired if attorneys choose to assault the integrity of the process and the individuals who are called upon to make decisions"); *In re Pyle*, 156 P.3d 1231, 1247-48 (Kan. 2007) ("[p]recisely because lawyers are perceived to have special competence in assessing judges, the public tends to believe what lawyers say about judges, even when lawyers speak inappropriately or make claims about which they are uncertain" (citation omitted)).

¶246 Among the numerous statements ODC charged as violations of Rule 8.2(a), many were unquestionably impugning. Accusations of "judicial misconduct," "conceal[ing] judicial branch misbehavior," "self-dealing," "self-interest," an "adversarial" posture, "misstatements," "counterfactual denial," and "actual impropriety" all strike at the integrity of the Court.[7] But the analysis does not end there. The rule requires ODC to prove by clear and convincing evidence that Knudsen lacked any objectively reasonable basis for making the statements. On this record, ODC did not meet, and the record does not support meeting, that burden.

¶247 At the time Knudsen made the challenged statements, both he and his clients possessed the 5,000 judicial-branch emails produced to the Legislature on April 8, 2021. The Legislature's Select Committee on Judicial Accountability and Transparency's April 27, 2021 Draft Report—available to Knudsen before he filed his impugning statements—identified the Chief Justice's involvement in internal discussions about judicial-branch lobbying on pending legislation using his state email. Regardless of whether those communications ultimately proved misconduct, the emails provided an objectively reasonable basis for Knudsen to raise questions about potential violations of § 2-2-121(6), MCA (2021),[8] and Montana's Code of Judicial Conduct, Canon 1, Rule 1.2

---

[7] For unknown reasons, ODC did not charge some of Knudsen's statements as violative of M. R. Pro. Cond. 8.2(a). For example, the following statement Knudsen made in his May 26, 2021 Petition for Rehearing of this Court's May 12, 2021 Order in *McLaughlin* was easily provable as false and violated M. R. Pro. Cond. 8.2(a): "[T]he Court asserts that no Justice 'participate[d]' in the polls conducted by the MJA. Respectfully, public records tell a different tale." Instead of alleging this statement violated M. R. Pro. Cond. 8.2(a), ODC incorrectly alleged this statement violated M. R. Pro. Cond. 3.4(c), 5.1(c), and 8.4(d), none of which it violates.

[8] Section 2-2-121(6), MCA (2021), provided that "[a] public officer or public employee may not

114

cmt. 5 ("actual impropriety" includes violations of law).[9] The correct Rule 8.2(a) inquiry is not whether these accusations were correct, but whether Knudsen had *an objectively reasonable* factual basis for raising them. He did.

¶248 ODC failed to prove that Knudsen made any impugning statement with knowledge or reckless disregard of falsity, i.e., without an objectively reasonable factual basis. Rule 8.2(a) demands proof not merely that a statement was harsh or ill-advised, but that the attorney lacked any reasonable factual foundation for making it. Sharp criticism of judicial conduct—even criticism that is uncomfortable or unsettling—does not satisfy Rule 8.2(a) absent clear and convincing evidence of knowledge or reckless disregard of falsity. Because the record does not establish the elements of M. R. Pro. Cond. 8.2(a), I agree with the majority that ODC failed to prove any Rule 8.2(a) violation.

### D. Rule 8.4(a): Requirement of a Stand-Alone Violation – Not Proven

¶249 M. R. Pro. Cond. 8.4(a), a violation of which the majority and I agree the ODC failed to prove, provides that "[i]t is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another

---

engage in *any activity*, including lobbying, as defined in 5-7-102, on behalf of an organization, other than an organization or association of local government officials, of which the public officer or public employee is a member while performing the public officer's or public employee's job duties." (Emphasis added.)

[9] This Court addressed the Legislature's claims of improper lobbying when resolving the subpoena-power issue in *McLaughlin*, holding, among other things, that the Legislature had no constitutional authority to investigate alleged violations of § 2-2-121, MCA; nor could it investigate alleged violations of the Montana Code of Judicial Conduct. Investigating violations of law is the province of the executive branch, not the Legislature. Likewise, investigating allegations of judicial misconduct is the province of the Judicial Standards Commission, not the Legislature. *McLaughlin*, ¶¶ 8-9, 21, 31, 34, 37, 41, and 46.

to do so, or do so through the acts of another." We considered Rule 8.4(a) in *In re Morin (Morin II)*, No. PR 17-0448, 2019 Mont. LEXIS 1369 (Feb. 26, 2019). There, because Morin disagreed that the court could appoint the same person to be J.A.L.'s counsel and guardian ad litem, she decided that J.A.L. was unrepresented. Morin then induced another attorney, McCann, to visit J.A.L., enter an agreement to represent J.A.L., enter an agreement to represent J.A.L.'s husband, and then file a petition on J.A.L.'s behalf that served the husband's best interest. We held that Morin violated M. R. Pro. Cond. 4.2 and 8.4(a) when she induced McCann to make unauthorized contact with J.A.L., who was already represented by counsel, and then "used, directed, and controlled" McCann to "ostensibly represent J.A.L. while simultaneously representing" J.A.L.'s husband, "a person with adverse interests"—i.e., by knowingly assisting and inducing McCann to violate the rules of professional conduct. *Morin II* (also holding that Morin's "subterfuge and manipulation" violated Rule 8.4(d) (prejudicial to the administration of justice)).

¶250 Here, the ODC alleged that Knudsen violated Rule 8.4(a) only because he also violated Rules 3.4(c), 5.1(c), 8.2(a), and 8.4(d). ODC interprets Rule 8.4(a) to permit an additional violation for each underlying rule violation.[10] But to read Rule 8.4(a) to allow separate punishment solely for violation of another rule, without more, creates a redundancy. *Morin II* counsels otherwise. Instead, the obvious purpose of Rule 8.4(a) is to prohibit lawyers from assisting or inducing others to violate the rules or from

---

[10] Based on my review of hundreds of prior disciplinary matters, it is not ODC's standard practice to also charge a Rule 8.4(a) violation for every other rule violation.

violating the rules "through the acts of another."[11] Rule 8.4(a) captured Morin's misconduct—improperly contacting a represented person by proxy—as intended. *Accord In re Stanley*, 2025 CO 51, 576 P.3d 171 (attorney violated Rule 8.4(a) "by engaging a subordinate to investigate unfounded rumors that [a judge] had domestically abused his former spouse"). Therefore, I agree with the majority that ODC failed to prove by clear and convincing evidence that Knudsen committed any stand-alone violation of Rule 8.4(a) because Rule 8.4(a) requires misconduct separate from that described in the other rules.

**E. Rule 8.4(d): Conduct Prejudicial to the Administration of Justice – Proven**

¶251 Because I disagree with the majority's conclusions related to M. R. Pro. Cond. 8.4(d), I address it in full. The majority substantially narrows, then misapplies, the rule and ultimately concludes Knudsen did not violate it. Rule 8.4(d) prohibits conduct "prejudicial to the administration of justice." Violation of the rule requires ODC to demonstrate only "*some* nexus between [the attorney's] conduct and *an* adverse effect upon the administration of justice." *In re Olson*, 2009 MT 455, ¶ 32, 354 Mont. 358, 222 P.3d 632 (emphasis added). The majority recasts *Olson*'s "nexus" as disruption of a trial phase and thus overlooks that, for purposes of M. R. Pro. Cond. 8.4(d), prejudice to "the administration of justice" is not limited to the trial phase but persists through enforcement and compliance[12] and, although it usually is limited to conduct connected with court

---

[11] Likewise, the rule captures lawyer conduct that does not rise to a violation because only "attempt[ed]," but not completed.

[12] *In re Pyle*, 156 P.3d 1231, 1247-48 (Kan. 2007) (the rule can be violated "even if a legal proceeding has ended and even if the lawyer stops somewhere short of spreading outright lies"; disciplined lawyer sent letters to people complaining that the disciplinary process was "stacked

proceedings, at times, it encompasses attorney behavior that is "only tangentially related to litigation."[13]

¶252   The majority's requirement for a "causal nexus of harm to a specific case" fails to account for the unique harm caused when the State's chief law-enforcement officer defies a court order.  This conduct was not merely an obstruction in *McLaughlin*; it was an overt and sustained challenge to the judiciary's constitutional authority, resulting in systemic harm to public confidence in the rule of law that cannot be confined to the four corners of a single case record.  The enforcement of judicial orders is the administration of justice, and defiance of an operative order is inherently prejudicial to it.

¶253   As the United States Supreme Court recognized, "[t]he orderly and expeditious administration of justice by the courts requires that an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." *Maness*, 419 U.S. at 458-59, 95 S. Ct. at 591 (citing *United Mine Workers*, 330 U.S. at 293, 67 S. Ct. at 696).  Failure to comply with court orders has been found to violate Rule 8.4(d).  *See, e.g.*, *In re Roose*, 69 P.3d 43 (Colo. 2003) (lawyer left courtroom midtrial in defiance of judge's express order); *In re Rennie*, 696 N.Y.S.2d 444 (N.Y. App. Div. 1999) (lawyer who failed to comply with court order violated Rule 8.4(d)).  Refusing to return materials in defiance of a binding

---

against him").

[13] *Lawyer Disciplinary Bd. v. Kupec*, 505 S.E.2d 619, 634-35 (W. Va. 1998) (citing cases in which lawyers were found to have violated Rule 8.4(d) in matters that were "only tangentially related to litigation").

118

order without seeking a stay impairs the Court's authority to effectuate its judgment in the very case where the order is entered. That is a textbook nexus.

¶254 Further, nothing in *Olson* limits nexus to courtroom delay, and nothing in the text of Rule 8.4(d) supports the majority's narrower interpretation. In *Olson*, we agreed with the Commission that ODC failed to prove by clear and convincing evidence that Olson violated M. R. Pro. Cond. 8.4(d) by possessing items (bagged, tagged, and under lock and key in his private investigator's office) that were taken from his client's apartment after police had completed a search of the apartment, because (1) Olson had a duty under M. R. Pro. Cond. 3.4(a) to conduct an investigation on behalf of his client and to prepare a defense, and (2) no statute or court order required Olson to disclose the items of evidence to the prosecutor. *Olson*, ¶¶ 29, 32. Unlike *Olson*, Knudsen had no duty under any law or rule to disobey this Court's lawful order and, instead, precedent required Knudsen to obey it. *See Maness*, 419 U.S. at 458-59, 95 S. Ct. at 591.

¶255 Knudsen concedes that, in *Olson*, this Court "adopted a narrowing interpretation for Rule 8.4(d)." Notwithstanding Knudsen's admission that *Olson* already avoids constitutional vagueness, the majority further and unnecessarily narrows Rule 8.4(d) to require "prejudice to an identifiable proceeding." Opinion, ¶¶ 123, 131. The majority cites *Morin II* for the proposition that "[t]his Court has previously required a causal nexus of harm to a specific case." Opinion, ¶ 119. While *Morin II* involved a Rule 8.4(d) violation, *supra*, there was *no* discussion or analysis of a "causal nexus" or "specific case" requirement. *Compare* Opinion ¶¶ 119, 131, *with Morin II*, No. PR 17-0448. The only reference to "nexus" was one *Morin made* in her many arguments for why the

Commission's recommended discipline was too harsh, which we concluded supported the Commission's finding that Morin "failed to show remorse, accept responsibility, or express contrition for her conduct." The majority also ignores that in *In re Molloy*, No. PR 08-0438 (Apr. 22, 2009), we imposed the Commission's recommended public censure and costs upon an attorney who failed to file state or federal tax returns over nine years in violation of M. R. Pro. Cond. 8.4(b) *and* 8.4(d)—criminal conduct unquestionably unrelated to "an identifiable proceeding." Moreover, the majority fails to apply its new standard—i.e., the majority does not explain *why* Knudsen's refusal to follow this Court's *McLaughlin* Order did not prejudice the *McLaughlin* proceedings.

¶256   By disregarding and defying this Court's July 14, 2021 *McLaughlin* order to return materials, Knudsen engaged in conduct prejudicial to the administration of justice. The nexus and adverse effect here was concrete: Knudsen's conduct impaired the orderly resolution of *McLaughlin* and undermined public confidence in the judiciary. The "nexus" to an "identifiable proceeding" does not end with a judgment; it continues until that judgment is effectuated. Knudsen's disobedience of this Court's *McLaughlin* Order extended until denial of certiorari in *McLaughlin* and was therefore well within that timeframe and squarely satisfies Rule 8.4(d).

¶257   Finally, the majority's analysis fails to recognize that enforcement of judicial orders is itself an indispensable component of "the administration of justice." A judgment does not conclude the administration of justice; enforcing that judgment does. A party's refusal to comply with an operative order—especially where no stay has been sought—directly impairs the judiciary's ability to effectuate its rulings. That impairment constitutes

120

prejudice under Rule 8.4(d). Nothing in *Olson* or any Montana authority requires that prejudice occur *before* judgment; prejudice occurs where conduct thwarts enforcement or undermines the Court's authority to resolve the controversy. Knudsen's refusal to return materials until after the denial of certiorari did precisely that. Therefore, I dissent from the majority's contrary conclusion.

## IV.  Commission's Actions Were Within Its Authority Under the MRLDE

¶258   The majority correctly recognizes that the record contains no support for Knudsen's repeated claim that Special Counsel Daniel McLean recommended dismissal of the grievance or that the Review Panel directed ODC to prosecute. McLean's May 2022 report found multiple rule violations and recommended a private admonition—not dismissal. The Review Panel, acting under MRLDE 3(B)(2) and 10(D)(2), lawfully referred the matter back to ODC for further investigation to determine whether a complaint was appropriate. Special Counsel Tim Strauch's memorandum confirms only that the Review Panel returned the matter for further investigation because the conduct "likely warranted public discipline." Nothing in the record shows the Review Panel instructed ODC to file a formal complaint.  After further investigation, ODC independently exercised its prosecutorial discretion and sought authorization to file the 41-count complaint under MRLDE 3(B) and 10(C).

¶259   This procedure complied fully with the MRLDE and is precisely the process preserved in *Best*, ¶¶ 30-33. *Best* condemned a Review Panel that drafted and prosecuted its own new charge outside the ODC process. Nothing comparable occurred here. Acting within its screening authority, the Review Panel referred the matter for further investigation

121

and left the prosecutorial decision where it belongs—with ODC. *Best* is therefore distinguishable, and the process here complied with the MRLDE as the majority properly recognizes.

## V. Knudsen's Due-Process Claims

### A. Governing Principles

¶260   Due process in attorney-disciplinary proceedings requires notice, an opportunity to be heard, and a fair tribunal. *In re Engel (Engel III)*, 2008 MT 215, ¶ 23, 344 Mont. 219, 194 P.3d 613. Montana law requires a showing of actual, substantial prejudice before a procedural error rises to the level of a constitutional violation. *See Potts*, ¶ 70; *Goldstein v. Comm'n on Practice*, 2000 MT 8, ¶¶ 49-50, 297 Mont. 493, 995 P.2d 923 (attorney must show "actual prejudicial effect on the results"); *Wyse*, 212 Mont. at 345-46, 688 P.2d at 762 (attorney must show "prejudice resulting . . . from a purported denial of due process"; disagreement with Commission decision is not enough).[14]

### B. Denial of Summary Judgment

¶261   The majority first concludes that the Commission violated its internal procedural rules when it denied Knudsen's summary-judgment motion without a quorum. Yet the majority also acknowledges that the denial itself was correct; the case properly proceeded to a full evidentiary hearing; and Knudsen experienced only "minimal prejudice" from the procedural defect. Opinion, ¶¶ 152-55.

---

[14] Knudsen concedes that "substantial prejudice" is the standard, citing to *Potts*, ¶ 70, in briefing.

¶262 A procedural misstep that neither altered the course of the hearing nor limited the presentation of evidence does not constitute a due process violation. Summary judgment is not constitutionally required in attorney-discipline proceedings, and Knudsen received all the process the Constitution guarantees: notice of the allegations; two days of hearing time; and the ability to testify, present evidence, cross-examine witnesses, and submit extensive briefing. *Engel III*, ¶ 23 (due process requires notice and an opportunity to be heard). Once the Commission denied summary judgment—correctly, as the majority concedes—the parties proceeded through a full adversarial hearing in which Knudsen fully participated.

¶263 Labeling the quorum issue a "due process violation" despite conceding "minimal prejudice" stretches due-process doctrine beyond recognition and conflicts with the standard that procedural error must meaningfully impair a party's ability to be heard. *See Potts*, ¶ 70; *Goldstein*, ¶¶ 49-50; *Wyse*, 212 Mont. at 345-46, 688 P.2d at 762. A ministerial flaw in the internal mechanics of the Commission's deliberations—followed by a full and fair hearing—does not constitute a due process violation. Nothing about the quorum issue impaired Knudsen's ability to defend himself, and nothing in our precedent transforms such a harmless procedural irregularity into structural constitutional error.

## C. Exclusion of Justice Thomas R. Lee's Testimony

¶264 The Commission properly excluded the expert testimony of Knudsen's proposed expert witness, Justice Thomas R. Lee, because it offered legal conclusions on the ultimate legal question—whether Knudsen violated the M. R. Pro. Cond.—and relied on Utah's "zealous-advocacy" framework, which Montana eliminated from its rules in 2004, four

123

years before Knudsen was admitted to practice here. Under M. R. Evid. 702 and 704, expert opinion that invades the factfinder's role or applies foreign legal standards is inadmissible. *Potts*, ¶ 65, expressly upholds exclusion of expert opinions purporting to interpret the Rules of Professional Conduct.

¶265 Notably, "[m]atters of trial administration," including evidentiary rulings, "are reviewed for abuse of discretion." *In re Neuhardt*, 2014 MT 88, ¶ 16, 374 Mont. 379, 321 P.3d 833. Under *Potts*, ¶ 70, the Commission's exclusion of evidence is reversible only if (1) it was in error, and (2) it caused substantial prejudice. *Accord* M. R. Evid. 103 ("[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected"). Here, the Commission originally granted ODC's motion to disallow Lee's opinion testimony under Rule 702[15] because it usurped the Commission's role in deciding whether Knudsen violated the Rules of Professional Conduct. Knudsen immediately filed a motion to reconsider with a supporting brief. After considering that brief, the Commission denied the motion for the same reasons stated in its original ruling. Contrary to the majority assertion that Knudsen had to "carry the burden of persuasion pursuant to M. R. Civ. P. 60," the Commission did not cite, much less apply, any heightened Rule 60 standard.

¶266 The majority further asserts that the Commission "shifted the burden" to Knudsen because it required him to argue admissibility in a motion to reconsider. That contention

---

[15] The Commission also cited *In re Crossen*, 880 N.E.2d 352 (Mass. 2008), which, like *Potts*, establishes that expert testimony is not admissible in disciplinary proceedings to establish rule violations "because the fact finder does not need assistance understanding and applying the ethical rules." *Crossen*, 880 N.E.2d at 380.

has no basis in Montana law. Due process does not prohibit a tribunal from ruling on a motion to exclude evidence or from requiring a party to justify the admissibility of its own proposed expert testimony. Evidentiary rulings routinely involve briefing and argument; nothing about that process shifts any constitutional burden or deprives a party of a meaningful opportunity to be heard. The majority identifies no authority—because none exists—converting a premature or disputed evidentiary ruling into a structural due process violation.

¶267 And the cases the majority invokes do not support its analysis. *Fennessy v. Dorrington*, 2001 MT 204, 306 Mont. 307, 32 P.3d 1250, addressed a lack of notice of a motion to dismiss; it did not involve or analyze due process, burden-shifting, or evidentiary rulings. *Armstrong v. Manzo*, 380 U.S. 545, 85 S. Ct. 1187 (1965), involved termination of parental rights without prior notice—a structural deprivation wholly unrelated to evidentiary management in a disciplinary proceeding.[16] Unlike the petitioners in those cases, Knudsen had notice of ODC's motion, responded by moving for reconsideration, and was heard on the merits.

¶268 The Commission did not apply Rule 60, did not reference a heightened standard, and did not require Knudsen to meet any burden beyond the one he already bore as the

---

[16] *Armstrong* is further distinguishable because there, reconsideration could not "cure" the due process violation—i.e., a complete lack of any notice of termination proceedings—because Armstrong had an evidentiary burden on reconsideration where he had *no* initial burden of proof; instead, the initial burden of proof belonged to the party seeking termination of his parental rights. *Armstrong*, 380 U.S. at 551-52, 85 S. Ct. at 1191. Knudsen's case is not analogous. Unlike Armstrong, Knudsen—like every proponent of expert testimony—had the burden to establish Lee's testimony was admissible under M. R. Evid. 702 and 704 in the first instance.

proponent of expert testimony. The party proffering expert testimony has the responsibility to establish its admissibility under M. R. Evid. 702 and 704. *State v. Russett*, 2002 MT 200, ¶ 14, 311 Mont. 188, 53 P.3d 1256 ("[t]he party presenting a witness as an expert must establish, to the satisfaction of the trial court, that the witness possesses the requisite knowledge, skill, experience, training, [or] education to testify as to the issue in question"). That was Knudsen's burden regardless of whether he made his argument in response to ODC's motion in limine or in his own motion to reconsider. His burden was unchanged; the only question was admissibility.

¶269 What the majority characterizes as "prejudice" is merely that Knudsen had to make his admissibility argument in a motion to reconsider rather than in an initial response to ODC's motion. That is not prejudice under *Potts*, ¶ 70. The majority bypasses the only relevant question—whether exclusion of the opinion testimony was an abuse of discretion—and ignores that Lee's opinion testimony was inadmissible under M. R. Evid. 702, 704, and *Potts*, ¶ 65. The Commission's evidentiary ruling was therefore within its discretion. Because exclusion of the testimony was both proper under Montana law and non-prejudicial, it cannot rise to constitutional dimension.

¶270 In the end, Knudsen had notice, an opportunity to brief the issue, and a meaningful opportunity to be heard before the Commission ultimately excluded Lee's opinion testimony. That is the full measure of due process, and it was provided here. *In re Doud*, 2024 MT 29, ¶¶ 29-30, 415 Mont. 171, 543 P.3d 586. Therefore, I disagree with the majority's conclusion that the Commission's evidentiary ruling violated due process.

**D. Adequacy of Findings**

¶271 The majority concludes that the Commission's findings of fact and conclusions of law are insufficient for our de novo review and constitute a due process violation warranting dismissal of the disciplinary proceeding. The majority contends that Knudsen was not sufficiently informed of the basis for the Commission's decision and therefore had to "hit a moving target" when preparing for appeal. However, the majority fails to identify any legal authority for the proposition that an imperfect Commission decision deprived Knudsen of due process. By addressing every single objection Knudsen has raised on appeal, this Court is providing him all process he is due.

¶272 MRLDE 12(D)(4) requires that, following a contested hearing, the Adjudicatory Panel "shall make findings of fact, conclusions of law and a recommendation to the Supreme Court for discipline or other disposition of the case." Upon objection, "[t]he Supreme Court shall consider the matter, issue its written decision, and impose such discipline, if any, as it considers appropriate." MRDLE 16. The Commission's 31-page Findings of Fact, Conclusions of Law, and Recommendation contained 32 enumerated findings, identified each rule violated, applied the clear-and-convincing standard required by MRLDE 12(D) and 22(B), and cited specific exhibits and testimony. Conceding the Commission's factual findings are "appropriately thorough," the majority independently applies the M. R. Pro. Cond. to those facts to determine the correctness of the Commission's legal conclusions regarding rule violations. This is quintessential de novo review. Any drafting imperfection is immaterial so long as this Court can conduct

127

informed appellate review under the de novo standard. *Doud*, ¶ 33. Because this Court can do so, and has done so, there is no substantial error.

¶273 Further, the majority identifies no authority for holding that imperfect articulation in a Commission decision constitutes a constitutional due process violation. Nor does the majority explain how Knudsen was unable to present or develop his defense, or how this Court's consideration of every objection does not provide him all process due on review. Accordingly, I cannot agree that the Commission's written decision was inadequate for review or rose to the level of a due process violation. The findings were more than sufficient to permit this Court to conduct de novo review, and any imperfections in their drafting were neither prejudicial nor constitutional in dimension.

## VI. Majority's Erroneous Dismissal Remedy

¶274 The majority concludes that Knudsen, personally and through his subordinates, violated M. R. Pro. Cond. 3.4(c) and 5.1(c) by intentionally disobeying this Court's July 14, 2021 *McLaughlin* Order. It then separately holds that, during the disciplinary proceedings arising out of that misconduct, the Commission violated due process by denying Knudsen summary judgment, excluding his expert witness, and rendering findings and conclusions it characterizes as insufficient for appellate review. Finally, the majority concludes that those "due process violations" cancel out Knudsen's proven misconduct and warrant dismissal of the proceedings entirely. The majority's extraordinary and unprecedented dismissal decision is problematic for numerous reasons.

¶275 The majority's conclusion—that procedural errors it concedes resulted in "minimal prejudice" are sufficient to justify the dismissal of a complaint with proven violations of

128

M. R. Pro. Cond. 3.4(c) and 5.1(c)—is an extraordinary departure from our precedent. The remedy of total dismissal is disproportionate to the non-prejudicial errors identified, effectively elevating form over the substance of established professional misconduct and insulating Knudsen from professional accountability. Dismissal is not merely a decision to impose no sanction; it nullifies the proceedings themselves. Nothing in Montana law authorizes dismissal where the attorney received notice, a full hearing, and appellate review, and where this Court finds proven violations of the Rules of Professional Conduct. Such a remedy is incompatible with our constitutional obligation to regulate the bar and protect the public.

### A. Knudsen Received All Process Due

¶276 The majority's conclusions that Knudsen was denied due process by the Commission's summary judgment decision, exclusion of expert opinion testimony, or the sufficiency of its written decision for appellate review are patently erroneous for all the reasons stated above. The majority concedes the Commission correctly denied summary judgment and Knudsen suffered only "minimal prejudice." After, the parties proceeded to a full evidentiary hearing in which Knudsen participated in every respect. As for Justice Lee's expert opinion, Knudsen had full opportunity to argue for admission before the Commission ultimately decided the issue, and the evidence was inadmissible anyway. Reversible error in excluding evidence requires a showing of improper exclusion and resulting substantial prejudice under *Potts*, ¶¶ 69-70. Lastly, the majority cites no legal authority for its holding that an imperfect written decision subject to de novo appellate

129

review constitutes constitutional error. Claiming the Commission's decision is insufficient for review, the majority nonetheless reviews it, line by line.

**B. Avoiding a Remand Concedes that the Commission's Decision Was Sufficient for Appellate Review**

¶277 After holding that the Commission's decision is insufficient for review and violates due process, the majority sidesteps the proper remedy—remand—in favor of outright dismissal, departing from its own cited precedent, *Del Duca v. Skydancer*, 2025 MT 156, ¶¶ 20-22, 423 Mont. 115, 572 P.3d 804. That choice is not merely a deviation from precedent; it is an implicit acknowledgment that the Commission's written decision was adequate for review, because remand is required only when the record is incapable of meaningful appellate examination. In *Del Duca*, the majority author, there and here, remanded to the district court with instruction to "specif[y] with particularity the grounds underlying its rulings." Although *Del Duca* instructs that remand is the proper remedy for insufficient findings, the majority claims that "remanding this matter for another round" would only compound the "time, expense, and turmoil" attendant these proceedings. But the only task on remand would be for the Commission to clarify its written decision—there would be no need for additional fact-finding where, as the majority acknowledges, the Commission's findings are already "appropriately thorough."

¶278 The majority's decision to avoid remand here is telling. First, the majority recognizes that remand for clarification is wholly unnecessary where it is fully able to, and does, consider the evidence, apply the M. R. Pro. Cond., and reach its own conclusions regarding rule violations. *See Wyse*, 212 Mont. at 346, 688 P.2d at 762 (Commission

130

decisions have no "special binding effect upon us" under de novo review). Second, by declining to remand, the majority concedes what our de novo standard already confirms: this Court's independent review cures any alleged articulation defect and affords Knudsen all process due. In short, forgoing remand proves that the Commission's decision *was* sufficient for review and *not* a due process violation.

¶279 Finally, by ruling out remand, the majority clears the path for its preferred and unprecedented remedy: dismissal. But there has never been a case where this Court dismissed a disciplinary action while also holding that the attorney committed proven misconduct. Until today.

### C. Dismissal for Non-Prejudicial Procedural Errors is Unprecedented

¶280 Our precedent shows that we have at our disposal a panoply of remedial options on disciplinary review, including affirming, modifying, remanding, or dismissing. In *Doud*, ¶¶ 50-56, we accepted and adopted the Commission's decision and imposed its recommended punishment. In *Olson*, ¶¶ 2, 34, we affirmed the Commission's dismissal recommendation where the evidence did not prove misconduct. In *In re Engel (Engel I)*, 2007 MT 172, ¶¶ 2, 49-51, 338 Mont. 179, 169 P.3d 345, we rejected the Commission's conclusions that no rule violations occurred and its dismissal recommendation, concluded that Engel violated multiple rules, and remanded to the Commission for consideration and recommendation of sanctions for those violations. In *In re Morse*, 245 Mont. 49, 55, 798 P.2d 75, 79 (1990), we rejected the Commission's recommendation for public censure and indefinite suspension; instead, imposing disbarment. In *In re Engel (Engel II)*, 2008 MT 42, ¶¶ 1-2, 35-38, 341 Mont. 360, 177 P.3d 502, we did the same—we rejected

131

the Commission's recommendation on remand from *Engel I* and imposed harsher punishment.

¶281   In *Best*, the only decision of its kind, we dismissed disciplinary proceedings based on a complete denial of process.  There, a group of lawyers filed a complaint alleging Best had violated M. R. Pro. Cond. 3.1, 3.3, 3.4, and 4.1 in her dealings with them.  ODC investigated the complaint and presented it to a Review Panel, recommending dismissal with a letter of caution.  *Best*, ¶¶ 8-9.  The Review Panel agreed to dismiss the alleged violations, but then separately, without referring the matter back to ODC for investigation, concluded that the evidence proved Best violated M. R. Pro. Cond. 4.2 and recommended a private admonition.  The Adjudicatory Panel agreed Best violated Rule 4.2 and adopted the Review Panel's recommendation.  The Commission then ordered Best to appear for a private admonition.  *Best*, ¶¶ 9-10.  The order served on Best did not identify any rule violation or grounds for discipline.  Because a private admonition was not appealable under MRLDE 13, Best initiated an original proceeding in this Court to challenge the imposition of discipline as a violation of due process.  *Best*, ¶¶ 11, 17-19.

¶282   On review, we held that (1) the Review Panel improperly usurped the ODC's prosecutorial role when it unilaterally drafted and acted on its own complaint; and (2) this unauthorized and manifestly deficient process deprived Best of notice of the Rule 4.2 violation and any opportunity to be heard, present evidence, or cross-examine witnesses prior to imposition of discipline or to appeal the disciplinary decision.  *Best*, ¶¶ 20-36.  Deciding that these due process violations created an intolerable risk of unfairness in the

proceedings, we dismissed the complaint against Best without reaching the merits of the rule violation.

¶283 Nothing in this record resembles the structural error that compelled dismissal in *Best*. Here, the Commission did not prosecute new charges outside of the complaint or eliminate any essential element of notice or hearing. *Best* illustrates the necessity of dismissal where prejudicial error permeates and corrupts the entire proceedings. Unlike Knudsen, Best was prosecuted wholly in the dark without any notice or opportunity to appear and defend against the alleged misconduct. Knudsen has not identified *any* actual denial of notice or an opportunity to be heard. Instead, he points only to procedural irregularities that did not prejudice his ability to defend himself.

¶284 Critically, as discussed above, the majority holds that the due process violations warranting dismissal in *Best* did not occur here. Opinion, ¶¶ 136-47, 183. The majority's decision to dismiss proceedings outright based on only "minimal prejudice" therefore stands in stark contrast to our due process jurisprudence. Montana has never permitted dismissal of a disciplinary complaint where the respondent both received all process due and committed proven misconduct; the majority's new approach has no footing in our Constitution, our rules, or our precedent. It is difficult to imagine this Court relying on similar procedural irregularities to dismiss criminal charges yet treating those same defects as sufficient to avoid professional discipline.

### D. The Majority's No-Punishment Punishment

¶285 The majority concludes that Knudsen violated M. R. Pro. Cond. 3.4(c) and 5.1(c) when he defied this Court's *McLaughlin* Order. But, finding the Commission denied him

summary judgment, excluded his expert's opinion testimony, and issued imperfect written findings, the majority decides to nullify the entire proceedings and evidentiary record by dismissing outright. The majority offers no principled reason for this extraordinary departure.

¶286 Although MRLDE 8(A)(1)-(7), 9(A)(1)-(7), and 9(C) leave the imposition of discipline and costs to this Court's discretion, MRLDE 9(B) requires us to consider specific enumerated factors when determining appropriate discipline. That requirement applies equally when the Court elects to impose no discipline. Once rule violations are found, the existence and effects of alleged procedural errors is not the sole determinative factor—MRLDE 9(B) requires consideration of:

(1) The gravity and nature of the duty violated, including whether the duty is owed to a client, to the public, to the legal system, or to the profession;

(2) The lawyer's mental state;

(3) The actual or potential injury caused by the lawyer's misconduct;

(4) The existence of aggravating or mitigating factors; and

(5) The existence of prior offenses.

This list is not exhaustive. Nevertheless, the majority omits this critical analytical step, bypassing the MRLDE altogether to achieve its unprecedented dismissal decision.

¶287 Given the unique nature of the rule violations here and Knudsen's role as the legal officer for the state, Knudsen's case is genuinely unprecedented. But, for as expansive as this case is, the majority decides it in a vacuum, focusing on irrelevant and inconsequential inquiries and forgetting the greater fundamental principles underlying rules for attorney

134

conduct. "Professional misconduct, although it may directly affect an individual, is not punished for the benefit of the affected person; the wrong is against society as a whole, the preservation of a fair, impartial judicial system, and the system of justice as it has evolved for generations." *In re Terry*, 394 N.E.2d 94, 95 (Ind. 1979). By dismissing outright, the majority weakens the Court's constitutional authority to protect the public and ensure the integrity of the legal profession.

¶288  This Court's authority to protect the public and ensure the integrity of the legal profession carries a corresponding duty to ensure accountability. To abdicate that duty by dismissing proven violations on procedural grounds undermines both the Court's authority and public confidence in its even-handed administration of its obligations. Treating an elected official as uniquely insulated from accountability contradicts the uniform application of the Rules of Professional Conduct. The judiciary's legitimacy depends on the principle that every attorney—particularly those who wield the State's power—must obey lawful orders and remain accountable under the same standards that govern all lawyers. That principle reassures the public that our disciplinary system is administered impartially and consistently.

¶289  For all the foregoing reasons, there is no basis in law or fact for dismissal here. I dissent.

## VII.  The Supreme Court's Procedural Irregularities

¶290 The majority dismisses this disciplinary proceeding on the ground that the Commission on Practice failed to follow its procedural rules. That rationale cannot be reconciled with the Court's own handling of this case. Before concluding that another

135

adjudicatory body committed procedural errors so severe that they nullify a fully developed evidentiary record, we must examine whether our own procedures comport with the Internal Operating Rules (IORs) that govern the exercise of our judicial authority. They did not.

¶291   These irregularities do not merely reflect internal administrative concerns.  They go to the heart of the majority's reasoning.  A Court that declines to follow its own mandatory procedures cannot credibly dismiss another tribunal's work for the same alleged defects.  The rule of law demands better consistency than this.

### A.  Classification for Oral Argument En Banc Did Not Comply with the IORs

¶292   As a threshold matter, MRDLE 16 provides that, upon objection to a contested case decision, "[t]he Supreme Court may, in its discretion, set the matter for oral argument." The Supreme Court's IORs contain explicit prerequisites for classifying a case for oral argument and for determining whether en banc consideration is required.  IOR § I(3)(a) requires that *three justices* request oral argument.  IOR § IV(1) requires that the Court hear a case en banc only under specific circumstances:  death sentences, certified questions, when a "bona fide challenge is made to the constitutionality of a statute," and when *two justices* determine a case warrants hearing en banc.

¶293   To my knowledge, neither IOR requirement was satisfied.  On February 14, 2025, the Chief Justice signed an order classifying the matter for oral argument before the Court sitting en banc.  In that order, the Chief Justice limited oral argument to specific time periods pursuant to M. R. App. P. 17(3) and directed counsel to "be mindful of the provisions of M. R. App. P. 17(6)" (use of physical exhibits).  The order was filed at 10:38

136

a.m. on February 14, 2025. Also on February 14, 2025, the Chief Justice signed an order appointing Judges Jessica T. Fehr, Rod Souza, Luke Berger, Gregory L. Bonilla, and Paul Sullivan to replace Justices Jim Rice, Ingrid Gustafson, Beth Baker, Laurie McKinnon, and James Jeremiah Shea, who had all previously recused.[17] This order was filed at 11:36 a.m. on February 14, 2025, almost an hour after the order setting the matter for oral argument en banc.

¶294 Although I was the only other sitting justice at the time the Chief Justice signed and filed the order setting the matter for oral argument en banc, I was not consulted regarding it. Even though someone later stamped a "02/19/2025" date over the original "02/14/2025" filing date on the oral argument/en banc order, the filing date recorded in the Court's internal case management system could not be altered and continues to show the docket entry of the oral argument order filed on February 14, 2025 *before* the order appointing substitute judges.[18] The case was set for oral argument en banc *before* the five substitute judges were appointed and the full Court formally empaneled.

¶295 Further, the Chief Justice contends that "the matter required en banc review and [was] appropriate for oral argument pursuant to the Court's internal operating rules because Knudsen has asserted a constitutional challenge to the Rules of Professional Conduct and

---

[17] Justices Baker, McKinnon, Shea, and Rice recused on October 24, 2024. Justice Gustafson recused on January 30, 2025.

[18] *Accord* the Montana Supreme Court's Public View Case Docket, No. PR 23-0496; https://supremecourtdocket.mt.gov/case-info/active/24857 (showing the oral argument/en banc order entered on February 14, 2025, notwithstanding the dual-dated filing stamp) (last accessed Dec. 30, 2025).

137

the Rules for Lawyer Disciplinary Enforcement." Opinion, ¶ 183 n.24. However, IOR § IV(1) permits en banc hearing only when a "bona fide challenge is made to the constitutionality of a *statute*"—the M. R. Pro. Cond. and MRLDE are Court-promulgated rules, not statutes.

¶296  The Court's IORs do not authorize classifying a case for oral argument en banc in the manner that the Chief Justice classified the matter here. The majority's insistence that the Commission adhere strictly to its rules sits uneasily beside the Court's abandonment of its own rules.

### B.  Chief Justice May Only Sign Orders "On Behalf of the Court"

¶297  IOR § V provides for orders that "may be *signed by* the chief justice or in his or her absence, the acting chief justice, *on behalf of the Court*." (Emphasis added.) The chief justice may *sign* orders concerning classification. IOR § V(2)(e). The chief justice may also *sign* orders "covering matters *decided by the Court in conference*." IOR § V(2)(c). (Emphasis added.)

¶298   IORs § I(2) (five-justice panels), §§ I(3)(d) and IV(1) (hearing en banc), § I(3)(a) (oral argument), § I(3)(c) (memorandum opinions), and § VII(7) ("full written opinion[s]") specifically provide how cases are classified. Nothing in the IORs authorizes the chief justice *to classify a case* unilaterally or to sign an order setting a case for oral argument where that decision was not previously *decided by the Court in conference*.

¶299   The Court appears to have a different standard for adherence to its own procedural rules in these proceedings.

## C. Acceptance of an Unauthorized Filing Without Ruling on the Objection and Inconsistent Application of M. R. App. P.

¶300   MRLDE 16 authorizes only two filings after a contested case hearing:  objections, and a response to objections.  It does not authorize replies.  Knudsen nevertheless filed a lengthy "Reply in Support of Objections," and the ODC promptly objected to its filing as unauthorized.  Knudsen filed a response to ODC's objection, contending, among other things, that, because ODC did not file "a formal motion to strike under M. R. App. P. 16, . . . the Court should disregard ODC's objection."  The Court honored Knudsen's request and did not rule on ODC's objection.  Knudsen's unauthorized reply remains in the record without order, rationale, or clarification.  Because ODC filed an objection to the reply brief rather than a "motion to strike" it under M. R. App. P. 16, the Court now treats the reply as part of the record while dismissing the Commission's proceeding for supposed procedural defects.  The inconsistency is evident.

¶301  Further, the Court has applied the Montana Rules of Appellate Procedure inconsistently throughout these proceedings.  The Chief Justice invoked M. R. App. P. 17 in the order setting the case for oral argument and M. R. App. P. 11 when granting a "multistate coalition led by Iowa and Texas" leave to file an amicus brief in support of Knudsen limited to 5,000 words.  Knudsen invoked M. R. App. P. 26 when asking for an extension to file his objections to the Commission decision.  The majority invokes M. R. App. P. 16 in refusing to consider ODC's objection to Knudsen's unauthorized "reply" brief.  Opinion, ¶ 183 n.24.  However, while the Court invoked and applied M. R. App. P. standards throughout the proceedings, it did not hold the parties to

M. R. App. P. 11 standards for briefing, claiming that Rule 11 does not apply to disciplinary proceedings. Opinion, ¶ 183 n.24. Here, both parties were permitted to submit filings with word counts far exceeding Rule 11 limits and without seeking leave of court for overlength filings pursuant to M. R. App. P. 12(10)—requirements for every other party in proceedings before the Court. Further, Knudsen "certif[ied]" his 27,359-word objections and 10,442-word "reply" as "complian[t]" with M. R. App. P. 11, which limits principal briefs to 10,000 words and reply briefs to 5,000 words. Regardless of whether Rule 11 applies, Knudsen certified that he complied with it, which he did not.

¶302 In a case where the Court faults the Commission for allegedly exceeding its procedural authority, the Court's inconsistent application of its own procedural rules—including acceptance of Knudsen's unauthorized, overlength filing over ODC objection and without explanation—is a procedural irregularity of its own.

### D. Institutional Consequences

¶303 As evidenced by the public record of actions on appeal, key procedural steps were missed here and the rules not uniformly applied. The Court's procedural rules—the IORs, MRDLE, and M. R. App. P.—exist precisely to prevent this kind of ad-hoc process in matters of statewide importance. They provide mandatory safeguards, not discretionary suggestions.

¶304 The flaws in our own process would not ordinarily warrant discussion in a dissent. But the majority makes procedural regularity its central rationale for dismissing this disciplinary case. The record does not permit the Court to apply one procedural standard to itself and another to the Commission. The Commission provided notice, held a two-day

140

evidentiary hearing, allowed Knudsen to present evidence and cross-examine witnesses, and issued written findings supported by the record and sufficient for appellate review. The majority, by contrast, proceeds to invalidate the Commission's work through a decision-making process that failed to adhere to our own governing rules.

¶305 The majority's willingness to overlook the Court's own procedural lapses while invalidating the Commission's work for alleged irregularities creates an untenable double standard. A Court that demands strict rule compliance from others must begin with its own internal processes. The rule of law cannot tolerate two tiers of procedural fidelity.

## VIII.  The Proper Remedy:  Discipline and Proportionality

¶306 The Commission recommended a 90-day suspension and costs. That recommendation rested on its conclusion that ODC proved every alleged violation of M. R. Pro. Cond. 3.4(c), 5.1(c), 8.2(a), 8.4(a), and 8.4(d).  Because I conclude that ODC proved violations only of M. R. Pro. Cond. 3.4(c), 5.1(c), and 8.4(d), a lesser sanction is appropriate. But "lesser" cannot mean "none."  Meaningful discipline remains necessary to vindicate the rule of law and this Court's constitutional authority.

¶307 The MRLDE requires this Court to consider a non-exhaustive list of factors when assessing proportional punishment. Application of MRLDE 9(B) factors demonstrates that discipline—not dismissal—is warranted.  Further, under *In re Morin (Morin III)*, No. PR 19-0017, 2020 Mont. LEXIS 953 (Mar. 31, 2020), the whole picture of an

141

attorney's conduct may be considered in assessing punishment, even conduct that was not proven to violate the Rules of Professional Conduct.[19]

¶308 Comparable cases may also inform the analysis. Our cases reveal a broad disciplinary range for violations of M. R. Pro. Cond. 3.4(c) and 8.4(d): from public admonition to suspension from practice and probation. *See, e.g.*, *Molloy* (public sanction and five-year probation for criminal conduct prejudicial to administration of justice); *In re Michael*, No. PR 12-0671 (Nov. 26, 2013) (public censure and one-year probation for threatening opposing counsel); *In re Gardner*, No. PR 21-0100, 2021 Mont. LEXIS 1051 (Dec. 21, 2021) (30-day suspension for obstruction and counseling client to ignore court-ordered search warrant); *In re Morin (Morin I)*, No. PR 17-0254, 2018 Mont. LEXIS 468 (Mar. 6, 2018) (public censure for violation of court order); and *Morin II* (seven-month suspension for inducing misconduct via subterfuge). These cases underscore that intentional disobedience of judicial orders, particularly by government attorneys, and conduct prejudicial to the administration of justice has always resulted in sanctions.

¶309 Knudsen's conduct—knowingly disobeying this Court's order, directing and ratifying similar conduct by subordinates, and prejudicing the administration of justice while serving as the State's chief law-enforcement officer—falls squarely within the category of misconduct that has consistently warranted discipline.

---

[19] In *Morin III*, the Commission decided that Morin's abusive, unprofessional, and uncivil conduct toward another attorney was not punishable under M. R. Pro. Cond. 1.1, 1.3, and 3.1(a), as alleged by ODC. Nevertheless, the Commission considered the conduct as an aggravating factor in its punishment analysis, even though it was not itself a violation of the Rules as charged. We agreed the conduct was an aggravating factor. *Morin III* shows that we are not limited to "proven violations" when assessing sanctions. *Compare* Opinion, ¶ 178.

## A. Application of MRLDE 9(B) Factors

### (1) Gravity and Nature of the Duty Violated – Aggravating

¶310 Under MRLDE 9(B)(1), we assess whether the duty violated was owed to a client, the public, the legal system, or the profession. This case implicates duties owed to the public, the profession, and, most directly, the legal system itself.

¶311 Knudsen violated M. R. Pro. Cond. 3.4(c), 5.1(c), and 8.4(d) by intentionally refusing to comply with a binding order of this Court and by permitting subordinates to do likewise, prejudicing the administration of justice. Obedience to judicial orders is foundational to the rule of law. When the State's chief law-enforcement officer chooses disobedience rather than lawful challenge, the harm extends beyond a single case. It strikes at the institutional authority of the judiciary and suggests that compliance with this Court's orders is optional—not mandatory.

¶312 Few duties are more central to the integrity of the justice system than the duty to follow court orders. For this reason alone, the gravity of Knudsen's violations weighs heavily in favor of meaningful discipline.

### (2) Lawyer's Mental State – Aggravating

¶313 MRLDE 9(B)(2) requires evaluating the lawyer's mental state. The record establishes that Knudsen acted knowingly and intentionally. He made a deliberate choice not to seek a stay of the *McLaughlin* Order, knowing full well that without a stay, the order remained binding. This was not an inadvertent misstep, a misunderstanding of obligations, or an error in judgment; it was a conscious and deliberate refusal to comply. A knowing

143

violation of the M. R. Pro. Cond. is a significant aggravator and places this case far from those involving negligence or inexperience.

### (3) Actual and Potential Injury Caused – Aggravating

¶314 Under MRLDE 9(B)(3), we consider actual or potential injury caused by the misconduct. The majority minimizes the injury by focusing solely on whether the *McLaughlin* judgment was ultimately enforced. That view is too narrow. The injury here is systemic and multifaceted: Knudsen's disobedience (1) delayed and complicated the resolution of *McLaughin*; (2) undermined public confidence in judicial authority; (3) eroded internal compliance norms among subordinate attorneys within the Department of Justice; and (4) conveyed to the public that even binding orders of the Montana Supreme Court may be disregarded by those who disagree with them. These harms—particularly to public trust and institutional integrity—are real, enduring, and difficult to repair. This factor strongly aggravates.

### (4) Other Aggravating Factors Under MRLDE 9(B)

### (a) Substantial Experience in the Practice of Law

¶315 Under MRLDE 9(B)(4), Knudsen's substantial experience and leadership role aggravate his misconduct. As Attorney General, he supervises hundreds of lawyers and represents the State of Montana. A lawyer occupying such a position must model respect for court orders and the rule of law. Instead, he modeled defiance.

### (b) Pattern of Misconduct and Multiple Offenses

¶316 This case does not involve a single lapse in judgment. MRLDE 9(B)(4) recognizes patterns of misconduct and multiple offenses as aggravators. Knudsen's conduct persisted

144

across multiple filings and involved his subordinates. His conduct reflected sustained resistance to this Court's authority during the *McLaughlin* litigation and throughout the disciplinary proceedings.

¶317 Further, *Morin III* permits us to consider the whole of an attorney's conduct as context.[20] Knudsen's impugning statements about this Court and disparaging rhetoric he used and ratified in numerous pleadings before this Court and the United States Supreme Court—though either uncharged or unproven as Rule 8.2(a) violations—remain aggravating context. Even the majority concedes that Knudsen's accusations of judicial misconduct and bias were "extraordinarily inflammatory." But the majority avoids condemning this conduct lest it appear to be exacting "revenge or vindication" for "criticism of the Court." Opinion, ¶¶ 177-78. Under *Morin III*, we are not required to consider a lawyer's conduct in a vacuum. Knudsen's overall conduct shows a pattern of disrespect for the judiciary and its authority.

### (c) Refusal to Acknowledge Wrongful Conduct

¶318 MRLDE 9(B)(4) identifies refusal to acknowledge wrongdoing as an aggravating factor. Knudsen continues to assert that he had no obligation to comply with this Court's order absent a ruling from a tribunal of his choosing. He also refuses to acknowledge the lasting adverse effects of ratifying his subordinates' similar misconduct. Lack of acknowledgment significantly aggravates the misconduct.

---

[20] *See supra*, note 19.

**(d) Abuse of a Position of Public Trust**

¶319   Although not expressly enumerated in MRLDE 9(B)(4), longstanding disciplinary principles recognize that attorneys holding public office bear heightened ethical responsibilities.  So, abuse of public office is a recognized aggravator.  As Attorney General—the State's chief law-enforcement officer—Knudsen occupies a position of extraordinary public trust.  Occupying that public office, Knudsen's misconduct had broader, more corrosive impact on public confidence in the justice system.

¶320   Each of these aggravating factors weighs heavily, independently and collectively, in favor of the imposition of meaningful discipline.

**(5) Mitigating Factors Under MRLDE 9(B)**

**(a) No Prior Discipline**

¶321   Knudsen's lack of prior discipline is a mitigating factor under MRLDE 9(B)(4). While it weighs in his favor, its mitigating force is limited where, as here, the misconduct was intentional and sustained.

**(b) Limited Remorse**

¶322 MRLDE 9(B)(4) recognizes remorse as mitigating.  Knudsen's limited remorse—only for the tone used by one subordinate and not for his own refusal to comply with this Court's order—provides limited mitigation.

**(c) Procedural Irregularities in Commission Proceedings**

¶323   The majority treats the Commission's procedural irregularities as grounds for dismissal.  Properly understood, they provide only minor mitigation under MRLDE 9(B)(4) because they did not impede Knudsen's ability to defend himself.  Even so, these

146

irregularities cannot outweigh the gravity of the misconduct, Knudsen's intentional mental state, and the numerous aggravating factors present here.

¶324 These mitigating factors support reducing the 90-day suspension recommended by the Commission. They do not justify eliminating discipline altogether.

### (6) Other Considerations – Knudsen's Arguments for Mitigation

¶325 Knudsen insists his conduct was justified by an "emergency" "constitutional crisis" playing out in the *McLaughlin* proceedings. But this Court routinely hears separation of powers disputes without counsel violating ethical rules. Knudsen also repeatedly invokes "zealous advocacy," a concept that has not appeared in the Montana Rules of Professional Conduct for decades—years before he became an attorney. Finally, Knudsen concedes that a suspension up to 90 days will not create a vacancy in the office of Attorney General.

### B. A 30-Day Suspension, Public Censure, and Costs Are Proportional and Appropriate Punishment

¶326 After weighing the MRLDE factors, I conclude discipline is required. Dismissal is unprecedented and unwarranted. The majority releases Knudsen from liability only because it elevates minor procedural issues into grounds for dismissal.

¶327 The record shows Knudsen violated M. R. Pro. Cond. 3.4(c), 5.1(c), and 8.4(d). Given the public nature of Knudsen's misconduct, public consequences are necessary. Given the nature of the proven counts of professional misconduct, substantial aggravating factors, limited mitigating factors, and Knudsen's unique role as Attorney General, and for reasons discussed above, I would impose a public censure and 30-day suspension from the practice of law.

147

¶328   I would also require Knudsen to pay for the costs of these proceedings and disagree with the majority's decision to not impose costs.  Knudsen, not the people of Montana, should pay for his misconduct.  The only case where we declined to impose costs was *Miller*, and that was because Miller expressly objected to paying them because ODC's haphazard and unprofessional prosecution had unduly *enlarged* costs.  First, Knudsen has made no such claim and does not argue costs should not be imposed.  Second, the record does not support a conclusion that ODC's prosecution of misconduct was frivolous—Knudsen himself claims the proceedings here are largely unprecedented.  Requiring Knudsen to pay the costs is appropriate.

**Conclusion**

¶329   This case places before us not a political dispute, but a question central to the rule of law:  whether an attorney—particularly the Attorney General and State's chief law-enforcement officer—may disregard a lawful order of this Court and allow his subordinates to do so without professional consequence.  The Montana Constitution answers that question.  Article VII, § 2(3) vests this Court with the exclusive authority and the corresponding duty to regulate the conduct of attorneys admitted to practice in this state.  That authority carries with it the obligation to apply our rules consistently and evenhandedly.

¶330   The record establishes that Knudsen violated M. R. Pro. Cond. 3.4(c), 5.1(c), and 8.4(d).  He received notice, a two-day evidentiary hearing, a full opportunity to present evidence and argument, and appellate review under our de novo standard.  None of the procedural imperfections the majority identifies impaired his ability to defend himself or

148

amounted to substantial prejudice. They do not rise to constitutional dimension, and they do not warrant dismissal of a fully adjudicated disciplinary complaint.

¶331 By dismissing outright, the majority departs from our precedent, nullifies an extensive evidentiary record, and weakens this Court's constitutional authority to protect the public and ensure the integrity of the profession. Remand is the ordinary remedy for insufficient findings, and discipline is the ordinary result when rule violations are established. The majority's departure from both principles risks eroding confidence that our disciplinary system applies to all members of the bar with equal force.

¶332 The rule of law depends on obedience to judicial orders. When the State's chief law-enforcement officer deliberately refuses to obey such an order and allows his subordinates to do the same, the harm is not theoretical. Such conduct strikes at the foundation of our constitutional system and threatens the public's trust in an impartial and functioning judiciary.

¶333 Because Attorney General Knudsen violated multiple provisions of the M. R. Pro. Cond. and was afforded all the process he was due, I would not dismiss the complaint. Instead, I would impose a public censure, 30-day suspension, and costs. Erasing a complete disciplinary record is inconsistent with our constitutional responsibility and our precedent. Discipline is not punitive; it is protective—of the public, the courts, and the profession—and serves to preserve confidence in the fair and orderly administration of justice. Respectfully, I dissent. The rule of law requires nothing less.

/S/ KATHERINE M. BIDEGARAY

149